1   JAMES J. BROSNAHAN (CA SBN 34555)
    JBrosnahan@mofo.com
2   JUDSON E. LOBDELL (CA SBN 146041)
    JLobdell@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California  94105-2482
    Telephone: 415.268.7000
5
    JAMES W. HUSTON (CA SBN 115596)
6   JHuston@mofo.com
    MORRISON & FOERSTER LLP
7   12531 High Bluff Drive, Suite 100
    San Diego, California  92130-2040
8   Telephone: 858.720.5100
    Facsimile: 858.720.5125
9
    Attorneys for Defendant
10  LUCASFILM LTD.

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                     SAN FRANCISCO DIVISION

14  RAND INTERNATIONAL, INC.,          Case No. CV-08-3897-JSW

15                 Plaintiff,          **LUCASFILM LTD.'S OPPOSITION TO
                                       RAND INTERNATIONAL, INC.'S
16        v.                           EX PARTE APPLICATION FOR
                                       TEMPORARY RESTRAINING ORDER
17  LUCASFILM LTD.,                    AND ORDER TO SHOW CAUSE RE:
                                       PRELIMINARY INJUNCTION**
18                 Defendant.
                                       Date:     August 22, 2008
19                                     Time:     9:00 a.m.
                                       Ctrm:     2
20                                     Judge:    Hon. Jeffrey S. White

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

SUMMARY OF ARGUMENT ............................................................................................... iv

I.      FACTUAL BACKGROUND ........................................................................................ 1

II.     ARGUMENT ................................................................................................................. 5

        A.    Rand Has the Burden to Establish its Right to Entry of a Preliminary
              Injunction ........................................................................................................... 5

        B.    Rand Has Not Met Its Burden ........................................................................... 6

              1.    Rand has no likelihood of success on the merits ................................... 6

                    a.    Rand's breach of contract claim is without merit .......................... 6

                          (i)    Lucasfilm was entitled to terminate the Agreement
                                 after Rand's repeated breaches ........................................... 6

                          (ii)   Rand's challenges to the test results are absurd ................. 7

                          (iii)  Rand's argument that it lacked an opportunity to
                                 cure its breaches also lacks merit ...................................... 10

                          (iv)   Rand's conspiracy theory and allegations of bad
                                 faith are groundless .......................................................... 11

                    b.    Rand's claim for tortious interference is without merit ............... 11

                    c.    Rand's 17200 claim is defective ................................................... 12

              2.    Rand has failed to establish a threat of immediate and irreparable
                    harm ....................................................................................................... 13

              3.    The balance of hardships tips heavily in favor of Lucasfilm .................... 15

              4.    Injunctive relief would not be in the public interest ................................ 15

III.    CONCLUSION ............................................................................................................ 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3    CASES

4    *Akiona v. United States,*
5       938 F.2d 158 (9th Cir. 1991) ........................................................................10

6    *Am. Passage Media Corp. v. Cass Commc'ns Inc.,*
        750 F.2d 1470 (9th Cir. 1985) ......................................................................15

7    *Anderson v. United States,*
8       612 F.2d 1112 (9th Cir. 1979) ........................................................................6

9    *Arthur J. Gallagher & Co. v. Edgewood Partners Ins. Ctr.,*
        No. C 07-06418 JSW
10      2008 U.S. Dist. LEXIS 8924 (N.D. Cal. Jan. 23, 2008)......................................6

11   *Bank Julius Baer & Co. Ltd. v. WikiLeaks,*
12      535 F. Supp. 2d 980 (2008) (N.D. Cal. 2008) ...................................................6

13   *Big Country Foods, Inc. v. Bd. of Educ.,*
        868 F.2d 1085 (9th Cir. 1989) ......................................................................14

14
15   *Everything Cycles Inc. v. Yamaha Motor Corp.,*
        No. 07-1434-HO,
16      2007 WL 3171253 (D. Or. Oct. 25, 2007)........................................................13

17   *Goldie's Bookstore, Inc. v. Sup. Ct. of Cal.,*
        739 F.2d 466 (9th Cir. 1984) ....................................................................13, 14

18
19   *Imperial Ice Co. v. Rossier,*
        18 Cal. 2d 33 (1941)....................................................................................12

20   *Jewel Cos. v. Pay Less Drug Stores Northwest, Inc.,*
21      510 F. Supp. 1006, 1011 (N.D. Cal. 1981) ......................................................12

22   *Los Angeles Mem'l Coliseum Comm'n v. National Football League,*
        634 F.2d 1197 (9th Cir. 1980) ......................................................................13

23
24   *Major League Baseball Promo. Corp. v. Colour-Tex, Inc.,*
        729 F. Supp. 1035 (D. N.J. 1990) ..................................................................12

25   *Pacific Rollforming, LLC v. Trakloc Intern., LLC,*
        No. 07cv1897-L (JMA),
26      2007 WL 3333122 (S.D. Cal. Nov. 7, 2007)......................................................13

27   *Sammartano v. First Jud. Dist. Ct.,*
28      303 F.3d 959 (9th Cir. 2002) ........................................................................15

ii

*Sampson v. Murray*,
415 U.S. 61 (1974) ......................................................................................................... 13

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) ........................................................................................ 6

*Vess v. Ciba–Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ........................................................................................ 12

**RULES**

16 C.F.R.
1303 ................................................................................................................................... 3
1303.1 (2008) .................................................................................................................... 8
1512 ................................................................................................................................... 3

**OTHER AUTHORITIES**

U.S. Dept. of Health & Human Servs. ATSDR, Toxicological Profile for Lead
CAS# 7439-92-1, Ch. 1 (2007) ....................................................................................... 8

LUCASFILM'S OPPOSITION TO APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION
Case No. CV 08-03897 JSW
sf-2562891

# SUMMARY OF ARGUMENT

In its opening memorandum, Rand International, Inc., asks this Court to order Lucasfilm Ltd. to license its *Star Wars* brand to Rand for use on children's toys despite the fact that Rand has repeatedly failed product safety tests, including one that found dangerous levels of lead on a bicycle intended for three-year-olds. Rand's request for a mandatory injunction compelling Lucasfilm to do business with Rand should be denied for four reasons.

First, Rand has not shown likelihood of success on its claim that Lucasfilm improperly terminated its licensing agreement with Rand. Termination was proper because Rand breached the agreement by failing to follow good manufacturing practices and failing to comply with relevant regulations, resulting in Rand's products repeatedly failing independently administered safety tests. Lucasfilm also had the right to terminate based on Rand's refusal to recall product that Lucasfilm reasonably suspected was defective. And termination was proper because Rand sold product under the *Star Wars* brand without authorization.

Second, Rand's contention that it will suffer irreparable harm to its reputation if the license agreement is not reinstated is speculative and highly improbable in light of the fact that Rand has already had recalls of at least 70,000 bicycle helmets and over 50,000 bicycles in various separate incidents for safety reasons, and has been barred by the FTC from mislabeling its products. Rand's reputation for safety in the marketplace does not have far to fall.

Third, the balance of the hardships weighs heavily in Lucasfilm's favor because of the grave harm that would be done to the *Star Wars* brand if it were attached to lead-contaminated or otherwise unsafe products in the marketplace. By contrast, Rand has admitted that if it does not sell its toys under the Star Wars brand, it will simply re-package them under another brand.

Fourth, it is not in the public interest for the Court to order that Rand, with its deplorable safety record, be given access to the huge market for children provided by the *Star Wars* brand. For all these reasons, this Court should deny Rand's request for injunctive relief.

I.    **FACTUAL BACKGROUND**

Defendant Lucasfilm Ltd. ("Lucasfilm") is a California corporation with its principal place of business in Marin County.  Lucasfilm produced the *Star Wars* saga and for over 30 years has been one of the most successful independent production companies in the world.  Through a subsidiary, Lucasfilm licenses trademark rights in *Star Wars* to hundreds of companies who distribute toys and other articles bearing the *Star Wars* brand.  (Declaration of Howard Roffman ("Roffman Decl.") ¶ 3.)  The *Star Wars* brand is one of the most successful and respected brands in the market for children's products.  *Star Wars* products have generated billions of dollars of revenue.  (*Id.* ¶ 4.)

During the Spring and Summer of 2008, in anticipation of the launch of *Star Wars*: *The Clone Wars* ("*Clone Wars*"), a new animated feature film, Lucasfilm began a substantial marketing program designed to promote the film and the associated children's products.  As part of this program, retailers throughout the country would all commence the sale of *Clone Wars* products on the same day — July 26, 2008 (the "Launch Date").

One of the many companies Lucasfilm contracted with to distribute *Star Wars* and *Clone Wars* products was Plaintiff Rand International.  Lucasfilm and Rand entered into a Merchandise License Agreement dated October 1, 2007 (the "Agreement").  (Declaration of Kristina Anderson ("Anderson Decl.") Ex. 1.)  The Agreement granted Rand a non-exclusive license to reproduce certain Licensed Property, including material from all of the *Star Wars* films, in connection with marketing certain Licensed Products within the United States and Canada through December, 2009.  (*Id.* at 1, 3.)  The Agreement provided that Rand would pay a royalty to Lucasfilm on all Licensed Products sold.

As discussed below, the Agreement included detailed provisions requiring Rand to comply with good manufacturing practices and with all laws and regulations (*id*. at Section 4.4), and requiring Rand to recall and cease distribution of any product upon Lucasfilm's demand.  (*Id.* at Section 4.6)  The Agreement further provided that Lucasfilm could terminate the Agreement for various reasons including Rand's breach of any material provision.  (*Id*. at Section 14.2.)

1        In the Spring of 2008, Toys "R" Us ("TRU") notified Lucasfilm that, based on prior

2    dealings, it had no confidence in Rand and would not do business with it.  (Anderson Decl.

3    Ex. 2.)  After Lucasfilm notified Rand of this discussion, Rand told Lucasfilm that TRU's

4    purchasing decisions were the result of unspecified "political" consideration and made a series of

5    strange demands of Lucasfilm, including "the opportunity to meet with the TRU Board of

6    Directors." (Anderson Decl. Ex. 3)  TRU did not explain the reason for its position and

7    Lucasfilm was not aware at that time of Rand's history, discussed below, of distributing defective

8    and dangerous products.

9        Lucasfilm informed TRU that it was relying on Rand to supply certain Licensed Products,

10   including bicycles, helmets, scooters, and skateboards, and encouraged the two companies to

11   work together to resolve any disputes they might have in time for the July 26 Launch Date.

12   (Anderson Decl. ¶ 9.)

13       On May 27, 2008 Lucasfilm learned that a respected independent testing company,

14   Bureau Veritas ("BV"), had determined that *Star Wars* branded helmets manufactured by Rand

15   were unsafe.  TRU forwarded to Lucasfilm an email it had sent to Rand describing the failed tests

16   and stating "Toys R Us will not be able to accept these items now or in the future." (Anderson

17   Decl. Ex. 4.)

18       Lucasfilm tried repeatedly to discuss this matter with Rand, but calls were unanswered

19   and e-mails and phone messages were not returned.  (*Id.* Ex. 5.)  Finally, Lucasfilm demanded in

20   writing that Rand provide assurance that "your safety testing will not be an issue" going forward.

21   (*Id.* Ex. 5.)  Rand provided no such assurance, but rather sent TRU a second test result, to which

22   TRU responded, "We are not granting a second test on the helmets.  They failed, that's the end of

23   it." (*Id.* Ex. 6.)

24       Approximately two weeks later, on or about June 10, TRU informed Lucasfilm that it had

25   purchased units of the Star Wars Clone 16-inch Bike (the "Bike") and the Star Wars Folding

26   Scooter (the "Scooter") from Rand and had them submitted to BV for safety testing.  TRU

27   reported that both products had failed the tests and sent Lucasfilm copies of the BV Technical

28

1    Reports.  (*Id.* Ex. 7.)  The Technical Report concerning the Scooter listed seven separate reasons

2    for failure:

3        • the Dynamic Strength test revealed the following failures:

4            ○    "permanent deformation" of the front wheel frame

5            ○    a "sharp edge" on the frame near the rear wheel

6            ○    the scooter showed "evidence of component failure"

7        • "the latching device can't prevent the scooter from folding"

8        • the "labeling mechanisms" test failed because of a "sharp edge" in the joint

9        • no instructions were included with the scooter

10       • the date code on the package and product was later than the inspection date.

11   (Anderson Decl. Ex. 7.)  TRU responded, "7 points of failure is unacceptable, we will pass on this

12   item."  (Anderson Decl. Ex. 6.)

13       The BV Technical Report dated June 2, 2008 concerning the Bike also reported the result

14   "FAIL."  (Anderson Decl. Ex. 7.)  The test showed that paint sampled from various areas of the

15   Bikes tested had a lead content of 970 mg/kg, well over the legal limit of 600 mg/kg.  *See*

16   16 C.F.R. 1303.  The Bike also failed because it did not comply with Consumer Product Safety

17   Commission ("CPSC") requirements that it contain a warning that the child rider should always

18   wear a helmet and an illustration of the minimum leg-length for safe riding.  *See* 16 C.F.R. 1512.

19       TRU informed Rand and Lucasfilm that, despite its enthusiasm for the *Clone Wars* brand,

20   based on the test results it would not purchase any product from Rand.  In an email copied to

21   Lucasfilm, TRU stated, "I shouldn't have to tell you the ramifications of having lead based

22   products on our shelves.  We will not be accepting the bikes.  The PO will be cancelled."

23   (Anderson Decl. Ex. 6.))

24       A *Star Wars* Skateboard also failed a BV test based on failure to include a date-code

25   sticker required by TRU.  (*Id.* Ex. 7.)  As of June 10, 2008, Lucasfilm had been informed that

26   four Licensed Products by Rand had failed testing for a multitude of different reasons.

27

28

1        Upon receipt of the test results, Lucasfilm immediately sought an explanation from Rand.

2    (Anderson Decl. ¶ 17.)  Incredibly, Rand ignored these requests, not returning email and phone

3    messages.  (*E.g.*, Anderson Decl. Ex 5.)

4        On June 18, therefore, Lucasfilm sent a letter to Rand demanding that Rand immediately

5    cease manufacturing and distribution of Licensed Products and recall all such products already

6    shipped, and invoking Lucasfilm's right to terminate the Agreement.  (Anderson Decl. Ex. 10.)

7    Lucasfilm explained that the failed tests "clearly demonstrate[] RAND does not have sufficient

8    control of its manufacturing processes to comply with the requirement to have good

9    manufacturing practices," as required by paragraph 4.4 of the Agreement.  (*Id*. at 1.)  Lucasfilm

10    further pointed out that Rand had breached its representation and warranty, contained in

11    Paragraph 10.2(e) of the Agreement, that it would comply with all applicable laws, rules, and

12    regulations relating to the manufacture and sale of all Licensed Products.

13        In a telephone-call response to the June 18 letter, Rand acknowledged that Lucasfilm's

14    position was entirely reasonable and promised to demonstrate to Lucasfilm that its products were

15    safe.  Lucasfilm offered to work with Rand on the condition it made such a demonstration,

16    writing "we are more than willing to hear what Rand intends to do to establish that these products

17    are in fact safe. . . ."  (*Id*. at Ex. 11)

18        Rand, however, never followed through on its commitment.  Instead, it quickly took the

19    extraordinary position that, "Rand did nothing wrong."  (*Id*. at Ex. 12)  Rand further stated that it

20    intended to continue selling the Scooter and the Bike to Wal-Mart and other retailers and did not

21    intend to inform Wal-Mart of the failed BV tests.  (*Id*.)  In fact, Rand demanded that Lucasfilm

22    not tell Wal-Mart about the failed tests, on the ground that Wal-Mart would (rightly) consider

23    Rand's products unsafe and refuse to purchase them.  (*Id*.)  Rand declined to recall any Licensed

24    Product.

25        Lucasfilm later learned that Rand had further breached the Agreement by distributing at

26    least one additional *Star Wars* product — a small electric car called a "Quad" — which Lucasfilm

27    never approved for sale.  This product is still available for sale at Wal-Mart, despite Lucasfilm's

28

1  demand that Rand recall all Licensed Product.  (Declaration of Tom E. Beyer ("Beyer Decl."
2  Exs. 1-2.)

3      In the days and weeks following the June 10 termination letter, Rand repeatedly made the
4  same arguments it now makes to this Court — that the tests were incorrect, that similar Rand
5  products had passed other safety tests, that TRU was pursuing an unfair personal vendetta against
6  Rand, and that terminating the Agreement would damage Rand's business.  (Anderson Decl.
7  ¶¶ 24-26; Declaration of David Anderman ("Anderman Decl.") ¶ 2.)  Never, however, did Rand
8  answer Lucasfilm's request that it investigate and report why it had manufactured bicycles for
9  sale at TRU with dangerously high lead levels, why it had delivered the other defective product
10  for sale, and how its quality assurance procedures would ensure that no such failures occurred
11  again.  (Anderman Decl. Ex. 4.)  To this day, it has not done so.  (*Id.*)

12      On August 14, 2008, Rand filed this application for a TRO and preliminary injunction
13  seeking a court-ordered resumption of its terminated contractual relationship with Lucasfilm.  In
14  its supporting memorandum, Rand represents to this Court that "Rand International has an
15  uncontroverted history of providing safe products to the market, and that termination of the
16  Agreement will harm that reputation."  An investigation undertaken in the days after Rand filed
17  suit, however, has revealed that Rand has a long history of introducing products into the
18  marketplace that are dangerous and/or mislabeled.  For example,

19  • In April 2000, Rand recalled 70,000 bicycle helmets sold nationwide.  (Beyer Decl. at
20    Ex. 3.)  The helmets, some of which were intended for use by children, failed impact
      testing and labeling requirements in violation of the Consumer Product Safety Act.

21  • In April 1998, Rand recalled 11,000 mountain bikes that had been distributed
22    nationwide after multiple incidents where the bike's front suspension fork separated
      from the frame, causing riders to suffer facial fractures and lacerations.  (Beyer Decl.
23    at Ex. 4.)

24  • In March 1988, Rand issued a recall of 40,000 bicycle wheels after laboratory tests
      showed that the plastic rim on the wheel could shatter and cause injury to the inflator
25    or bystanders.  (Beyer Decl. at Ex. 5.)

26  • On April 16, 1999, the Federal Trade Commission issued an order barring Rand, for a
      period of 20 years, from misrepresenting that its products were made in the U.S.
27    (Beyer Decl. at Ex. 6.)

28  • In December 2006, Mattel sued Rand for copyright and trademark infringement
      related to Mattel's Lil' Quad toy.  (Beyer Decl. at Ex. 7.)

1    II.    **ARGUMENT**

2        A.    **Rand Has the Burden to Establish its Right to Entry of a Preliminary**
3             **Injunction.**

4        To obtain preliminary injunctive relief, the moving party bears the burden of establishing

5    "either (1) a combination of probable success on the merits and the possibility of irreparable

6    injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of

7    the moving party." *Bank Julius Baer & Co. Ltd. v. WikiLeaks*, 535 F. Supp. 2d 980, 983 (2008)

8    (N.D. Cal. 2008) (citation omitted). "Because injunctive relief prior to trial is a harsh and

9    extraordinary remedy, it is to be granted sparingly and only in cases where the issues are clear

10   and well defined and the plaintiff has established a reasonable certainty of prevailing at trial."

11   *Arthur J. Gallagher & Co. v. Edgewood Partners Ins. Ctr.*, No. C 07-06418 JSW, 2008 U.S. Dist.

12   LEXIS 8924, at *5 (N.D. Cal. Jan. 23, 2008).

13       A moving party's burden is heightened where, as here, a party seeks a mandatory

14   injunction or to alter the status quo. *See Anderson v. United States*, 612 F.2d 1112, 1114-1115

15   (9th Cir. 1979) (mandatory injunctions are "particularly disfavored" and "are not granted unless

16   extreme or very serious damage will result . . . .") (citation omitted); *Schrier v. Univ. of Colo.*,

17   427 F.3d 1253, 1258-59 (10th Cir. 2005) (preliminary injunctions that alter the status quo are

18   "disfavored" and the requirements for injunctive relief are "more closely scrutinized"). Here,

19   Rand demands both a mandatory injunction and to alter the status quo through an order

20   reinstating the Agreement that Lucasfilm terminated in June 2008.

21       B.    **Rand Has Not Met Its Burden**

22            1.    **Rand has no likelihood of success on the merits.**

23                 a.    **Rand's breach of contract claim is without merit.**

24       Rand's contention that Lucasfilm breached the Agreement when it issued a notice of

25   termination is entirely without merit. Lucasfilm's termination was proper because Rand violated

26   material provisions of the Agreement by repeatedly delivering defective products to TRU, and

27   failing to maintain good manufacturing practices.

28

1              **(i)**      **Lucasfilm was entitled to terminate the Agreement after**
                         **Rand's repeated breaches.**

2

3       Paragraph 14 of the Agreement permitted Lucasfilm to terminate the Agreement if Rand

4  breached any "material term or condition."  Rand breached several material conditions here.

5       Paragraph 4.4 requires that Rand "complies with all good manufacturing practices" and

6  with "all laws and regulations relevant to any Licensed Product."  Paragraph 10(e) provides that

7  Rand "and all others authorized by it or acting on its behalf will comply at all times hereunder

8  with all applicable laws, rules and/or regulations relating, affecting or pertaining to the use of any

9  Licensed Property."  The failure of the Bike to meet the testing requirements for lead paint and

10  the seven-part failure of the Scooter demonstrate that Rand had failed to ensure compliance with

11  "good manufacturing practices" and with "all laws and regulations" in accordance with

12  Paragraphs 4.4 and 10.2(e).

13       Rand further breached the Agreement by refusing Lucasfilm's instruction to recall and

14  cease distribution of all its Licensed Product.  The Licensing Agreement states:

15           4.6  <u>Recall Of Product</u>.  Licensee agrees to recall immediately on the
         demand of Licensor any or all Licensed Products . . . which Licensor

16           reasonably suspects to be defective for any other reason and cease the
         distribution and/or sale of such Licensed Products until such time as the

17           Licensed Products have been corrected to Licensor's satisfaction.

18  (Anderson Decl. Ex. 1 at 6.)  Lucasfilm made a demand under Section 4.6 in the June 18 letter.

19  At that time, Lucasfilm had much more than a "reasonable suspicion" that Rand lacked the

20  quality assurance procedures necessary to comply with good manufacturing practices — it had

21  proof in the form of four failed tests from an independent testing lab.  Rand, however, refused to

22  comply with Lucasfilm's recall demand.  (*Id*. Ex. 13 at 1.)[1]  Rand's failure to recall and cease

23  distribution was a further breach of a material term of the Agreement and provided further

24  grounds for termination under Section 14.

25

26       [1] Rand has admitted that it has failed to recall literally thousands of the same Scooters with
seven points of failure and asserts that "The Scooters have been selling well at Wal-Mart. . . ."

27  (Worksman Decl. at¶ 56).  Rand has also refused to recall any other Licensed Product.
(Anderman Decl. Ex. 5)

28

1    Finally, Section 14.2(c) provides that Rand's sale of Licensed Product "without the

2    appropriate written approval" of Lucasfilm is grounds for immediate termination.  As described

3    above, Rand's sale of the Quad to Wal-Mart, which was only discovered when the product was

4    observed on a store shelf, was unapproved and clear grounds for termination.  (Anderman Decl.

5    Ex. 6; Beyer Decl. 1-2.)

6    **(ii)    Rand's challenges to the test results are absurd.**

7    Rand claims it did not breach the Agreement because, "there was absolutely no reason to

8    believe that [the Bike and the Scooter] or any other licensed products were defective."

9    (Worksman Decl. ¶ 41.) In the face of the failed BV tests, this argument is simply absurd.

10    There is no question that BV is one of the leading testing facilities in the world.  "Rand

11    International has itself used Bureau Veritas on occasion to quality-test its products."  (Worksman

12    Decl. ¶ 36.)

13    There is no question that the sale of the Bike would violate CPSC restrictions because

14    "there is an unreasonable risk of lead poisoning in children associated with lead content of over

15    0.06 percent in paints and coatings to which children have access."  16 C.F.R. 1303.1 (2008).

16    There is also no question that the effects of a child being exposed to lead in even small

17    concentrations are horrific.  *See U.S.* Dept. of Health & Human Servs. ATSDR, Toxicological

18    Profile for Lead CAS# 7439-92-1, Ch. 1, 3 (2007).  Lead retards a child's developing nervous

19    system causing a multitude of problems including:  "attention problems, learning disabilities,

20    mental retardation, antisocial and delinquent behavior, and lower intellectual ability, measured as

21    loss in IQ points."  H.R. REP. No. 110-501 at 19 (2007).  Frighteningly, the signs of neurological

22    damage to children from cumulative exposure to lead are not evident without medical testing.  *Id.*

23    Since IQ impairments have been identified at blood lead levels below 5 µg/dl, there is no safe

24    level of lead exposure.[2]

---

25    [2]  Just last year the California Attorney General and Los Angeles City Attorney filed a lawsuit
against 20 companies for manufacturing or selling toys with "unlawful quantities of lead."
26    (Beyer Decl. Ex. 9.)  The Los Angeles City Attorney noted that "lead in toys poses a significant
threat to the health and well being of our children." (*Id.*)  The City Attorney further stated that
27    the "lawsuit is intended to ensure that these companies eliminate lead and other harmful
substances in children's toys, once and for all."  (*Id.*)

28

1    Rand's failure to investigate the cause of the lead contamination and prove to Lucasfilm

2    that it had procedures in place to prevent a recurrence demonstrated Rand's complete failure to

3    follow good manufacturing practices in the critical area of child safety and its disregard of

4    relevant regulations, in breach of Paragraphs 4.4 and 10(e).

5    After Lucasfilm discovered the failed lead test, Rand promised to perform a full

6    investigation.  Rand, however, never provided any such explanation to Lucasfilm, despite

7    repeated requests for one.  (Anderson Decl. 12, Roffman Decl. 22.)  Indeed, only two days later,

8    Rand asserted that it had nothing more to say on the subject, stating,

9    
10   > At this point in time Rand has supplied enough information for
   > Lucas Film to make a value judgment concerning Rand's quality
   > assurance program and procedures.  As such, we respectfully
   > request reinstatement of our contract standing.

11   

12   (Anderson Decl. Ex. 14.)

13   Rand speculates that the BV test was wrong because it shows even distribution of lead

14   throughout the bicycle, despite the fact that different bicycle parts were made and painted by

15   different factories in China.  (Worksman Decl. ¶ 61, Rand Memorandum at 5.)  This argument is

16   absurd on its face.  The report shows only one lead level — 970 gm/kg — for the paint taken

17   from several different surfaces, not the same level for each sample.  (Worksman Decl. Ex. I.)  BV

18   confirmed in a telephone call with Lucasfilm in July that it scraped paint from each area on the

19   bike that was painted black and tested those paint scrapings for lead.  (Anderman Decl.¶ 3.)  If

20   only one or two of these pieces were coated with lead-based paint, the lead levels of these parts

21   must have been *much higher* than the already toxic level of 970 mg/kg.

22   Rand questions the test's accuracy because a second test, allegedly (but without

23   confirmation) "from the allotment from which the sample allegedly failed" was negative.  (Rand

24   MPA at 5.)  The existence of inconsistent results, however, does not establish that the positive

25   lead test was inaccurate.  Even if Rand were to present multiple "clean" lead tests, it would not

26   answer the critical question:  How did Rand so grossly depart from good manufacturing practices

27   as to produce a bicycle for sale to Toys "R" Us with dangerous and unlawful lead levels, why did

28   

LUCASFILM'S OPPOSITION TO APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION
Case No. CV 08-03897 JSW
sf-2562891

1    Rand's quality assurance program fail to stop the bicycle from being sold, and what practices,

2    policies and procedures had Rand instituted *to guarantee that the incident would not be repeated*.

3          The failure of the Scooter test provides additional support for Lucasfilm's conclusion that

4    Rand was not following good manufacturing practices.  Rand states that "the standard for a

5    scooter for children is and has always been for a 100-pound rider, the Bureau Veritas test which

6    the Scooter failed was set for a 200-lb. rider."  (Rand MPA at 5.)  Assuming Rand is correct that

7    BV used a 200-lb. test — which is not evident from the face of the test report — Rand provided

8    no reason to believe BV's decision was incorrect.  Rand had the Scooter tested for children aged

9    5 to 14.  Most 14-year olds weigh more than 100 lbs.  (Beyer Decl. Ex. 8)

10          Finally, the Scooter failed for seven independent reasons, including that its latch did not

11    prevent the Scooter from folding inadvertently, posing an obvious risk to a rider of any weight.

12    (Anderson Decl. Ex. 7)  Those multiple failures demonstrated to Lucasfilm that Rand did "not

13    have sufficient control of its manufacturing processes to comply with the requirement to have

14    good manufacturing practices" or even applicable laws and regulations justifying termination.

15    (Anderson Decl. Ex. 12.)

16          Rand repeatedly asserts that it has "an uncontroverted history of providing quality and

17    safe products," and that it has sold other products for 30 years "with little or no incident."  (Rand

18    MPA at 8; Worksman Decl. ¶ 41.)  As shown above, this is false — Rand's deplorable safety

19    record includes recalls of tens of thousands of bicycles and an FTC consent order.[3]

20

21          [3] This assertion is also irrelevant.  As Rand admits, it "is a wholesaler and [] buys from China

22    suppliers."  (Worksman Decl.¶ 28.)  Whether other products that went through Rand's wholesale
       operation at other times were safe (or escaped testing or detection) is unknown and fails to meet

23    Rand's obligation to show that the Licensed Product is safe.  Rand implies that the *Clone Wars*
       bikes were identical to bikes with other branding.  (Worksman Decl. ¶ 42.)  On its face, however,

24    this makes no sense because even the *Clone Wars* bikes were not all made by the same
       manufacturers, and different manufacturers used different sub-contractors for different parts.

25          Rand contends that BV destroyed the Bike that failed the lead test and asks the Court to invoke
       the "doctrine of spoliation to infer that there was never a lead paint problem with the sample

26    which allegedly tested positive."  Yet, the very case cited by Rand — *Akiona v. United States*,
       938 F.2d 158 (9th Cir. 1991) — makes clear that the adverse inference for spoliation only applies

27    where there is evidence that the party destroyed evidence in anticipation of litigation.  *Id*. at 161.
       Here Rand makes no such contention and no such thing occurred.

28

    **(iii) Rand's argument that it lacked an opportunity to cure its breaches also lacks merit.**

    Rand's contention that Lucasfilm did not provide it a sufficient opportunity to cure its breach is without merit.  In light of the scope and gravity of Rand's misconduct, it simply would not have been possible for Rand to satisfy Lucasfilm that it had adopted good manufacturing practices within the 20 days permitted under the Agreement to cure.  Nevertheless, as discussed above, Lucasfilm provided Rand with an opportunity by requesting that Rand investigate the defects, explain how they occurred (or prove that the tests were somehow wrong), and provide credible assurances that the defects would not occur again.  Rand not only failed to do this, it affirmatively declined the opportunity to do so, denied there was a breach to cure in the first place, and insisted, only five days after the June 18 termination letter, "Rand has supplied enough information for Lucas Film to make a value judgment concerning Rand's quality assurance program."  (Anderson Decl. Ex. 12.)  Rand's denial of a breach, and its failure to cure within 20 days (or even to this day), provide firm ground for termination of the Licensing Agreement.

    **(iv) Rand's conspiracy theory and allegations of bad faith are groundless.**

    Rand asserts that Lucasfilm wanted to amend or terminate the Agreement to permit TRU to purchase from other suppliers, especially because the *Clone Wars* television cartoon series was expanded from 26 to 200 episodes.  (MPA at 9; Worksman Decl. ¶¶ 24-32.)  This speculation makes no sense.  The Agreement was non-exclusive; Lucasfilm was free, therefore, to enter into any agreement with any other company to distribute the Licensed Product — including any items licensed to Rand — at any time.  It did not need to cancel or amend the Agreement to do so.

    Rand also asserts that Lucasfilm did not really believe that Rand's quality assurance was inadequate because Lucasfilm agreed to allow Rand to sell the scooters and bikes after all.  This is incorrect; Lucasfilm never agreed to allow Rand to sell either the scooters or the bikes.  (Anderman Decl. ¶ 5.)[4]

---

[4] Lucasfilm entered into negotiations in an attempt to resolve the dispute with Rand.  One of the proposals involved Rand selling the scooters and bikes, but only upon the condition that they

(Footnote continues on next page.)

LUCASFILM'S OPPOSITION TO APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION
Case No. CV 08-03897 JSW
sf-2562891

1

**b.    Rand's claim for tortious interference is without merit.**

2      The termination of an existing contract according to its own terms cannot not give rise to a

3   claim of interfering with another contract.  *Major League Baseball Promo. Corp. v. Colour-Tex,*

4   *Inc.*, 729 F. Supp. 1035, 1052 (D. N.J. 1990).  This fact precludes Rand's tortious interference claim.

5      Furthermore, even if Lucasfilm's termination were wrongful (which it was not), there is

6   no evidence that Lucasfilm acted with the specific intent to interfere with Rand's retail contracts,

7   as required to support a tortious interference claim.  *See Imperial Ice Co. v. Rossier*, 18 Cal. 2d

8   33, 37 (1941).  ("If the actor had no knowledge of the existence of the contract *or his actions*

9   *were not intended to induce a breach*, he cannot be held liable though an actual breach results

10   from his lawful and proper acts") (emphasis added).[5]  Although Lucasfilm strongly encouraged

11   Rand to come clean to retailers about the failed tests, it nonetheless went to great lengths to avoid

12   disclosing facts to retailers without Rand's cooperation and approval, which was never

13   forthcoming.  TRU already knew the results (and was under no obligation to keep that

14   confidential), and ultimately Rand itself disclosed the test results to Wal-Mart.

15

**c.    Rand's 17200 claim is defective.**

16      Rand's Section 17200 claim is simply a restatement of its other claims and fails for the

17   reasons stated above.  To the extent that Rand's claims are based on fraud or misrepresentations,

18   Rand must identify "what is false or misleading about a statement" alleged to be deceptive and

19   "why it is false."  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  Here,

20   Rand has failed to point to any false statement that Lucasfilm made to third parties or the public

21

(Footnote continued from previous page.)

22   established conclusively that the bikes and scooters were of different manufacture than the ones
that failed the tests, that it notify retailers of the failed tests, and that it agree to other conditions.

23   Agreement was never reached on that proposal.  Lucasfilm's consideration of permitting a small
number of products to be shipped does not show that Lucasfilm trusted Rand to employ the good

24   manufacturing policies necessary to safely mass produce those products.

25      [5] Furthermore, "interference with a contract is justified when the person is seeking to protect
an interest of greater social value than that attached to the stability of the contract."  *Jewel Cos. v.*

26   *Pay Less Drug Stores Northwest, Inc.*, 510 F. Supp. 1006, 1011 (N.D. Cal. 1981) (*citing Imperial*
*Ice Co.*, 18 Cal. 2d at 33); REST. TORTS, § 767.  "Thus, a person is justified in inducing the breach

27   of a contract the enforcement of which would be injurious to health, safety, or good morals."  *Id.*
at 35.  Although Lucasfilm denies inducing Rand to breach its own contracts, such conduct would

28   be fully justified to prevent delivery of the defective product at issue here.

1    about Rand's products.  In fact, Lucasfilm only asked Rand to be honest with retailers about the

2    two Toys "R" Us tests and to explain why Lucasfilm had terminated the Agreement.  (Roffman

3    Decl. ¶ 27.)  Lucasfilm's request that Rand make truthful statements cannot form the basis of a

4    17200 claim premised on misrepresentations.

5                    **2.      Rand fails to establish a threat of immediate and irreparable harm.**

6         Rand's request for a mandatory injunction reinstating the Agreement should be denied

7    because Rand's claim that it may lose future revenue does not establish irreparable harm.  *See*

8    *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (monetary injury, "however substantial" does not

9    justify injunctive relief (citation omitted)); *Goldie's Bookstore, Inc. v. Sup. Ct. of Cal.*, 739 F.2d

10   466, 471 (9th Cir. 1984) (same).  In his declaration, Worksman asserts (without any supporting

11   evidence) that Rand will lose millions of dollars in revenue unless the Agreement is reinstated.

12   Loss of revenue, however, is a financial injury and does not establish irreparable harm.  *See Los*

13   *Angeles Mem'l Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir.

14   1980).[6]

15        Rand attempts to avoid the rule barring injunctive relief for financial injury by claiming

16   harm to its goodwill and reputation.  As catalogued above, however, Rand's history and

17   reputation is as a company that has repeatedly furnished products that were defective,

18

19        [6] Rand cites two unpublished district court decisions — *Everything Cycles* and *Pacific
     Rollforming, LLC* — to support its proposition that a breach of a license agreement constitutes
20   irreparable harm.  (MPA at 13, 15-17.)  These cases are clearly distinguishable.  In *Everything
     Cycles*, the district court granted an injunction under an Oregon statute that made it unlawful to
21   terminate a franchise agreement until a court decided that there was good cause for termination.
     *Everything Cycles Inc. v. Yamaha Motor Corp.*, No. 07-1434-HO, 2007 WL 3171253 at *2 (D.
22   Or. Oct. 25, 2007).  According to the district court, the statute impliedly mandated issuance of a
     preliminary injunction to maintain the status quo between a franchisor and franchisee.  *Id*.  Here,
23   by contrast, there is no such statutory basis for an injunction.  In *Pacific Rollforming*, the district
     court enjoined the defendant-licensor from taking over plaintiff-licensee' dry wall business by
24   soliciting customers in plaintiff's exclusively licensed territory.  *Pacific Rollforming, LLC v.
     Trakloc Intern., LLC*, No. 07cv1897-L (JMA), 2007 WL 3333122 at *4 (S.D. Cal. Nov. 7, 2007).
25   The court found that the defendant provided no plausible basis for terminating the licensing
     agreement and took actions that plainly violated various terms of the agreement.  Unlike the
26   defendant in *Pacific Rollforming*, however, here Lucasfilm properly terminated its license based
     on its reasonable concern regarding the failed product tests and Rand's subsequent actions.  In
27   addition, Rand does not even allege that Lucasfilm is attempting to drive Rand out of business by
     taking over its business.

28

                                                  13

1  misbranded, and/or dangerous to consumers.  The facts of this case are fully consistent with

2  Rand's history of prior conduct and could not, therefore, damage Rand's reputation.

3      Furthermore, Rand's alleged harm to its goodwill and reputation is speculative.  Rand

4  alleges that it has various orders from customers that it will not be able to fulfill unless the

5  Agreement is reinstated.  Rand, however, fails to produce any evidence of actual orders, let alone

6  the amount of such orders or the amount of profits it would realize if such orders were placed.

7  Unsupported assertions that a movant will lose "goodwill" or suffer damage to its business are

8  insufficient to establish irreparable injury.  *See Goldie's Bookstore*, 739 F.2d at 472 (alleged loss

9  of goodwill and "untold" customers' speculative); *see also*, *Big Country Foods, Inc. v. Bd. of

10  Educ.*, 868 F.2d 1085 (9th Cir. 1989) ("loss of contract" does not constitute irreparable harm

11  without evidence that the contract would have been profitable).

12      Rand raises the specter of "being forced out of business altogether," because of "being

13  forced to discard the inventory without cause."  (Rand MPA at 16:2-5.) It is hard to understand

14  why Rand would have to discard its inventory, however, given its admission that the inventory

15  consists of existing, generic product lines to which Rand "merely" applied *Star Wars* and *Clone

16  Wars* logos.  (Worksman Decl. ¶ 12.)  Based on Worksman's statement, Rand could sell its

17  inventory by simply re-labeling the products.[7]  Indeed, Worksman offered to do just that during

18  one of his calls with Lucasfilm.

19      In addition, Worksman's declaration suggests that products licensed from Lucasfilm play

20  only a small role in Rand's business.  According to Worksman, Rand has sold over 500,000

21  scooters, and last year it sold 33,000 scooters to Toys "R" Us under the Batman brand alone.  In

22  light of this information, it is hard to understand how the loss of a single license with a single

23  company could prove fatal to Rand.[8]

24  _____

25      [7]  In addition, according to a June 20, 2008 email from Mr. Worksman, Rand did not have a
large inventory of *Star Wars* and *Clone Wars* products.  (Anderman Decl., Ex. 5.)  Given that the
Agreement was terminated on June 18, 2008, Rand bore the risk that it would be able to sell the

26  product after that date.

27      [8]  Worksman's provides no facts from which to assess the seriousness or magnitude of this
threat.  Furthermore, assertions are particularly suspect where, as here, they are based on the
movant's own conclusory statements.  *See Am. Passage Media Corp. v. Cass Commc'ns Inc.*,

28                                                                                (Footnote continues on next page.)

LUCASFILM'S OPPOSITION TO APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION
Case No. CV 08-03897 JSW
sf-2562891

1

### 3.    The balance of hardships tips heavily in favor of Lucasfilm.

Rand has also failed to demonstrate that "the balance of hardships tip heavily in its favor."

On the one hand, and as noted above, any potential injury to Rand is speculative and self-

inflicted.  Moreover, much of the alleged harm has likely already occurred following Rand's

inexplicable delay in seeking injunctive relief.

On the other hand,  an injunction would severely harm Lucasfilm by forcing it to license

its brand to a company in which it has lost all confidence with respect to safety issues.  The safety

of all products bearing the *Star Wars* brand is critical to Lucasfilm's mission.  The association of

the *Star Wars* brand with a dangerous toy — especially a toy that is tainted with lead — would

constitute a direct threat to Lucasfilm's reputation and business.  (Roffman Decl. ¶ 9.)

### 4.    Injunctive relief would not be in the public interest.

Ninth Circuit law "requires that [the Court] examine the public interest in determining the

appropriateness of a preliminary injunction."  *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959,

974 (9th Cir. 2002).  Here, Rand's request for a court order that it be allowed to sell children's

toys under the *Star Wars* brand, even though it has never demonstrated good manufacturing

practices with regard to safety, would not be in the public interest.

## III.    CONCLUSION

For the foregoing reasons, Lucasfilm respectfully submits that Rand's Motion for a

Temporary Restraining Order and Preliminary Injunction should be denied.

Dated: August 19, 2008                      MORRISON & FOERSTER LLP


By:    ____/s/  James J. Brosnahan____
       James J. Brosnahan
       Judson E. Lobdell

       Attorneys for Defendant
       LUCASFILM LTD.

---

(Footnote continued from previous page.)

750 F.2d 1470, 1473 (9th Cir. 1985) (discounting probative value of conclusory declarations from movant's own executives); *Los Angeles Mem. Coliseum Comm'n*, 634 F.2d at 1201 (same).

LUCASFILM'S OPPOSITION TO APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION
Case No. CV 08-03897 JSW
sf-2562891

1

<u>GENERAL ORDER 45 ATTESTATION</u>

2

I, Geoffrey Graber, am the ECF User whose ID and password are being used to file this

3

Notice of Appearance.  In compliance with General Order 45, X.B., I hereby attest that Judson

4

Lobdell and James Brosnahan have concurred in this filing.

5

Dated:  August 19, 2008                    MORRISON & FOERSTER LLP

6

7

By: /s/ Geoffrey Graber
                                                                     Geoffrey Graber

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16