JAMES J. BROSNAHAN (CA SBN 34555)
JBrosnahan@mofo.com
JUDSON E. LOBDELL (CA SBN 146041)
JLobdell@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000

JAMES W. HUSTON (CA SBN 115596)
JHuston@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendant
LUCASFILM LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RAND INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> LUCASFILM LTD., <br><br> Defendant. | Case No. CV-08 -3897-JSW <br><br> **DECLARATION OF HOWARD ROFFMAN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER** <br><br> Date: August 22, 2008 <br> Time: 9:00 a.m. <br> Ctrm: 2 <br> Judge: Hon. Jeffrey S. White |

I, Howard Roffman, hereby declare as follows:

1. I am the President of Lucas Licensing Ltd. ("Lucas Licensing"). I also serve as a Vice President of Lucasfilm Ltd. ("Lucasfilm"), a California corporation. Lucas Licensing is a division of Lucasfilm Entertainment Company Ltd., a subsidiary of Lucasfilm. I have been an employee of Lucasfilm since 1980. I have been President of Lucas Licensing since 1986. I am responsible for the licensing and marketing of all Lucasfilm properties in ancillary consumer markets. Except for any matters stated on information and belief, of which I am informed and I believe are true, I have personal knowledge of the facts stated in this declaration.

2. Lucasfilm is the sole owner of all rights in the *Star Wars* series of films, which includes *Star Wars: Episode I—The Phantom Menace*, *Star Wars: Episode II—Attack of the Clones*, *Star Wars: Episode III—Revenge of the Sith*, *Star Wars: Episode IV—A New Hope*, *Star Wars: Episode V—The Empire Strikes Back*, *Star Wars: Episode VI—Return of the Jedi*, and our most recent animated film, *Star Wars: The Clone Wars*, which was released theatrically this past weekend.

3. Through Lucas Licensing, Lucasfilm licenses intellectual property rights in the *Star Wars* films to hundreds of companies who distribute toys and other products bearing the *Star Wars* brand. Over the course of thirty years in business we have become one of the most recognized entertainment franchises in the world. Specifically, the *Star Wars* brand is one of the most successful and respected brands in the market for children's products.

4. Worldwide box office receipts for the six *Star Wars* films currently exceed $4.3 billion. Global retail sales of *Star Wars* merchandise currently exceed $15.5 billion since inception. *Star Wars* is one of the three most valuable entertainment franchises in the world.

5. Essential to the continued success of the *Star Wars* franchise is our reputation as an all-family brand that is trusted by parents worldwide. Over half of our business comes from products made for children.

6. Product safety is critically important to Lucas Licensing, both to protect the value of the brands we manage, and as part of the obligation we have to our consumers to not allow unsafe product into the marketplace. This is particularly true with regard to lead paint, a safety

threat that the consuming public and regulators have resoundingly condemned as unacceptable. When it comes to lead paint, Lucasfilm has a zero tolerance attitude.

7. On both ethical and financial grounds Lucasfilm considers lead paint contamination a black-and-white issue: there is no such thing as a "little bit" of a violation of rules regulating acceptable levels of lead; any violation of lead safety standards is unacceptable. We have not, to my memory, experienced lead paint problems with any of our products.

8. The trust that consumers and retailers have in the *Star Wars* brand has been built over a thirty year period as a result of considerable effort and strict adherence to quality standards.

9. Based on my knowledge of the consumer and retailer response to the discovery of lead violations in toy products in 2007, I have no doubt that if any *Star Wars* branded children's product was found to be contaminated with lead paint, Lucasfilm would experience an immediate, drastic loss of revenue, brand value, and goodwill.

10. Similarly, I expect the reverberations of a lead paint violation in any *Star Wars* children's product would extend far beyond the revenue generated by the specific product in question. It would affect the entire *Star Wars* brand.

11. After paying close attention to the public reaction that followed the discovery of multiple instances of lead contamination in children's toys in 2007, I believe one negative news story confirming lead contamination in a *Star Wars* product would result in the rapid erosion of consumer trust in the *Star Wars* brand, and it would take tremendous effort to rebuild that trust.

12. The retailers with whom we do business are also highly sensitive to any violation of lead standards.

13. *Star Wars* branded products are sold worldwide by retailers such as Toys "R" Us, Target, and Wal-Mart.

14. Lucasfilm depends on, values, and nurtures its positive relationship with these retailers.

15. From personal knowledge of the industry and conversations with retailers I am aware that retailers of *Star Wars* products, like Lucasfilm, view lead paint violations as a black-

2

and-white issue. They do not want contaminated product in their stores or, worse, in the households of their customers.

16. If any *Star Wars* branded children's product was found to be contaminated with lead paint, Lucasfilm would suffer an immediate loss of good relations with major global retailers.

17. We rely heavily on the quality control measures of our licensees to protect our high standards regarding product safety. Lucas Licensing consists of a staff of approximately thirty-five people who are responsible for intellectual property matters such as product planning, negotiations, retail relations, and design approval—we do not have expertise in product safety testing and we do not employ individuals for that purpose. Rather, we rely on our licensees to have the expertise, knowledge, and quality control measures to ensure that all products are well within the relevant product safety standards.

18. As President of Lucas Licensing I took very seriously reports that a number of Rand products had failed product safety tests conducted on behalf of Toys "R" Us. I was particularly alarmed upon learning that one of the soon-to-be released *Star Wars* products failed a lead contamination test that was conducted by Bureau Veritas, one of the leading test companies in the world. The fact that four separate items had failed testing was also a serious concern, as it indicated to me that there could be a major problem with Rand's quality control processes for all of its products.

19. My concerns were especially acute given the impending retail launch of our new line of products based on *Star Wars: The Clone Wars*, which was scheduled for (and occurred on) July 26, 2008, just over a month from the time we learned of the Rand lead paint failure. The shipment of massive amounts of product onto store shelves around the world is not a simple or quick process—the lead time for shipments from China can be many weeks. The information about the test failures of Rand's *Clone Wars* products was brought to our attention by Toys "R" Us well within the time that I would expect product to start shipping to retailers.

20. I was very concerned that products from Rand which were not certified to be safe—including bikes contaminated with lead paint—could already be on their way to store

shelves. I did not believe that we had the luxury of waiting for an extended investigation of the cause of the problems.

21. Upon learning this information, my number one concern was to assure that no tainted product ever make it to store shelves. Accordingly, we acted promptly to terminate our agreement with Rand, thereby preventing shipments. To the extent any product was already making its way through the distribution process, we insisted that Rand recall that product.

22. In the discussions that followed issuance of the termination notice, we asked Rand to explain how these products had failed testing and what steps might be taken to assure that the issues would be addressed. In response to our repeated queries we received unverified assurances that the tests were wrong with no indicia that Rand was conducting a thorough investigation into what actually occurred. While Rand told us that its "investigation was ongoing," they provided no information whatsoever about that investigation, such as the source of the lead paint, the actions it was taking with its factories, the quality assurance programs it had in place, and what they were going to do to prevent this from happening in the future. Instead, Rand simply insisted that the tests from Bureau Veritas were wrong.

23. We repeatedly asked Rand to provide us with updated safety certifications from Bureau Veritas establishing with certainty that the tests were wrong, particularly the test of the bike that showed lead paint. None was forthcoming.

24. We repeatedly requested that Rand provide us with some sort of empirical explanation for the failed lead paint test. The only explanation they provided was that the test could not have been right as all the parts that were tested resulted in the same finding, a result which was later explained by Bureau Veritas.

25. On July 9, I was one of the people on a telephone conversation with Mark Worksman, President of Rand International. I asked Mr. Worksman for an explanation regarding the failed test. I did not receive an explanation, but was told I should trust Rand in general and Mr. Worksman in particular. I have still not received a satisfactory explanation as to why the Rand products failed their test other than the obvious conclusion that they in fact did not meet applicable safety standards, particularly with respect to lead paint.

4

DECL. OF HOWARD ROFFMAN ISO DEF'S OPP. TO EX PARTE APPLICATION FOR TRO
Case No. CV-08 -3897-JSW
sf-2563587

26. During the call, Mr. Worksman impugned the integrity of Bureau Veritas and the motives of both Toys "R" Us and Lucasfilm, without providing any support or documentation for his position. I explained to him that we terminated the Rand agreement not because we were engaged in some sort of "conspiracy" with Toys "R" Us but because four of his products failed independent safety tests and Toys "R" Us had cancelled their orders as a direct result. He stated to me that he had e-mails in which Bureau Veritas agreed that the test results, including the lead paint failure, were wrong. I asked him to send us those e-mails. As far as I am aware we never received any written document from Bureau Veritas that said the lead paint failure report was wrong.

27. During my discussion with Mr. Worksman he requested that we grant permission for him to ship unfilled outstanding orders to retailers, particularly Wal-mart. I told Mr. Worksman that the only way I could entertain such a request was if Rand informed the retailers such as Wal-Mart about the safety testing failures and if such retailers subsequently decided to accept shipments based on further product safety tasting. He rejected this suggestion.

28. We asked him why he didn't want to disclose this information to Wal-Mart and he admitted that if Wal-Mart knew about the failed lead test they would not take Rand's product even given passed tests from other independent testing companies.

29. Upon hearing Mr. Worksman's response, we pointed out to him that if he believed that Wal0mart, the largest retailer in the world, would refuse to buy Rand's products due to a failed lead paint test, then surely it was not unreasonable for both Toys "R" Us and Lucasfilm to come to the same conclusion that a failed lead paint test warrants rejection of the product and raises serious concerns about the safety of all Rand products, thereby confirming that Lucasfilm's termination of the Rand agreement was appropriate.

30. At that point Mr. Worksman agreed it would be appropriate to wind down our relationship, saying something to the effect of "if you're not happy as a partner then we need to wind down the relationship amicably."

31. Based on this history with Rand I do not trust them.

5

1  I declare under penalty of perjury under the laws of the United States and the State of
2  California that the foregoing is true and correct.
3  DATED this ___ day of August, 2008 at San Francisco, California.

_____
Howard Roffman

6
DECL. OF HOWARD ROFFMAN ISO DEF'S OPP. TO EX PARTE APPLICATION FOR TRO
Case No. CV-08 -3897-JSW
sf-2563587

1    I declare under penalty of perjury under the laws of the United States and the State of
2    California that the foregoing is true and correct.
3    DATED this 19 day of August, 2008 at San Francisco, California.

_____
Howard Roffman

6
DECL. OF HOWARD ROFFMAN ISO DEF'S OPP. TO EX PARTE APPLICATION FOR TRO
Case No. CV-08-3897-JSW
sf-2563587