1   JAMES J. BROSNAHAN (CA SBN 34555)
    JBrosnahan@mofo.com
2   JUDSON E. LOBDELL (CA SBN 146041)
    JLobdell@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California 94105-2482
    Telephone: 415.268.7000
5
    JAMES W. HUSTON (CA SBN 115596)
6   JHuston@mofo.com
    MORRISON & FOERSTER LLP
7   12531 High Bluff Drive, Suite 100
    San Diego, California 92130-2040
8   Telephone: 858.720.5100
    Facsimile: 858.720.5125
9
    Attorneys for Defendant
10  LUCASFILM LTD.

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14  RAND INTERNATIONAL, INC.,              Case No. CV-08 -3897-JSW

15              Plaintiff,                 DECLARATION OF KRISTINA
                                           ANDERSON IN SUPPORT OF
16      v.                                 DEFENDANT'S OPPOSITION TO
                                           PLAINTIFF'S EX PARTE APPLICATION
17  LUCASFILM LTD.,                        FOR TEMPORARY RESTRAINING
                                           ORDER
18              Defendant.
                                           Date:      August 22, 2008
19                                         Time:      9:00 a.m.
                                           Ctrm:      2
20                                         Judge:     Hon. Jeffrey S. White

21

22

23

24

25

26

27

28

1       I, Kristina Anderson , hereby declare as follows:

2       I am Licensing Manager at Lucasfilm.  Except for any matters stated on information and

3   belief, of which I am informed and I believe are true, I have personal knowledge of the facts

4   stated in this declaration.

5       1.      During the Spring and Summer of 2008, Lucasfilm launched a substantial

6   marketing program to promote our latest film, *Clone Wars*, and the related children's toys and

7   products bearing the Clone Wars theme.

8       2.      The film was scheduled for release, and was released, on August 15, 2008.

9       3.      The Clone Wars marketing program timed the opening day of sales of all related

10  Clone Wars products for July 26, 2008 with the expectation based on experience that a uniform

11  launch date for all products would generate exponential interest in Clone Wars products,

12  increasing sales.

13      4.      As part of this marketing program, Lucasfilm entered into a non-exclusive

14  contractual agreement with Rand International (Rand), a toy wholesaler and distributor that

15  manufactures products in China and elsewhere.  Attached hereto as Exhibit 1 is a true and correct

16  copy of the Merchandise License Agreement dated October 1, 2007.

17      5.      Under this agreement, Lucasfilm licensed use of the Star Wars brand for products

18  such as bicycles, scooters, skateboards, and bicycle helmets.

19      6.      According to the licensing agreement, Rand was to submit a product plan for every

20  Star Wars product manufactured under the agreement, along with specifications, so that

21  Lucasfilm could approve each product before manufacture and distribution.

22      7.      In Spring of 2008 we received notification from one of our large retail distributors,

23  Toys "R" Us ("TRU") informing me that, based on prior dealings, TRU had no confidence in

24  Rand and would not do business with them.  Attached hereto as Exhibit 2 is a true and correct

25  copy of the March 6, 2008 series of e-mails between TRU buyer Jon Roman and Lucasfilm

26  Director of Licensing (Toys) Derek Stothard.

27      8.      When queried about the situation, Rand insisted that TRU's decisions were the

28  result of unspecified "political" considerations and made a series of strange requests of

1

1    Lucasfilm, including a request for a meeting with the TRU "Board of Directors." Attached hereto

2    as Exhibit 3 is a true and correct copy of the March 11, 2008 series of e-mails between Rand

3    International employee Steve Goldmeier and myself.

4          9.      Lucasfilm encouraged TRU to find a solution with Rand, as it was relying on Rand

5    to supply the Clone Wars products in time for the coordinated launch date, July 26, 2008.

6          10.     On May 27, 2007 Lucasfilm learned, for the first time, that Rand manufactured

7    bicycle helmets that failed to meet safety standards. Attached hereto as Exhibit 4 is a true and

8    correct copy of the May 27, 2008 series of e-mails between TRU buyer Jon Roman and Lucasfilm

9    Director of Licensing (Toys) Derek Stothard.

10         11.     I tried repeatedly to discuss this matter with Rand, but we did not receive a

11   response. Attached hereto as Exhibit 5 are true and correct copies of the May 28 and 29, 2008

12   e-mails to George Gross from myself.

13         12.     Around June 10, 2008 Lucasfilm learned from TRU that they had submitted Clone

14   Wars bikes and scooters that it ordered from Rand for safety testing and both products failed the

15   safety tests. Attached hereto as Exhibit 6 is a true and correct copy of the June10, 2008 series of

16   e-mails between Paul Southern et al., and myself.

17         13.     TRU delivered Lucasfilm copies of the test results, which indicated, among other

18   things, that the bike failed the test for lead safety. Attached hereto as Exhibit 7 are true and

19   correct copies of the May 20 & 27, 2008 and June 2, 2008 Bureau Veritas field test reports.

20         14.     The timing of these failures was critical because Rand was approaching the

21   marketing deadline for the July 26 product launch date. Attached hereto as Exhibit 8 is a true and

22   correct copy of the June 17, 2008 series of e-mails between Jon Roman and myself.

23         15.     Upon receiving copies of the failed test results from TRU, Lucasfilm immediately

24   determined that the defective products should not be sold.

25         16.     Lucasfilm further concluded that the fact that Rand had released these defective

26   products for sale raised serious doubt that Rand had the proper quality assurance procedures in

27   place to ensure that all its products were safe and complied with all applicable laws.

28

2

17.     Lucasfilm immediately and repeatedly sought from Rand an explanation of the failed tests and facts that would reasonably assure Lucasfilm that Rand would be able to cure the problem and ship clean, safe products in time for the July 26 launch.

18.     Rand did not reply to my e-mail requests, nor did they return my phone calls. Attached hereto as Exhibit 9 is a true and correct copy of the June 17, 2008 series of e-mails between Steve Goldmeier and myself.

19.     In light of not hearing from Rand, Lucasfilm sent a letter to Rand describing the test results, stating that Lucasfilm does not approve the distribution of those products, and demanding that Rand immediately cease manufacturing and distribution of Licensed Products and recall all such products that are already shipped.  Attached hereto as Exhibit 10 is a true and correct copy of a letter dated June 18, 2008 from Lucasfilm  Director of Business Affairs Christine Talarides to Rand International representative Steve Goldmeier.

20.     In telephone response to Lucasfilm's June 18 letter, Rand acknowledged that Lucasfilm's response was entirely reasonable and Rand promised to ensure no Licensed Products would be offered for sale to consumers, recall any Licensed Product already shipped or in transit; and provide a complete inventory of Licensed Product manufactured.  Attached hereto as Exhibit 11 is a true and correct copy of a letter dated June 20, 2008 from Lucasfilm  Director of Business Affairs Christine Talarides to Rand International representative Mark Worksman.

21.     On June 23, 2008 Lucasfilm  received a letter from Rand in which Rand claimed to have done nothing wrong and indicating an intent to continue sales to Wal-Mart and no intent to inform Wal-Mart of the failed product safety tests.   Attached hereto as Exhibit 12 is a true and correct copy of a June 23, 2008 letter from Allan Goldmeier to Chrisine Talarides.

22.     On June 26, 2008 we sent Rand another letter requesting, again, that Rand provide us with updated certificates from Bureau Veritas indicating that product safety issues were resolved.   Attached hereto as Exhibit 13 is a true and correct copy of a June 26, 2008 letter from Allan Goldmeier to Chrisine Talarides.

3

1   23. During our ongoing conversations with Rand regarding their soured relations with

2 TRU and the multiple product safety test failures, including the failed lead safety test, Rand never

3 addressed our stated concerns.

4   24. Rand repeatedly made unverified assertions that the tests were incorrect and that

5 TRU was pursuing a vendetta against Rand for unstated reasons.

6   25. Rand never answered Lucasfilm's request for a thorough investigation and report

7 into why it had bicycles with dangerously high lead levels, or why it had other defective products

8 intended for sale.

9   26. Rand never demonstrated how its quality assurance procedures would ensure that

10 no such failures would occur again.

11   I declare under penalty of perjury under the laws of the United States of America and of

12 California that the foregoing is true and correct.

13   DATED this 19 day of August, 2008 at San Francisco, California.

14

15                  _____

16                  Kristina Anderson

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF KRISTINA ANDERSON ISO DEF'S OPP. TO EX PARTE APPLICATION FOR TRO
Case No. CV-08 -3897-JSW
sf-2562986

# Exhibit 1

Fully Executed
COPY

## MERCHANDISE LICENSE AGREEMENT

### (CATEGORY: GAMES, TOYS)

**BASIC TERMS:**

| | | |
|---|---|---|
| A. | CONTRACT NO: | L5179 |
| B. | DATED: | As of October 1, 2007 |
| C. | PARTIES: | |

|  |  |
|---|---|
| **LUCASFILM LTD.**    -and-<br>("Licensor")<br>a California Corporation | **RAND INTERNATIONAL, INC.**<br>("Licensee")<br>a New York Corporation |
| P.O. Box 29901<br>San Francisco, CA, 94129-0901<br>Tel: (415) 623-1000<br>Fax: (415) 623-1059<br>Attn: Business Affairs | 51 Executive Boulevard<br>Farmingdale, NY 11735<br>Tel: (631) 249-6000<br>Fax: (631) 249-6015<br>Email: sgoldmeier@randinternational.com<br>Attn: Steve Goldmeier |

D. **LICENSED PRODUCTS:** "Licensed Products" means those products, goods and articles as defined in the Rider.

E. **LICENSED PROPERTY:** "Licensed Property" means subject to the terms, conditions and restrictions contained in any agreement between Licensor or any Licensor-Related Entity and any person, firm or entity rendering services or granting rights, the original titles, designs, place names, character names and likenesses, dialogue, music, sound effects, words, symbols, logographics, selected footage clips, photographs, artwork, visual representations of props, costumes, sets, special effects and any other original creative elements which appear in, have become directly associated with, and as depicted in, the motion pictures listed below (the "Picture[s]")]:

**STAR WARS:** "STAR WARS: EPISODE IV - A NEW HOPE," "STAR WARS: EPISODE V - THE EMPIRE STRIKES BACK," "STAR WARS: EPISODE VI - RETURN OF THE JEDI", "STAR WARS: EPISODE I - THE PHANTOM MENACE" ("EPISODE I"), "STAR WARS: EPISODE II – ATTACK OF THE CLONES" ("EPISODE II") and "STAR WARS: EPISODE III – REVENGE OF THE SITH" ("EPISODE III");

**CLONE WARS:** "Clone Wars Volume I" (produced by Cartoon Network), and "Clone Wars Volume II (produced by Cartoon Network)" and that certain as yet unreleased production produced by Lucasfilm Animation Ltd. tentatively entitled "Clone Wars";

and such original trademarks, tradenames, servicemarks and servicenames owned by Licensor and arising out of and which have become directly associated with the Pictures, to the extent of Licensor's rights in each applicable country of the Territory under such country's applicable trademark laws (the "Licensor Trademarks").

F. **RIGHTS GRANTED:** Subject to the terms of the Agreement, Licensor hereby grants to Licensee the non-exclusive right to utilize the Licensed Property only in connection with the Licensed Products during the Term in the Territory.

G. **TERRITORY:** The territory of this Agreement (the "Territory") consists of The United States and Canada.

H. **TERM:** The term of this Agreement ("Term") commences as of October 1, 2007 ("Start Date") and ends on December 31, 2009, inclusive ("Expiration Date"), except as extended or earlier terminated as provided in this Agreement.

I.   **PAYMENTS:**

(1)   **Advance(s):** Licensee agrees to pay to Licensor, as an advance against unearned Royalties hereunder, the amount of Two Hundred Thousand Dollars ($200,000). This sum shall be payable in the following amounts at the following times (collectively the "Advance"):

(a)   Seventy-five Thousand Dollars ($75,000) thereof, to be received by Licensor upon Licensee's execution of this Agreement;

(b)   Fifty Thousand Dollars ($50,000) thereof, to be received by Licensor on or about June 1, 2008;

(c)   Seventy-five Thousand Dollars ($75,000) thereof, to be received by Licensor on the date five (5) days following, and contingent upon the occurrence of, the first U.S. Exhibition (as defined herein) of the new "Clone Wars" animated production.]

Notwithstanding anything to the contrary, with respect to all Advance payments pursuant to this Clause I(1), interest shall accrue immediately on all late payments at the rates set forth in Subparagraph 8.1 hereinbelow.

(2)   **Royalties:**

(a) WHEELED GOODS: Ten Percent (10%) of Net Sales; and

(b) NON-WHEELED GOODS: Twelve Percent (12%) of Net Sales.

(3)   **Bank Guaranty.** Licensee agrees to secure on behalf of Licensor, and to deliver to Licensor, concurrently with the its delivery of the execution original of this Agreement, a Bank Guaranty from a bank in the form attached hereto as Exhibit R-2 and incorporated herein by this reference, or such other such form as Licensor may approve.

J.   **PROPOSED PRODUCT & MARKETING PLAN:** (See Exhibit II); LIST PRICES

(1)   Proposed Product & Marketing Plan: Due by: October 15, 2007.

(2)   Proposed Product & Marketing Plan: Due by January 15 of each Calendar Year of the Term, commencing with January 15, 2008.

(3)   List Prices: Due no later than thirty (30) days prior to the first sale of Licensed Products hereunder.

K.   **ENTIRE AGREEMENT:**

The foregoing Basic Terms (together with the Standard Conditions, the Rider, and all Exhibits and Schedules attached hereto, all of which are incorporated herein by this reference), are referred to collectively as the "Agreement" and constitute the complete and entire agreement between the parties with respect to the subject matter hereof, superseding and replacing any and all prior agreements, negotiations, communications, and understandings (both written and oral) regarding such subject matter. This Agreement, whether or not executed by the parties, shall not become effective until all required documentation (including as applicable, but not limited to, letter of credit, bank guaranty and/or insurance certificate) has been received by Licensor. In the event of a conflict between the terms or conditions of the Standard Conditions and those of these Basic Terms and/or the Rider, the terms and conditions of these Basic Terms and/or of the Rider, to the extent that they conflict, shall prevail. In the event of a conflict between the Basic Terms and the Rider, the terms of the Rider shall prevail. This Agreement may only be modified, or any rights under it waived, by a written document executed by both parties.

All terms not otherwise defined herein shall have the same meaning as set forth in the Standard Conditions or Rider to which these Basic Terms are attached.

LUCASFILM LTD. ("Licensor")
a California Corporation

By: _____

Print Name: _____ Howard Roffman _____

Title: _____ Vice President _____

RAND INTERNATIONAL, INC. ("Licensee")
a _New York_ Corporation

By: _Steven Goldmeier_

Print Name: _____ Steven Goldmeier _____

Title: _____ Principal _____

BUSINESS AFFAIRS

| Date | Initial |
|---|---|
| 1/28/08 | |

ACCOUNTING

| Date | Initial |
|---|---|
| 1-17-08 | |

TAX

| Date | Initial |
|---|---|
| 1-17-08 | |

## STANDARD CONDITIONS

All terms not otherwise defined herein shall have the same meaning as set forth in the Basic Terms or Rider to which these Standard Conditions are attached.

1.     GRANT OF LICENSE:  In consideration of the promises, warranties, representations, obligations, payments and agreements made or assumed by Licensee hereunder, and subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee the non-exclusive, non-transferable, non-assignable license during the Term and only within the Territory:

    1.1    to reproduce any and all elements comprising Licensed Property in conjunction with the development, design, manufacture, packaging, advertisement, publicity and marketing of Licensed Products;

    1.2    to distribute and sell Licensed Products:

        (a)    to a bona fide third party Permitted Distribution Channel for resale on a retail basis to an End Consumer; or

        (b)    to a bona fide third party Distributor for sale to a bona fide third party Permitted Distribution Channel for resale on a retail basis to an End Consumer; and

    1.3    to use the Licensor Trademarks on and in connection with any Advertising Material for a Licensed Product.

2.     RESTRICTIONS ON LICENSE:

    2.1    Distribution.  Without limitation, Licensee shall not have the right to distribute or sell (or authorize any entity to distribute or sell) any Licensed Product:

        (a)    to or through any channel, method or outlet of distribution set forth in Exhibit I as an "EXCLUDED DISTRIBUTION CHANNEL", without Licensor's prior written consent;

        (b)    for export to any country outside of the Territory unless such Licensed Product is destined for ultimate delivery within the Territory and Licensee shall not distribute or sell (or authorize any entity to distribute or sell) any Licensed Product to or through any party if Licensee knows, or in the exercise of its reasonable good faith business judgment should know, that such distribution or sale will result in the distribution for sale or resale of any Licensed Product outside of the Territory, subject to any Applicable Laws to the minimum extent Licensee is permitted thereby to fulfill orders to locations that are outside of the Territory, and provided that such orders have not been solicited by or on behalf of Licensee;

        (c)    to or through a Closeout Entity in any country of the Territory prior to the date eighteen (18) months after the initial "sale" (as defined in Subparagraph 15.50 hereinbelow) of such Licensed Product to a Customer in such country, unless Licensor otherwise expressly agrees in writing;

        (d)    through any Television Home Shopping Retailer except to the extent that, at Licensor's request, Licensee supplies to Licensor or to Licensor's designee any Licensed Product to such specific Television Home Shopping Retailer(s) as Licensor may approve, if at all, in advance in writing.

    2.2    Advertising.  Licensee shall not at any time have the right to conduct (or authorize any entity to conduct) advertising for any Licensed Product that is primarily intended to be disseminated outside of the Territory.  Without limiting the generality of the foregoing, Licensee shall not directly or indirectly authorize or expressly solicit the fulfillment of, or fulfill orders for, the distribution or sale of any Licensed Product outside of the Territory through means of the so-called World-wide Web, Internet or any so-called "on-line service" or other electronic media, without Licensor's prior written consent and provided Licensee has executed a separate license agreement with Licensor in this regard, in a form satisfactory to Licensor.

    2.3    Initial Shipment Date.  Licensee agrees that the initial shipment of any Licensed Product to a Customer in the Territory or, if Licensor specifies in a country ("Initial Shipment Date") shall not occur later than the applicable date for such Licensed Product as set forth in the applicable Annual Product & Marketing Plan approved by Licensor hereunder.

    2.4    Manufacturing.  Licensee shall have no right to sublicense to any entity the right to manufacture any Licensed Product hereunder, whether or not such entity is a Licensee Affiliate, unless and until Licensor has approved any such proposed manufacturer and such proposed manufacturer shall have also executed an Approval of Manufacturer Agreement with Licensor on Licensor's form for such agreement (such approved entity a "Manufacturer") attached to and made a part of this Agreement as Exhibit IV as same may be modified from time to time.

    2.5    Sublicensing.  Licensee shall have no right to sublicense to any entity any right licensed to it hereunder (other than the right to manufacture Licensed Product which is governed by Subparagraph 2.4 hereinabove), whether or not such entity is a Licensee Affiliate, unless and until Licensor has approved any such proposed sublicensee and such proposed sublicensee shall have

also executed an Approval of Sublicensee Agreement with Licensor on Licensor's then-current form for such agreement (such approved entity a "Sublicensee").

2.6    <u>No Joint or Cross Distributing, Promoting or Selling</u>.  No Licensed Product shall be created for any specific Customer, or jointly or cross distributed, marketed, promoted or sold with any other product or service without Licensor's prior written consent in each instance.

2.7    <u>No Similar Products or Dumping of Licensed Products</u>. Licensee agrees that, during the Term and any applicable Sell-Off Period and throughout the Territory, Licensee:

    (a)    will not Dump any Licensed Product anywhere; and

    (b)    will not manufacture, distribute or sell any merchandise or authorize the manufacture, distribution or sale of any merchandise bearing any artwork or other representation which is confusingly similar to or which disparages the Licensed Property (or any element thereof).

2.8    <u>Third Party Sourcing</u>.  Licensee shall not have the right to use any artwork or other creative material incorporating elements of the Licensed Property used in connection with the products, goods or articles of third parties (including, without limitation, books, comics and trading cards) without first advising Licensor in writing of the third party which had used such artwork and without first obtaining Licensor's written approval thereof in accordance with Paragraph 4 hereinbelow.

2.9    <u>No Electronic Mechanism or Element</u>.  Except as permitted in this Agreement or as the parties may otherwise agree in writing, no Licensed Product may include any electronic mechanism or electronic element which allows Licensed Products to interact with the Internet or with any product which is not a Licensed Product, and the fact that a Licensed Product is or could be incorporated with or used in conjunction with any other product which is not a Licensed Product (whether or not such other product has any electronic feature or capability) neither renders such other product a Licensed Product hereunder, nor is Licensee nor any third party authorized to utilize any Licensed Property in connection with or in association with such other product.

2.10    <u>No Electronic Transmissions of Licensed Property</u>.  For the avoidance of doubt, except as otherwise agreed in advance in writing by Licensor, Licensee shall have no right to electronically transmit or to authorize the "electronic transmissions" (as hereinafter defined) of any Licensed Property to any unauthorized party(ies).  The terms "electronically transmit" and "electronic transmission" shall mean, without limitation, the public performance, dissemination, distribution, or other use, reproduction, republication and/or duplication by means of the so-called Internet including, without limitation by means of "digital downloads" and/or "streaming," webcasting and/or file transfer or any other means whether now or hereafter known, devised or invented.

2.11    <u>Third Party Obligations</u>.  If and to the extent that the rights licensed to Licensee are exclusive, notwithstanding anything to the contrary contained in this Agreement or otherwise, but without limitation of Licensor's other rights and remedies, with respect to any exclusive rights granted hereunder:

    (a)  Licensee acknowledges that Licensor may have heretofore executed agreements with third parties which may encompass rights with respect to some or all of the Licensed Products and/or which may grant to such third parties the right to dispose of, distribute and sell Licensed Products during their respective sell-off periods, which sell-off periods may occur during the Term, and that such sell-off rights shall not violate the terms of this Agreement; and

    (b)  Licensor shall have the unrestricted right, prior to the expiration or termination of the Term to provide for the disposition of any or all of the rights licensed to Licensee hereunder, including, without limitation, entering into agreements with any third party(ies) which provide for the right for such third party(ies) to design, manufacture and/or distribute Licensed Products anywhere in the Territory, provided, that such agreement(s) shall not by its terms authorize the shipment of a Licensed Product to a Retail Entity on a date that would allow such Licensed Product to be sold on a retail basis to the consuming public prior to the expiration or termination of the Term.

3.    <u>RESERVED RIGHTS</u>:

3.1    <u>General</u>.  Licensor retains all rights not expressly licensed to Licensee under this Agreement, such reserved rights including, without limitation, the right to grant licenses to third parties which do not violate the terms of this Agreement, and the right, subject to Subparagraph 3.2 hereinbelow, to advertise, promote, manufacture, distribute and sell through any Licensor Channel any Licensed Product or other products based on the Licensed Property anywhere in the world, including without limitation in the Territory during the Term.

3.2    <u>Licensor Channels</u>.  In the event that Licensor desires to distribute and/or sell Licensed Product that has been distributed and/or sold hereunder by Licensee, Licensor shall have the right to purchase from Licensee any Licensed Product for which Licensee has rights hereunder (if at all). Licensee shall manufacture for or distribute and sell to (or cause the manufacture for or distribution and sale to) Licensor or Licensor's designee such quantities of such Licensed Product as Licensor shall request for the applicable Licensor Channel, and shall sell such Licensed Product to Licensor or to Licensor's designee at the lowest price and on the most favorable terms given by

Licensee or a Sublicensee to a Customer for the same or comparable Licensed Product. Further, if Licensor desires to distribute and/or sell Licensed Product that is exclusive to Licensor through Licensor's web site, then Licensor shall so notify Licensee of its requirements therefor and Licensee shall manufacture (or cause the manufacture) of such exclusive Licensed Product in the quantities requested by Licensor and shall sell same solely to Licensor or Licensor's designee at the lowest price and on the most favorable terms given by Licensee or a Sublicensee to a Customer for comparable product. Licensee acknowledges and agrees that Licensed Product purchased by Licensor pursuant to this Paragraph may be advertised, promoted, manufactured, distributed and sold through any Licensor Channel at any time throughout the world.

3.3    Premiums/Consumer Marketing. Notwithstanding anything to the contrary contained in this Agreement or otherwise, Licensor retains all rights not expressly licensed to Licensee pursuant to this Agreement, including, without limitation, the exclusive right to license to Licensee or to any third party the right to manufacture, market, conduct advertising, distribute or sell any Licensed Product in connection with any Premium or Consumer Marketing. In this connection, if Licensee is selected by Licensor or by Licensor's designee to manufacture, market, distribute or sell any Licensed Product manufactured and packaged by Licensee as part of such arrangement, then Licensor and Licensee shall negotiate on good faith toward an agreement regarding any such Premium or Consumer Marketing and, without limitation, Licensee shall supply such Licensed Product to Licensor or Licensor's designee at an amount equal to the lowest price given by Licensee or any Sublicensee to any Customer for the same or comparable Licensed Product.

4.    LICENSOR APPROVALS:

4.1    Proposed Product & Marketing Plans. In addition to the foregoing, Licensee shall submit to Licensor for Licensor's approval a thorough and detailed Proposed Product & Marketing Plan (in Licensor's standard form[s], as such form may be modified from time to time) regarding the development, production, manufacture, distribution, advertising and/or sale of each and every Licensed Product, all in accordance with Exhibit II attached hereto and incorporated by this reference. Each such submission shall occur prior to the product development, manufacture, production, distribution, marketing, shipment or sale of any Licensed Product hereunder for the applicable time period to which a Proposed Product & Marketing Plan relates, together with any relevant Quarterly Updates. If Licensor disapproves all or any part of a Proposed Product & Marketing Plan, Licensee shall revise such Proposed Product & Marketing Plan (or any **Plan Element** thereof), as the case may be, and re-submit same to Licensor for its approval again pursuant to this Subparagraph, until such Proposed Product & Marketing Plan (or **Plan Element**), as the case may be, is approved by Licensor. Licensor's approval of any one Proposed Product & Marketing Plan or Quarterly Update shall not be deemed to constitute Licensor's approval of any other Proposed Product & Marketing Plan or Quarterly Update, as the case may be.

4.2    Copyright Materials. Prior to the manufacture, production, distribution, marketing, shipment, sale or use by Licensee of any Licensed Product or the use, printing, duplication or application of any other Copyright Material including any of the following, or of any modification(s) thereof, Licensee will submit to Licensor for Licensor's approval, and shall concurrently therewith complete Licensor's then-current applicable Standard Approval Form for, each and every:

(a)    Licensed Product, including, but not limited to, the initial concepts, design documents, scripts, copy, alpha version, beta version, unpainted sculpt, painted sculpt, prototype and manufacturing sample;

(b)    audio and/or visual material (including, without limitation, artwork, photographs, images and designs and web site materials) incorporating any part of the Licensed Property, including, without limitation, initial concepts, preliminary designs and final artwork intended for any use hereunder including, without limitation, all uses in connection with any use of Licensed Property in connection with Subparagraph 2.10 hereinabove (the "Designs"); and

(c)    carton, container, packaging, instruction, tag, label, wrapping and any other material for any Licensed Product and/or for any advertising, marketing, publicity, promotional or other material related to any Licensed Property to be used hereunder and/or Licensed Product (including, by way of illustration, but without limitation, any audio and/or visual material, banner, graphic image, catalog, flyer, sales sheet, package insert, point-of-purchase or display material or any trade, Consumer Marketing [if any] and other marketing or similar advertisements or announcements), whether or not any such material makes use of the Licensed Property (each such material an "Advertising Material"). Each and every Advertising Material submitted in a language other than English will be accompanied by a complete and accurate English translation thereof.

Without limiting the generality of the foregoing, Licensor shall have the sole right to approve and/or, at its election, develop the conceptualization, design, creation, preparation and exploitation of all marketing concepts, plans, materials and/or activities (including any retail sales activities) involving any use of Licensed Property in connection with this Agreement. If and to the extent Licensee is permitted, if at all and with Licensor's prior written consent, to display on the Internet any Licensed Property in connection with its advertising and/or marketing rights hereunder, Licensee shall place or cause to be placed on each applicable web site an appropriate copyright or other notice approved or provided by Licensor with respect to all Licensed Property, Licensor

Trademarks and other intellectual property of Licensor and/or its contracting parties and a clearly visible and legible written statement expressly prohibiting the use of any Licensed Property other than for "private, non-commercial home use."

4.3    <u>General</u>. Licensor has absolute approval in its sole discretion of all Proposed Product Plans, all Annual Product & Marketing Plans and all Copyright Materials, at all stages of the development, production and application thereof. Licensee agrees to strictly adhere to all of Licensor's product approval procedures, to comply with all of Licensor's style and legal guides provided to Licensee (including the Sourcebook), and to cause all parties with whom it contracts relative to the Licensed Products to do so. If any alteration or modification to any Copyright Material is made, it shall be made at Licensee's sole cost and each such alteration and modification shall be submitted to Licensor for further written approval in accordance with this Paragraph 4 unless and until Licensee has received Licensor's approval thereof in the manner prescribed herein. Licensee shall ensure that each and every Licensed Product, in its finished goods form, shall in all material respects be an accurate representation of the prototype sample for the applicable Licensed Product as approved by Licensor. Licensor's approval of any item or element in accordance with this Paragraph 4 with respect to any Proposed Product & Marketing Plan, Licensed Product or other matter shall not be deemed to be approval of such item or element with respect to the use of such item for any other Proposed Product & Marketing Plan, Licensed Product or other matter, whether or not similar. Licensee's timely submission of and compliance with the material terms of each Proposed Product & Marketing Plan approved by Licensor is of the essence of and deemed to be a material term of this Agreement. Any acts by Licensee contrary to the terms of this Paragraph 4 shall be deemed a material breach of this Agreement entitling Licensor, in addition to any and all remedies it may have at law and in equity, to terminate this Agreement.

4.4    <u>Quality Assurance</u>. Licensee shall ensure that the form, quality and standard of all materials used in the connection with each Licensed Product conform to that of the samples approved by Licensor pursuant to this agreement and complies with all good manufacturing practices relevant to any Licensed Property and/or Licensed Products including methods of storage and with all laws and regulations relevant to any Licensed Product(s) including, without limitation, any and all relevant regulations and other Applicable Laws concerning the Licensee's web site and/or the advertising, marketing, manufacture, sale or promotion, labeling or marking of such Licensed Product(s) hereunder. Any modification by Licensee to any Licensed Product previously approved above shall be submitted to Licensor for written approval as if the same were new and without approval.

4.5    <u>Right To Inspect</u>. Licensee shall allow Licensor and/or Licensor's duly authorized representative the right to inspect samples of the Licensed Product at any time and on reasonable notice, and shall afford it every reasonable assistance and allow or procure them access to any of Licensee's premises or other premises where any Licensed Product is being created or held to Licensee's order, for so long as any use is made of the Licensed Property.

4.6    <u>Recall Of Product</u>. Licensee agrees to recall immediately on the demand of Licensor any or all Licensed Products which fail to conform to the samples approved by Licensor pursuant to this Agreement or which Licensor reasonably suspects to be defective for any other reason and cease the distribution and/or sale of such Licensed Products until such time as the Licensed Products have been corrected to Licensor's satisfaction. Licensee will at all times have in place appropriate procedures to ensure that such recall and cessation can be carried out immediately.

5.    <u>ARTWORK, CLIPS AND MUSIC; COPYRIGHT MATERIALS:</u>

5.1    <u>Artwork, Clips and Music</u>. Licensee agrees and acknowledges that, notwithstanding the license granted by Licensor under this Agreement, use of any visual material, musical material, audio representation and/or audiovisual material relating to the Licensed Property including, without limitation, any and all music, vocals, drafts, manuscripts, artwork, tapes, preprinted material and all positive prints of footage (whether or not supplied by Licensor) (collectively "Artwork, Clips and Music") may require license payments independent of and unrelated to Licensee's obligations to make payments to Licensor of Advance(s) and Royalties under this Agreement. Examples of such licenses and/or payments include, without limitation, rights and/or residual payments to talent, trade unions and guilds, reuse fees, master use fees, synchronization licenses and residuals. Licensee agrees and acknowledges that Licensee may in addition be required under any applicable talent agreements or collective bargaining agreements to obtain releases from third parties, including, without limitation, performers, artists, talent, unions and/or guilds, for use of Artwork, Clips and Music.

5.2    <u>Approvals</u>. Licensee shall not have the right to make any use of the Licensed Property, including, without limitation, any Artwork, Clips and Music, without first obtaining any required authorization, release, approval or license, and the prior written approval of Licensor, exercised in its good faith discretion. Licensee shall be solely responsible for any and all payments required with respect to the use of any Artwork, Clips and Music in connection with a Licensed Product and the marketing, advertising, sale, distribution and/or promotion thereof. All specific uses of any Artwork, Clips and Music shall be subject to the prior written approval of Licensor, as provided in Paragraph 4 above, but the granting of such approval does not negate Licensee's obligations under this subparagraph 5.2.

6

5.3    <u>Licensee's Expense.</u>

Licensee shall pay to Licensor, within thirty (30) days after Licensee's receipt of an invoice therefor, any and all fees in excess of One Thousand Dollars ($1,000) relating to the production, duplication and shipping of Copyright Materials for Licensee; provided, however, that Licensor shall lend to Licensee, free of charge, one (1) copy of Licensor's standard style guide/sourcebook containing CDs with images for the Licensed Property (the "Sourcebook"), subject to Subparagraph 5.4 hereinbelow. The payment obligations by Licensee set forth in this subparagraph 5.3 shall apply to any original artwork done at Licensee's request by Licensor, or by third parties under contract to Licensor. Licensee will pay for all costs arising in any way by reason of the license granted and the uses of any Copyright Materials hereunder including, without limitation, all production, duplication, transfer, handling, shipping, conversion fees and charges, as well as the cost of distributing, delivery and returning such Copyright Materials and the cost of replacing any lost or damaged materials delivered to or made available to Licensee hereunder. Without limitation, as between Licensor and Licensee, Licensee shall be solely responsible for obtaining any necessary licenses for and paying for any and all authorized electronic transmission(s) authorized hereunder of any Licensed Property.

5.4    <u>Delivery/Return of Materials.</u> Licensee agrees to deliver (free of charge) to Licensor, or to give reasonable access to Licensor and Licensor's designees, free of charge, any and all Copyright Materials (in such formats, including, without limitation, high resolution files, electronic or otherwise, as Licensor may, in its sole discretion, request) for duplication and other purposes. Upon the earliest to occur of the completion of its use thereof, the expiration of the Term hereof or the termination of this Agreement, Licensee at its sole expense (including, without limitation, shipping and handling) shall return all Copyright Materials (including, without limitation, Licensor's Sourcebook) still remaining in Licensee's possession or control which was delivered to or made available to Licensee hereunder and such delivery shall be to Licensor or to such other source or location(s) as Licensor shall designate. In any event, Licensee's return of such Copyright Materials must occur no later than the Initial Shipment Date for the applicable Licensed Product to which any such Artworks, Clips and Music relates, unless Licensor otherwise agrees in writing.

6.    <u>PRODUCT SAMPLES:</u>

6.1    <u>Sample Requirement.</u> Upon commercial release of each version of each and every Licensed Product (including, without limitation, each language version and modified version) by or for Licensee, Licensee will furnish to Licensor at no cost the following items, as well as all respective containers, tags, labels and packaging therefor, not later than thirty (30) days prior to the Initial Shipment Date of each and every version of a Licensed Product SKU the following number of samples:

(a)    six (6) samples (twelve [12] if the Licensed Products are collectibles or toys) of each version of a Licensed Product SKU having a suggested retail selling price of One Hundred Dollars ($100) or less, six (6) samples (twelve [12] if the Licensed Products are collectibles or toys) of each version of a Licensed Product SKU having a suggested retail selling price of over One Hundred U.S. Dollars ($100) but less than Two Hundred Dollars, and six (6) samples (twelve [12] if the Licensed Products are collectibles or toys) of each version of a Licensed Product SKU having a suggested retail selling price of such SKU of more than Two Hundred Dollars ($200);

(b)    six (6) samples of all advertising, promotional and display materials referencing each such version of a Licensed Product SKU; and

(c)    one (1) DVD copy of any film or video advertising material for referencing each such version of a Licensed Product SKU.

6.2    <u>Reimbursement of Costs.</u> If Licensor requests samples in addition to those set forth above, Licensee will supply to Licensor such additional samples at Licensee's direct out-of-pocket cost of manufacture. If Licensee fails to timely provide Licensor with the samples of any Licensed Product version so requested by Licensor, then, without limitation, of Licensor's rights and remedies in such event, Licensee shall reimburse to Licensor an amount equal to one-hundred percent (100%) of all costs and charges (including, without limitation, shipping and handling) incurred by Licensor in obtaining such samples on its own, within thirty (30) days of its receipt of Licensor's invoice therefor. Licensee's repeated failure to provide to comply with the requirements of this Paragraph 6 shall, at Licensor's option, be deemed a material breach of this Agreement.

6.3    <u>No Royalty to Licensor on Samples.</u> No samples supplied to Licensor pursuant to this Paragraph 6 shall be subject to the Royalty obligations to Licensor pursuant to this Agreement.

7.    <u>ADVANCES / ROYALTIES:</u>

7.1    <u>Advances.</u> Licensee shall pay to Licensor each of the amounts set forth in Clause I of this Agreement (each such amount an "Advance" herein) on or before the due date provided in Clause I

above, which amounts shall constitute non-returnable advances against and recoupable from Royalties otherwise payable to Licensor hereunder.

7.2    ROYALTIES.

    (a)    Royalty Amount. Licensee will pay to Licensor an amount for each unit of the Licensed Products hereunder equal to the percentage of Net Sales set forth in Clause I(2) of the Agreement (the "Royalties").

    (b)    Net Sales. "Net Sales" means one hundred percent (100%) of all gross amounts (subject to Subparagraphs 7.2[g] and 7.2[h] hereinbelow) derived by Licensee or a Sublicensee, as the case may be, from the "sale" (as defined in Subparagraph 15.50 hereinbelow) of each and every Licensed Product hereunder, calculated on the greatest of the following: (i) the highest list price specified by Licensee in the Annual Product and Marketing Plan for the applicable Permitted Distribution Channel (e.g. the mass, mid-tier, specialty and direct classes of trade) without discount; or (ii) the amount actually charged for each Licensed Product by Licensee or a Sublicensee, as the case may be, for the applicable Permitted Distribution Channel; or (iii) the amount actually received for each Licensed Product by Licensee or a Sublicensee, as the case may be, for the applicable distribution channel; or (iv) the average of the highest invoice price charged to customers in a particular distribution channel calculated by adding the highest invoice prices shown on 10% of such invoices and dividing the result by the number of invoices (such greatest amount is sometimes hereinafter referred to as the "List Price"); less only the "Allowable Deductions" (as defined hereinbelow). Other than the Allowable Deductions, there shall be no deductions from or reductions of Net Sales of any kind, including, but not limited to, deductions for returns, cash payment discounts or freight discounts or any allowances or reserves of any kind, including for uncollectible or uncollected amounts (whatever the reason), so-called "free goods," any costs incurred in connection with the product development, manufacture, distribution or sale of a Licensed Product, any general or administrative costs of any kind; any taxes, freight, insurance or other transportation costs; or any other costs or expenses of any nature.

    (c)    Allowable Deductions. The term "Allowable Deductions" means the following:

        (i)    any and all reasonable and actual trade or promotional discounts and allowances which are shown on an invoice and which do not exceed in their totality three percent (3%) of the list price set forth in the Annual Product and Marketing Plan; and

        (ii)    returns supported by credit memos actually issued to a "Customer", provided that such returns may not exceed three percent (3%) of the total invoiced amount during the life of the contract (regardless of whether such returns are the result of return policies, defective products, product warranties, stock balancing, price protection or any other provision or obligation).

    (d)    F.O.B. or Ex Works. Notwithstanding anything to the contrary contained herein, unless otherwise specified in Clause I.(2) of the Basic Terms, the applicable Royalty for a Licensed Product sold on a F.O.B., Ex Works or similar basis ("F.O.B. Product") shall be the applicable non-F.O.B Royalty Percentage of Net Sales set forth in Clause I(2) hereinabove multiplied by 1.67 (the "F.O.B. Royalty").

    (e)    Rebates, Discounts, Deductions. Notwithstanding anything to the contrary contained in Subparagraph 7.2(b) hereinabove, there shall be no rebates, discounts, allowances, deductions from or reductions to the gross amounts derived by Licensee or a Licensee-Related Entity with respect to a Licensed Product as a result of the manufacturing, distribution, marketing, promotion or sale of a product, good or article that is not a Licensed Product.

    (f)    Bundling. Licensee shall not have the right to distribute, market or sell (or authorize a third party to distribute, market or sell) any Licensed Product with any other product, good or article (other than another Licensed Product) in a single package at a single price ("Bundling") without Licensor's prior written approval of whether or not such Bundling may occur, the terms and conditions of such Bundling, and Licensor's Royalty in such instance.

    (g)    Evaluation Units. Any shipment or other distribution by Licensee or a Sublicensee of a promotional or evaluation unit to a third party ("Evaluation Unit") of any Licensed Product will be deemed Net Sales and shall be calculated at an amount equal to the List Price for such Licensed Product for the applicable Permitted Distribution Channel in the applicable country from the time of its initial commercial release until the date of such shipment or, if such Licensed Product has not been commercially released, at an amount equal to the List Price for a comparable Licensed Product for the applicable Permitted Distribution Channel in the applicable country from the time of its initial commercial release until the date of shipment of such Evaluation Unit, except to the extent that Licensee has obtained Licensor's prior written consent to exempt an Evaluation Unit of a Licensed Product from Licensee's Royalty obligations hereunder.

8

(h)    <u>VAT</u>.  Any VAT that is included in the List Price of a Licensed Product SKU shall not be treated as part of the gross amounts used to determine the amount of Net Sales. Accordingly, Licensee shall not pass along to Licensor and Licensor shall not bear any VAT incurred in connection with any Licensed Product.

(i)    <u>Sales In Violation</u>.  If Licensee sells any Licensed Product(s) in violation of the terms and/or conditions of this Agreement (including without limitation without the appropriate written approval from Licensor as described in this Agreement, or outside of the Permitted Distribution Channels, or outside the Territory), then notwithstanding anything contained in this Agreement, and without limitation, the Royalty payable to Licensor with respect to such Licensed Product(s) shall be one hundred percent (100%) of all gross amounts derived by Licensee or a Sublicensee from such sales.

(j)    <u>No Waiver</u>.  Acceptance of any sums by Licensor by way of Advances, Royalties or otherwise shall not prevent Licensor at any time from disputing or demanding particulars with reference to the amounts due nor shall such acceptance constitute Licensor's waiver of any breach by Licensee of any terms hereof.

(k)    <u>No Carryover</u>.  If the parties agree to an extension of the Term and if, on the expiration of the Term, any Advance shall not have been recouped by the applicable Royalties paid to Licensor, then the shortfall will not be carried forward to any extension of the Term.

(l)    <u>List Prices</u>.  Licensee shall submit to Licensor in writing a complete set of its List Prices no later than thirty (30) days prior to the date of the first sale of Licensed Products hereunder, which List Prices shall be resubmitted to Licensor as and when same are revised or modified by Licensee during the Term.

8.    <u>STATEMENTS, PAYMENTS AND AUDITS</u>:

8.1    <u>Payment Terms</u>.  Licensee will wire transfer to Licensor (as immediately available funds) all sums due to Licensor hereunder for Licensor's receipt thereof within thirty (30) days following the end of each calendar quarter based on the Net Sales of Licensed Products in such calendar quarter. Net Sales generated hereunder shall be reported to Licensor in respect of the calendar quarter in which such Net Sales are paid or reported by Licensee, whichever first occurs.  All payments to be made pursuant to this Agreement will be in United States currency.  Late payments will accrue, and Licensee's statements and payments hereunder shall reflect, interest charges from the due date through the date of payment at an interest rate equal to three percent (3%) over the prime lending rate set by the Bank of America N.T.S.A., or the maximum legal rate, if such maximum legal rate is lower, and shall be payable upon demand.

8.2    <u>Remittance of Funds</u>.  In the event that payments are made to Licensor hereunder, all compensation amounts stated in the Agreement, including, without limitation, Advances and Royalties accrued and/or payable to Licensor pursuant to the Agreement shall be computed, accrued, paid and remitted to Licensor in U.S. Dollars.  It shall be Licensee's sole responsibility and expense to obtain the approval of any governmental authorities to take whatever steps that may be required and to comply in all respects with all applicable laws and regulations in order to remit funds to Licensor.  All monies, including, without limitation, Royalties, due to Licensor hereunder shall be payable to Licensor's account and/or shall be remitted to Licensor in U.S. Dollars (except as otherwise agreed by Licensor in writing, if at all), and, the rate of conversion to U.S. Dollars from the local currency of a source country other than the United States shall be the official government rate of exchange for such currency which is in effect according to the *Wall Street Journal* either:

(i)    on the date the relevant statement is due (if no Royalties are actually payable to Licensor with such statement); or

(ii)   on the date payment is due (if Royalties are actually payable to Licensor) or, if payment to Licensor is late, then the rate of exchange published in the *Wall Street Journal* on the date payment is due or the date of actual payment, whichever yields the higher amount of U.S. Dollars.

8.3    <u>Royalty Report</u>.  WITHIN THIRTY (30) DAYS AFTER THE CLOSE OF EACH CALENDAR QUARTER, LICENSEE WILL PREPARE AND DELIVER TO LICENSOR A ROYALTY REPORT IN LICENSOR'S STANDARD ROYALTY REPORT FORM, AS SUCH FORM SHALL BE MODIFIED BY LICENSOR FROM TIME TO TIME ("ROYALTY REPORT FORM").  A current copy of such Royalty Report Form is attached hereto as Exhibit III and incorporated herein by this reference.  A Royalty Report Form will be due each calendar Quarter of the Term and of the Sell-Off Period (if applicable) whether or not Royalties are payable to Licensor hereunder.

8.4    <u>Licensee's Records</u>.  During the Term and for not less than three (3) years after the expiration or termination thereof, Licensee will maintain complete and accurate records of all transactions relating to this Agreement and/or Licensee's rights and/or obligations hereunder including, but not limited to, the data and information contained in the Royalty Report (collectively "Licensee Records").

8.5    Inventory.  At the request of Licensor, Licensee shall submit a statement showing the number and description of Licensed Products manufactured, shipped, distributed, on hand and/or in process. Licensor shall have the right at any time to take a physical inventory to ascertain such information and/or verify such inventory statement.

8.6    Audits.  Licensor or any independent auditor selected by Licensor may from time to time, but not more frequently than once per Calendar Year, upon reasonable notice and during normal business hours, inspect (with respect to audits conducted in the Territory) at Licensee's main headquarters located in the Territory any and all Licensee Records maintained by Licensee in the Territory and such audit samples from other countries as may be requested by Licensor and (with respect to audits outside of the Territory) wherever such records are kept outside of the Territory.  If, upon performing such audit, it is determined that Licensee has underpaid Licensor, Licensee will immediately make full payment of all monies due under Paragraph 7 hereinabove.  If the amount of underpayment exceeds Five Thousand U.S. Dollars (U.S. $5,000) of the payments due Licensor in the period being audited, Licensee will bear all direct expenses and costs related to such audit in addition to its obligation to make full payment under Paragraph 7 hereinabove. Further, Licensee agrees that it shall modify Licensee's accounting procedures as set forth in the audit findings in order to ensure future compliance with the provisions of this Agreement.  In addition, if such inspection and audit reveals a discrepancy of more than three percent (3%) between the book inventory versus the physical inventory, Licensee shall be required to pay to Licensor the Royalty based on the difference between the book inventory and the physical inventory for each of the Licensed Products.  If such inspection and audit reveals any Royalty payments due to Licensor of twenty percent (20%) or greater for the period covered by such inspection, then, in addition to any and all other rights, legal and/or equitable, of Licensor, Licensor shall have the right to immediately terminate the Agreement upon notice to Licensee. Without limiting the foregoing, if such inspection and audit reveals any sale of Licensed Product(s) in violation of any term and/or condition of this Agreement, then the provisions of subparagraph 7.2(i) shall also apply.  All underpayments and late payments will be subject to interest charges, at the rate specified for late payments in Subparagraph 8.1 hereinabove, calculated from the due date to the actual payment date.  The obligation to maintain records and to grant Licensor and Licensor's representatives access to such records shall survive the expiration or earlier termination of this Agreement.

8.7    Taxes.

    (a)    No taxes of any kind may be deducted from any Royalties or gross amounts derived with respect to the sale of any Licensed Product.

    (b)    If and only to the extent that Royalties hereunder are remitted to Licensor from a jurisdiction having a tax withholding requirement, then Licensee is authorized by Licensor to deduct and to withhold from Royalties generated from such jurisdiction any withholding tax imposed by such jurisdiction at the local statutory rate or lower income tax convention rate, if applicable; provided, however, that:

        (i)    the Royalties due to Licensor with respect to any particular units of a Licensed Product may not be reduced by withholding taxes from more than one taxing jurisdiction, and

        (ii)    such tax payments made by Licensee on behalf of Licensor may not reduce the amounts payable and paid to Licensor under this Agreement by more than the applicable withholding taxes of the relevant taxing jurisdiction.  Licensee shall promptly provide Licensor with notification of and official receipts for all tax payments made on Licensor's behalf pursuant to this Agreement.  If within forty-five (45) days after each payment is made hereunder, Licensor has not received either:

            (A)    an authenticated withholding tax certificate (stamped by the appropriate tax authority); or

            (B)    written evidence by Licensee (in form satisfactory to Licensor) that Licensee has filed an application to receive a withholding tax certificate from such tax authority, then Licensee shall immediately pay to Licensor an amount equal to the amount previously withheld by Licensee from such payment, divided by 1 minus the applicable withholding tax rate, (e.g., if the tax withheld was $15, and the withholding tax rate was 15%, then Licensee shall remit to Licensor $15 / 85%, or $17.65).

    (c)    It shall be Licensee's sole responsibility to obtain at its expense the approval of any governmental authorities; to take whatever steps may be required to remit funds to Licensor; and to comply in all respects with all Applicable Laws.

8.8    Blocked Funds.  Any monies accrued to Licensor or received in a currency in the Territory which cannot be converted into U.S. Dollars and cannot be promptly remitted to Licensor in the United States because such monies are restricted due to moratorium, embargo, banking regulations, exchange restrictions or other governmentally-imposed restrictions against such conversion and remittance (such restricted monies the "Blocked Funds") shall be deposited into an account in Licensor's (or Licensor's designee's) name either within or without the Territory (at Licensor's

election), and Licensee shall immediately notify Licensor in writing of such deposit (including the name of bank, account number, amounts deposited). Blocked Funds shall not be treated as Advances or Royalties or otherwise accrue to Licensor's account hereunder unless and until such Blocked Funds are so deposited and Licensor has received written notice thereof as required above.

8.9    <u>Net Sales to Licensee Affiliates</u>. With respect to the Net Sale of any Licensed Product to any Licensee Affiliate (or to any employee, officer, director, shareholder of Licensee or of a Licensee Affiliate) at a special price or at a price less than the List Price, Licensee shall pay Royalties based upon either the List Price (regardless of the price charged by Licensee to such License Affiliates) or upon the highest Net Sales price charged by the applicable Licensee Affiliates on sales of such Licensed Products to customers or other entities which are not Licensee Affiliates, whichever yields the larger amount of Royalties to Licensor.

9.    <u>OWNERSHIP:</u>

9.1    <u>Ownership</u>. Licensor represents and warrants that it has the right to grant the license granted by this Agreement. Licensee acknowledges and agrees that, as between Licensor and Licensee, the Licensed Property is owned solely and exclusively by Licensor. Further, Licensee acknowledges and agrees that all worldwide perpetual right, title and interest in and to each and every Copyright Material immediately from inception is and shall remain the sole, exclusive property of Licensor and be owned solely and exclusively by Licensor including, without limitation, all worldwide, perpetual copyrights therein (and all renewals and extensions thereof) and all other intellectual property rights in and to such Copyright Material, and Licensor shall have the right to use, and authorize others to use, such Copyright Material in any manner and by any means and media in perpetuity throughout the world without restriction.

9.2    <u>Employment for Hire</u>. Licensee acknowledges that the Licensed Property is owned solely and exclusively by Licensor. Licensee has caused or shall cause any Copyright Material created or contributed (in whole or in part) to any Copyright Material as a result of the services of any employee of Licensee, as well as the results and proceeds of such services, to constitute a "work made for hire" (as that term is understood in the U.S. Copyright Law) within the scope of such employee's employment for Licensee. Each such Copyright Material and the results and proceeds of such employee's services in connection therewith are freely assignable by Licensee, and are hereby assigned, to Licensor hereunder.

9.3    <u>Assignment of Contractors</u>. Licensee at its sole expense will obtain from each third party who is not an employee of Licensee and who is engaged to assist with or contribute to the development or creation of any Copyright Material, prior to and as a condition of such engagement, a complete written assignment to Licensor, in Licensor's standard form, as such form may be revised from time to time, such that Licensor shall acquire from Licensee or such third parties all right, title and interest in, to and with respect to such Copyright Material and the results and proceeds of such third party in connection therewith are assigned to Licensor in accordance with this Agreement.

9.4    <u>Assignment by Licensee</u>. Licensee hereby assigns, transfers and conveys to Licensor all right, title and interest that Licensee may have in the Licensed Products and in any Copyright Material, including any and all intellectual property rights therein and goodwill associated therewith. Licensee hereby, on behalf of itself, its employees and its contractors, irrevocably transfers and assigns to Licensor, and waives and agrees never to assert, any and all Moral Rights which Licensee, any of its employees or any of its contractors may have in or with respect to the Licensed Property or in or to any Copyright Material, even after expiration or termination of this Agreement. Notwithstanding the foregoing and any provision to the contrary in this Paragraph 9, Licensor agrees and acknowledges that, as between Licensor and Licensee, Licensee remains the owner of all tangible rights in and to all physical inventory of Licensed Products, subject to Licensor's rights with respect thereto in the event of a termination pursuant to Paragraph 14 hereinbelow.

9.5    <u>Ownership of Production Materials</u>. In addition to Licensor's other rights and remedies hereunder, if Licensee is in material breach of this Agreement or if the Agreement, in whole or in part, is terminated prior to the expiration of the Term then, at Licensor's sole option exercisable within one hundred eighty (180) days of the termination date by written notice to Licensee, Licensee shall transfer, assign and deliver to Licensor, and shall cause all Sublicensees and Manufacturers to transfer and assign to Licensor the full, complete and immediate ownership and possession of any and all physical, tangible tools, molds and printing plates used in the development or production of any and all Copyright Material including, without limitation, any Licensed Product created pursuant to this Agreement which reproduce any aspect of the Licensed Property (collectively "Production Materials"), whether or not developed by or on behalf of Licensee, a Licensee Affiliate, a Sublicensee, a Manufacturer or any third party.

10.    <u>REPRESENTATIONS AND WARRANTIES; INDEMNITIES:</u>

10.1    <u>Licensor's Warranties</u>. Licensor represents and warrants: that it is a corporation duly organized under applicable law; and that it has the full right, power and authority to enter into and to perform this Agreement and to grant the rights licensed to Licensee pursuant to Paragraph 1 hereinabove. Licensor makes no representation or warranty as to the amount of receipts Licensee will derive

hereunder or as to the quality, rating or success of any Picture or reception it will receive by the public, nor shall Licensor be obligated to distribute, exhibit or exploit any Picture or to continue to use any of the Licensed Property.

10.2   <u>Licensee's Warranties</u>. Licensee represents and warrants that:

(a)   it has the full right, power and authority to enter into and to perform this Agreement;

(b)   neither the use of Licensee's name, logos and/or any intellectual property of Licensee or of any third party(ies) in connection with any Licensed Property or any Licensed Product nor any of the obligations and agreements made or assumed by Licensee does or will violate the right of any party whatsoever;

(c)   it will not harm or misuse the Licensed Property or bring the Licensed Property into disrepute;

(d)   it will not create any expenses chargeable to Licensor without the prior written approval of Licensor;

(e)   it and all others authorized by it or acting on its behalf will comply at all times hereunder with all applicable laws, rules and/or regulations relating, affecting or pertaining to the use of any Licensed Property (including, without limitation, laws relating to tax, advertising, promotional offers and/or privacy) and to all applicable laws, rules and/or regulations relating, affecting or pertaining to the taxation, manufacture, sale, advertising, marketing, promotion, safety and/or use of each and every unit of a Licensed Product sold hereunder (individually and collectively the "Applicable Law[s]");

(f)   it shall maintain the highest quality and standards of Licensee in effect as of the Start Date, as well as the international brand image created by Licensor in respect of the Property from time to time; and

(g)   it will diligently and continuously manufacture, distribute, and sell the Licensed Products in each country within the Territory, subject to the terms and conditions of this Agreement;

(h)   it will enter into a valid and binding agreement with each Retail Entity and Distributor to whom it sells any Licensed Product expressly prohibiting such Retail Entity or Distributor from directly or indirectly selling or distributing any Licensed Product to or through an Excluded Distribution Channel in contravention to the terms and conditions of this Agreement, and if such Retail Entity is an Internet Retail Entity, requiring that such Internet Retail Entity post a notice on its web site(s) that the Licensed Products are not available for shipment outside the Territory (and requiring that such Internet Retail Entity shall not fulfill orders to locations outside of the Territory, subject to Applicable Laws); Licensee shall enforce all such agreements and shall promptly inform Licensor if it knows or has reason to suspect that any such agreement has been breached with respect to any Licensed Product;

(i)   it will not accept, and shall cause all employees and independent contractors not to accept, any third party creative submissions on Licensor's behalf which have not been expressly authorized by Licensor; and

(j)   it will not use or authorize the use of the name or intellectual property of any Licensor-Related Entity, nor any Licensed Property, nor any talent, nor any association with any of the foregoing to endorse, directly or indirectly, any product or service except as expressly authorized in writing by Licensor.

10.3   <u>Licensor's Indemnity</u>. Licensor shall indemnify and hold harmless Licensee from any and all losses, liabilities, damages, fines, judgments, settlements, costs and expenses (including, without limitation, any reasonable counsel fees and costs, whether or not in connection with litigation) to the extent arising out of any claims or suits brought or made against Licensee arising solely out of the use by Licensee of the Licensed Property as authorized by Licensor pursuant to this Agreement.   Licensor shall have the option to undertake and conduct the defense of any suit so brought. If Licensor undertakes such defense and Licensee nevertheless retains its own counsel to monitor such defense, Licensee shall be solely responsible for the fees and any other expenses related to such counsel.

10.4   <u>Licensee's Indemnity</u>. Except to the extent of Licensor's obligations under Subparagraph 10.3 hereinabove, Licensee shall indemnify and hold harmless Licensor from any and all losses, liabilities, damages, fines, judgments, settlements, costs and expenses (including, without limitation, any reasonable counsel fees and costs, whether or not in connection with litigation) to the extent arising out of any claims or suits brought or made against Licensor by reason of the breach by Licensee of any warranty, representation or obligation made by Licensee hereunder including, without limitation, and any such claims or suits brought arising out of or in connection with any of Licensee's obligations pursuant to this Agreement, including, without limitation, Subparagraph 13.2 hereinbelow and/or any of the following:

(a)   any unauthorized use of Licensed Property by Licensee or any person, firm or entity with whom Licensee contracts;

(b)   any alleged defects or any inherent danger in any Licensed Product;

(c)     any infringement or violation of any copyright, patent, trademark, trade secret or other intellectual property or proprietary right of any third party in connection with any Copyright Material;

(d)     any libel, slander, other forms of defamation, plagiarism, piracy or unfair competition resulting from the alleged unauthorized use of any intellectual property or material; and/or

(e)     any breach of contract, implied in fact or in law, resulting from the alleged submission, acquisition or use of any material related to the Licensed Property and used by Licensee.

Subject to Licensor's prior written approval, Licensee shall have the option to undertake and conduct the defense of any suit so brought, provided, that in addition Licensee's selection of counsel shall be subject to Licensor's prior approval, and further, provided, that Licensee regularly consults with Licensor regarding such defense. Licensee will not enter into any settlement of any claims or suits without the prior written approval of Licensor. If Licensee undertakes such defense and Licensor nevertheless retains its own counsel to monitor such defense, Licensor shall be solely responsible for the fees and any other expenses related to such counsel. Licensee shall not at any time defend on its own behalf any action arising directly or indirectly from any claim that the Licensed Property (or any element of it) infringes or otherwise violates any rights of any third party.

11.    **INSURANCE:**

11.1    <u>General</u>. Licensee will, throughout the term of this Agreement and for a period not less than three (3) years following termination or expiration of this Agreement, maintain insurance obtained from a reputable carrier acceptable to Licensor adding Licensor and each and every Licensor-Related Entity as additional insureds to each insurance policy to which this Paragraph 11 applies, covering claims brought and/or arising anywhere in the world relating to the Licensed Property.

11.2    <u>Coverage</u>. Licensee shall cause Licensor and all Licensor-Related Entities to be added as additional insureds to Licensee's Commercial General Liability Insurance Policy by endorsement to such policy, which policy shall provide coverage for any and all claims, demands and causes of action for personal injury and/or property damage arising out of or purporting to arise out of any defects in or failure to perform by any Licensed Product and/or any physical or intangible material used in connection therewith in the minimum amounts required pursuant to this Paragraph 11. Licensee will also cause Licensor and all Licensor-Related Entities to be added as additional insureds to Licensee's standard errors and omissions insurance policy by endorsement to such policy, which policy shall provide coverage, in the minimum amounts required pursuant to this Paragraph 11, for any and all claims, demands and causes of action applicable to standard errors and omissions including, without limitation, indemnification for any claims arising out of: (a) invasion or infringement of or interference with the right of privacy or publicity, whether under common law or statutory law; (b) infringement of copyright or trademark, whether under statutory or common law; (c) libel, slander or other forms of defamation; (d) plagiarism, piracy or unfair competition resulting from the alleged unauthorized use of titles, formats, ideas, characters, plots, performers, or other material; and/or (e) breach of contract, implied in fact or in law, resulting from the alleged submission, acquisition or use of program, musical or literary material used in connection with the subject matter of this Agreement.

11.3    <u>Liability Limits</u>. Each and every policy required pursuant to this Agreement shall have normal deductibles and shall have limits of liability of at least Ten Million Dollars ($10,000,000) per occurrence and Ten Million Dollars ($10,000,000) in the aggregate. Each such policy shall provide for thirty (30) days' notice to Licensor from the insurer by registered mail, return receipt requested, in the event of any modification, cancellation or termination of such policy. Licensee will: (a) furnish to Licensor within thirty (30) days after the execution of this Agreement an actual endorsement to such policy so adding Licensor and all Licensor-Related Entities as additional insureds thereto and Licensee, (b) provide Licensor with a certification from Company's insurance carrier confirming that Licensor and all Licensor-Related Entities have been so added, and (c) cause such policy to provide that the coverage afforded to Licensor is primary, and not in excess of or contributing to any similar insurance maintained by Licensor, and (d) cause such coverage of Licensor and all Licensor-Related Entities to continue in effect until the expiration or termination of the Term plus a minimum of three (3) years thereafter.

12.    **CONFIDENTIALITY:**

12.1    <u>Announcements</u>. Each party acknowledges that the terms and conditions of this Agreement are and shall remain confidential. Neither party shall reveal such terms and conditions to any third party (excepting only statements issued to either party's attorneys, accountants, financial advisors, affiliated and subsidiary entities and statements otherwise required by law). Licensee will not make any promotional or other announcement relating to this Agreement or the rights licensed under this Agreement without prior written consent of Licensor.

12.2    <u>Licensor Information</u>. Licensee acknowledges that Licensor or any Licensor-Related Entity may disclose, orally or visually, certain information to Licensee, including, without limitation, any of the following (such information being individually and collectively the "Licensor Information" herein):

13

    (a)    any information or material concerning or pertaining to businesses, methods, plans and/or projects of Licensor or of any Licensor-Related Entity;

    (b)    any of the following related to Licensor or any Licensor-Related Entity and/or their present or future activities (including, without limitation, any pre-production, production or post-production schedule or release schedule for any Picture or for any derivative work thereof): any logo, character, place or product name; title; design; idea; concept; plan; script; schedule; language; word; creature; vehicle; report; analysis; writing; sculpture; method; process; data; list; statistic; program; research; development; project; prototype; product; good; article; survey; invention; trade secret; idea; know-how; design; deal term; drawing; business plan; Proposed Product & Marketing Plan, production plans and/or publicity plan, or other Copyright Material; and/or

    (c)    any term or condition of any agreement between Licensor and any individual or entity relating to any Picture (including, without limitation, any talent agreement).

12.3    <u>Restrictions</u>.  Licensee agrees that, from and after the Start Date and continuing in perpetuity, as follows:

    (a)    Licensee will regard and preserve as confidential to Licensor all Licensor Information that may be obtained by Licensee from any source in connection with this Agreement or as a result of Licensee's interactions with or through Licensor or any of Licensor's employees, officers, directors, independent contractors or business contacts;

    (b)    except as otherwise expressly provided in this Agreement, Licensee shall not use, copy or disclose, or authorize or permit the use, copy or disclosure of, any Licensor Information in whole or in part in any manner or to any person, firm, enterprise, organization, corporation or entity (including, without limitation, to any and all of Licensee's employees or independent contractors) for any purpose unless Licensor otherwise agrees and such third party has executed a written confidentiality agreement in form and substance acceptable to Licensor;

    (c)    Licensee agrees to restrict the use of any Licensor Information to the minimal extent necessary to effectuate an agreement between the parties, if at all, arising out of this Agreement as it applies to Licensee;

    (d)    Licensee agrees that Licensee has no right to use, and shall not use, any Licensor Information, or any materials, trademarks, or servicemarks of Licensor or of any of its employees, officers, directors or independent contractors: in any resumes, advertising, publicity, or promotion; to express or to imply any endorsement or engagement by Licensor; or in any manner other than in accordance with this Agreement; and

    (e)    Licensee shall use Licensee's best efforts to maintain all Licensor Information in the strictest confidence and to protect the confidentiality of all Licensor Information.

12.4.    <u>Exceptions</u>.  Licensee's obligations pursuant to this Agreement shall not apply to any information which is the minimum amount required to be publicly disclosed in order to comply with a valid order of a court of competent jurisdiction.

13.    <u>INTELLECTUAL PROPERTY PROTECTIONS</u>:

13.1    <u>Notices</u>.

    (a)    <u>Copyright and Trademark Notices</u>.  Licensee will place the following notice on each unit of each of the Licensed Products and on all advertising, promotional material, packaging and other material using the Licensed Property:

© (_____) Lucasfilm Ltd. & ™ (or ®, if verified in writing by Licensor)

All Rights Reserved.  Used Under Authorization.

(_____) = Year of first publication

If this notice cannot be used due to space limitations, Licensor will supply an alternative notice upon request or pursuant to Licensor's instructions.  Licensee agrees that trademarks arising from the Licensed Property will only be displayed in a form and manner approved by Licensor.  Licensor reserves the right to require changes in the required notice if Licensor in its reasonable judgment deems changes are appropriate.

    (b)    <u>Other Required Notices</u>.  As and if requested by Licensor, Licensee will place a notice on each unit of each of the Licensed Products and on any hangtags and outside packaging of each unit of each of the Licensed Products in a manner that would require impairment of the Licensed Products if such notice were to be removed, such as, for example:

"FOR SALE IN [INSERT TERRITORY HERE] ONLY"

Further, Licensee agrees that it shall specifically notify each and every Customer of Licensee in writing of such restriction.

13.2 <u>Registration and Enforcement</u>. Licensee shall assist Licensor, to the extent reasonably necessary, in protecting any of Licensor's rights to the Licensed Property. Licensor may commence or prosecute any claims or suits in its own name or (with the consent of Licensee, which consent will not to be unreasonably withheld) in the name of Licensee or may join Licensee as a party thereto. Licensee may at its own expense institute any suit or take action on account of any infringement or limitation of the Licensed Property only with the prior written consent of Licensor. At Licensor's expense, but subject to the other terms and conditions of this Agreement, Licensee shall execute any and all additional documents requested by Licensor which Licensor deems necessary in obtaining registration and Licensor's enforcement of copyrights and other rights of any kind or nature in any Licensed Product, Design, Advertising Material and/or other Copyright Material, or any portion of any of the foregoing, in accordance with Subparagraph 16.13 hereinbelow. Notwithstanding anything to the contrary, if any approval is or shall be required at any time by any governmental unit or other entity anywhere in the Territory during the Term in order to give legal effect to this Agreement or any provision hereof and/or to assure the rights of Licensor, including, without limitation, any intellectual property rights of Licensor, Licensee shall notify Licensor promptly of any such requirement and Licensee shall, at its sole expense, within ninety (90) days after the date of this Agreement, notify Licensor in writing that it has complied with the requirements of this Subparagraph 13.3. If Licensee fails to timely comply with the obligations set forth in this Subparagraph 13.3 within ten (10) business days of Licensor's request, Licensee hereby irrevocably appoints Licensor and its representatives as Licensee's attorneys-in-fact (which appointment is irrevocable and coupled with an interest) to execute documents and to do such acts, at Licensee's sole expense and on behalf of Licensee and/or its employees and contractors.

13.3. <u>Licensor Intellectual Property</u>. Notwithstanding anything to the contrary contained in this Agreement or otherwise, no warranty or indemnity, express or implied, is given by Licensor with respect to any liability or expense arising from any claim that use of any Licensor Trademark as used on or in connection with any Licensed Product hereunder or any packaging, advertising, marketing or promotional material is registered, registrable or infringes on any trademark or other intellectual property right of any third party or otherwise constitutes unfair competition. Without limitation of the foregoing, title, character and place names may or may not be registered trademarks or trademarks in the United States and other countries in the classes covering Licensed Products and Licensor makes no representations with respect thereto. It is expressly agreed that it is Licensee's sole responsibility to carry out such investigations as Licensee may deem appropriate to establish that the use of any Licensor Trademark as a trademark on any Copyright Materials does not infringe such right of any third party and Licensor shall not be liable to Licensee if such infringement occurs.

13.4 <u>Promotional Value and Goodwill</u>. Licensee acknowledges that Licensor is entering into this Agreement not only in consideration of the Royalties to be paid, but also for the promotional value to be secured by Licensor for the Pictures as a result of the manufacture, sale and distribution by Licensee of Licensed Products and the advertising and promotion of the Licensed Products. Further, Licensee recognizes the great value of the goodwill associated with the Licensed Property and acknowledges that such goodwill exclusively belongs to Licensor and that the Licensed Property has acquired a secondary meaning in the mind of the public. Further, any and all goodwill arising from Licensee's use of the Licensed Property under this Agreement will inure to Licensor's sole benefit.

14. <u>TERM AND TERMINATION</u>:

14.1 <u>Term</u>. This Agreement will continue in full force and effect during the Term, unless terminated earlier in accordance with the provisions of this Agreement.

14.2 <u>Termination.</u>    Without limiting any of Licensor's other rights or remedies under this Agreement:

14.2.1 <u>Immediate Right To Terminate Agreement</u>. Licensor will have the right to terminate this Agreement immediately upon written notice to Licensee if:

(a)    Licensee fails to obtain or maintain product liability insurance in the amount and of the type provided for herein;

(b)    Licensee breaches any of the provisions of the Agreement relating to the unauthorized use or assertion of rights in the Licensed Property or the Licensed Products;

(c)    Licensee sells Licensed Product without the appropriate written approval from Licensor as described in this Agreement;

(d)    Licensee breaches any other material term or condition of this Agreement which breach is of an uncurable nature;

(e)    Licensee becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due;

(f)    Licensee becomes the subject of an involuntary petition in bankruptcy or any involuntary proceeding relating to insolvency, receivership, liquidation or consolidation for the benefit of creditors, if such petition or proceeding is not dismissed within sixty (60) days of filing; or

    (g)    Licensee attacks the title of Licensor in and to the Licensed Property or any copyright or trademark pertaining thereto or the validity of the license granted hereunder.

14.2.2   <u>Right To Terminate Subject to Cure</u>.  Licensor will have the right to terminate this Agreement if:

    (a)   Licensee fails to make timely payment of a Royalty when due and such failure continues for thirty (30) days, it being understood that interest accruing from the original date is not hereby waived; or

    (b)   Licensee breaches any other material term or condition of this Agreement which breach is of a curable nature, provided, that Licensee has failed to cure any such breach within twenty (20) days (five [5] days for failure to make timely payment) after written notice of breach from Licensor, or if in Licensor's reasonable judgment any such breach requires a longer cure period, Licensee fails to make satisfactory progress towards curing such breach within twenty (20) days (five [5] days for failure to make timely payment) after written notice, or fails thereafter to make such progress.

14.2.3   <u>Immediate Right to Terminate a Portion of the Agreement</u>.  Licensor shall have the right to immediately terminate the portion(s) of the Agreement relating to any of the respective type(s) or category(ies) of Licensed Product(s) with respect to any country in the Territory, if Licensee, for any reason:

    (a) Fails to meet the manufacturing and distribution dates specified in the Proposed Product & Marketing Plan regarding the particular type(s) or category(ies) of Licensed Product(s); or

    (b)   After the commencement of manufacture and sale of a particular Licensed Product in a particular country, Licensee fails to sell such Licensed Product during any consecutive thirty (30) day period; or

    (c)   Departs from the approved sample of a particular Licensed Product, or in the event that there is a recall; or

    (d)   If Licensee is unable to sell Licensed Product(s) in any country of the Territory due to any governmental law, rule or regulation.

14.3    <u>Liquidation / Bankruptcy / Administration / Receivership Proceedings</u>.

This Agreement shall automatically terminate if a receiver, administrator, administrative receiver or manager shall be appointed or any distress or execution or other process shall be levied on or enforced (and not being discharged within 7 days) over the whole or any part of Licensee's assets, or if Licensee offers to make or makes any arrangement with or for the benefit of its creditors, or commits an act of bankruptcy, or if any petition to consider a resolution for the making of an administration order or to wind up or dissolve Licensee shall be passed or presented, or if Licensee ceases or threatens to cease to carry on business, or is unable to pay its debts as they fall due, or suffers any analogous proceedings under any Applicable Law.

14.4    <u>Other Agreements</u>:  In addition to, and without prejudice to any other right or remedy available to Licensor, Licensor will have the right to terminate this Agreement immediately upon written notice to Licensee (a) upon the occurrence of any default by Licensee in the observance or performance of any covenant or condition in any other agreement between Licensor and Licensee or any default by Licensee in the observance or performance of any covenant or condition in any other agreement between Licensor and a Licensee Affiliate, or (b) if any other event shall occur or condition shall exist, the effect of which default or other event or condition is to cause Licensor to terminate, with the giving of notice if required, such other agreement.

14.5    <u>Effect of Termination</u>.

    (a)    <u>Direct Licenses</u>:  In the event of the termination of this Agreement by Licensor for any of the reasons set forth in Subparagraphs 14.2, 14.3 or 14.4 hereinabove, no creditor, agent, representative, receiver or trustee of Licensee shall have the right to dispose of any units of the Licensed Products without the prior written consent of Licensor until payment of all monies due to Licensor from Licensee.  Licensor shall have a lien on any and all units of Licensed Products not then disposed of by Licensee at any time in respect of the Net Sales of the Licensed Products and on any monies due to Licensee from any Customer in respect of the "sale" (as that term is defined in Subparagraph 15.50 herein below); and, at Licensor's election, Licensor may treat all Customers of Licensee and Sublicensees as Licensor's direct licensees with no obligation to Licensee.

    (b)    <u>Limited Sell-Off Rights</u>.  Upon expiration (but not termination) of this Agreement, Licensee shall have the non-exclusive right, for a period of ninety (90) days after expiration of this Agreement (the "Sell-Off Period"), to dispose of remaining Licensed Products then in inventory, solely if the following conditions are met:

        (i)    this Agreement has not been terminated for breach;

(ii)  Licensee has paid all monies owed to Licensor as of the expiration date;

(iii)  Licensee can document that during the last six (6) months of the Term Licensee has not manufactured a quantity that is more than seventy-five percent (75%) of the quantity manufactured of each Licensed Product SKU for the six (6)-month period prior to commencement of such last six (6)-month period;

(iv)  Licensee shall not manufacture or authorize the manufacture of Licensed Products during the Sell-Off Period;

(v)  Licensor has the right to pre-approve the amounts of each and every Licensed Product to be distributed during the Sell-Off Period;

(vi)  Licensee will, upon Licensor's request, provide to Licensor a written inventory statement specifying the number of each of the Licensed Products in Licensee's inventory as of the date of expiration of this Agreement and otherwise on Licensor's request;

(vii)  Licensee shall continue to adhere to all of the provisions of this Agreement, including without limitation, those relating to payment of Royalties, the Royalty to be calculated on the Net Sales value for each Licensed Product, which value for the purposes of calculating the Royalty shall not be less than the average net sales value of the Licensed Product during the ninety (90) day period immediately preceding the expiration or termination of the Term; and

(viii)  for the avoidance of doubt, Advances may be recouped against any Royalties earned during the Sell-Off Period

(c)  <u>Destruction of Licensed Products</u>.  Upon expiration or termination of this Agreement Licensee shall turn over to Licensor or, if requested by Licensor, destroy all remaining stock of the Licensed Products and all molds, plates and other materials used in the manufacture of the Licensed Products, and an officer of Licensee will certify to Licensor in writing that Licensee has done so.

(d)  <u>Reversion of Rights</u>.  Upon the earliest of termination or expiration of this Agreement, or Sell-Off Period, if applicable, all license rights granted hereunder will immediately revert to Licensor, Licensor may exploit such license rights itself or grant such rights to any third party, and Licensee will not reproduce, manufacture, sell or distribute any Licensed Product. Further, Licensee shall cancel or terminate all contracts, orders and requests for the manufacture or supply of any goods or services which involve or may lead to any use, application or exploitation of the Licensed Property or the rights herein granted or any part therefor.

(e)  <u>Return of Confidential Information</u>.  Upon termination or expiration of this Agreement, Licensee will immediately return all units of the Licensor's Confidential Information in its possession or control, and an officer of Licensee will certify to Licensor in writing that Licensee has done so.

(f)  <u>Payments</u>.  Upon expiration or termination of this Agreement, all monies owed Licensor will become immediately due and payable by Licensee to Licensor. Further, if Licensor has terminated this Agreement for sale of Licensed Product(s) in violation of any term and/or condition of this Agreement, then in addition to any and all of Licensor's other rights and remedies with respect to such violation, Licensee shall immediately pay to Licensor upon such termination the amount referenced in 7.2(i) above as liquidated damages for such failure.

14.6  <u>No Damages for Termination</u>.  Licensor will not be liable to Licensee for damages of any kind, including incidental or consequential damages, on account of the expiration or termination of this Agreement and Licensee waives any right it may have to receive any compensation or reparations on account thereof. Without limiting the generality of this Subparagraph 14.6, Licensor will not be liable to Licensee, on account of such termination or expiration, for reimbursement or damages for the loss of goodwill, prospective profits or anticipated income, or on account of any expenditures, investments, leases or commitments made by either party or for any other reason whatsoever based upon or growing out of such termination or expiration.

14.7  <u>Nonexclusive Remedy</u>.  The exercise by either party of any remedy under this Agreement will be without prejudice to its other remedies under this Agreement or otherwise.

14.8  <u>Survival</u>.  The rights and obligations of the parties contained in Paragraph 7 (Royalties), Paragraph 8 (Statements, Payments and Audits), Paragraph 10 (Representations and Warranties; Indemnities), Paragraph 11 (Insurance), Paragraph 12 (Confidentiality), Paragraph 13 (Intellectual Property Protections), Paragraph 14 (Term and Termination), Paragraph 15 (Definitions) and Paragraph 16 (General) will survive the termination and/or expiration of this Agreement.

15.  <u>DEFINITIONS:</u>

15.1  "Advance" has the meaning set forth in Subparagraph 7.1 hereinabove.

15.2  "Advertising Material" has the meaning set forth in Subparagraph 4.2 (c) hereinabove.

15.3    "Allowable Deductions" has the meaning set forth in Subparagraph 7.2(c) hereinabove.

15.4    [Intentionally omitted]

15.5    "Annual Product & Marketing Plan" has the meaning set forth in Exhibit II hereinbelow.

15.6    "Applicable Law(s)" has the meaning set forth in Subparagraph 10.2 (e) hereinabove.

15.7    "Artwork, Clips and Music" has the meaning set forth in Subparagraph 5.1 hereinabove.

15.8    "Bundling" has the meaning set forth in Subparagraph 7.2(f) hereinabove.

15.9    "Calendar Month" means the period commencing on the first date (inclusive) and ending on the final date (inclusive) of each of the following months in the applicable Calendar Year: January, February, March, April, May, June, July, August, September, October, November, December.

15.10    "Calendar Quarter" means any of the following applicable consecutive successive three (3) month periods during a Calendar Year: commencing on January 1 (inclusive) through and including March 31; commencing on April 1 (inclusive) through and including June 30; commencing on July 1 (inclusive) through and including September 30; and commencing on October 1 (inclusive) through and including December 31.

15.11    "Calendar Year" means the time period from and including January 1 through and including December 31 of the same successive consecutive twelve (12) month period.

15.12    "Closeout Entity," means any entity (including, without limitation, any so-called rackjobber, outlet store, closeout store, discount store, discount web site operation or other similar entity or service) other than a Licensor Channel which offers for sale or resale a majority of its inventory initially on a so-called "closeout" basis.

15.14    "Consumer Marketing" means any form of solicitation and/or commercial enticement for the sale of any product, good or article by means of television, radio, print, outdoor, Internet, sweepstakes, free-goods offers, giveaways, cross-promotions with third parties or other promotional arrangements directed to consumers, retailer in-store display materials, point-of-purchase signage, roto print advertisements, public relations efforts, or by any other means, whether now or hereafter known, devised, invented or developed.

15.15    "Copyright Material" means each and every Licensed Product, Advertising Material, Design, Production Material and any and all other work and intellectual property which, in whole or in part, constitutes, is based on or is derived from any Licensed Property.

15.16    "Customer" means a third party entity that is not Licensee or a Licensee Affiliate.

15.17    "Distributor" means a Customer that is ordinarily in the business of selling and physically shipping (or distributing) products, goods and articles to another distributor and/or to a Retail Entity (as opposed to an End Consumer).

15.18    "Dump" means distributing a Licensed Product in a manner which disparages the Licensed Property or materially diminishes the value of Licensor's goodwill, business opportunities, trademark(s), tradename(s) or other rights pursuant to Applicable Law.

15.19    [Intentionally omitted]

15.20    "End Consumer" means an individual (non-business) Customer to whom a Licensed Product is sold with the intention of ultimate consumption (as opposed to re-sale or re-distribution) by the purchaser thereof, and expressly excluding all Distributors and Retail Entities.

15.21    "Evaluation Unit" has the meaning set forth in Subparagraph 7.2(g) hereinabove.

15.22    "Excluded Distribution Channel" has the meaning set forth in Subparagraph 2.1(a) hereinabove and in Exhibit I hereinbelow.

15.23    "Expiration Date" has the meaning set forth in Clause H hereinabove.

15.24    "Firm Orders" has the meaning set forth in Subparagraph 14.5(b) hereinabove.

15.25    "Initial Shipment Date" has the meaning set forth in Subparagraph 2.3 hereinabove.

15.26    "Internet" means the computer-generated, computer-mediated or computer-assisted transmission, reception, recordation or display arising from any network or other connection of instruments or devices now or hereafter known, devised, invented or developed capable of transmission, reception, recordation and/or display (such instruments or devices to include, without limitation, computers, laptops, cellular or PCS telephones, pagers, PDAs, wireless transmitters or receivers, modems, radios, televisions, satellite receivers, cable networks, smart cards and set-top boxes).

15.27    "Internet Retail Entity" means a Retail Entity that sells goods directly to an End Consumer through one or more "business-to-consumer" web site(s) on the Internet expressly excluding, without limitation, any Excluded Distribution Channel.

15.28    "Licensee" has the meaning set forth in Clause C hereinabove.

15.29    "Licensee Affiliate" means any entity that is directly or indirectly controlled by, under common

control with or that controls Licensee. For purposes of this definition of "Licensee Affiliate," an entity will control another entity, or be deemed to control another entity, if such entity: (a) has the ability to elect a majority of the directors, trustees (or other managers) of such other entity; (b) is a general partner or joint venturer of such other entity; (c) directly or indirectly holds (or has power to vote) twenty percent (20%) or more of the economic interests of such other entity; or (d) directly or indirectly holds (or has power to vote) five percent (5%) or more of the voting equity interests of such other entity.

15.30    "Licensee Records" has the meaning set forth in Subparagraph 8.4 hereinabove.

15.31    "Licensed Products" has the meaning set forth in Clause D hereinabove.

15.32    "Licensed Property" has the meaning set forth in Clause E hereinabove.

15.33    "Licensor" has the meaning set forth in Clause C hereinabove.

15.34    "Licensor Channel" means a retail outlet and/or retail method of distribution or delivery of any products, goods or articles (including, without limitation, through catalogs, direct mail, Internet and/or any fan club[s]), which retail outlet and/or method of distribution or delivery is owned or controlled (in whole or in part) or licensed by Licensor or by any Licensor-Related Entity, including, without limitation, any Internet Retail Entity owned, controlled and/or operated by, on behalf of or under license from Licensor.

15.35    "Licensor Information" has the meaning set forth in Subparagraph 12.2 hereinabove.

15.36    "Licensor-Related Entity" means each of Licensor's affiliated, related and subsidiary entities including, without limitation, Lucasfilm Entertainment Company Ltd., Lucasfilm Animation Ltd., George W. Lucas, and their respective agents, employees, officers, directors, shareholders, successors, joint venturers, partners, licensees and assigns.

15.37    "Licensor Trademarks" has the meaning set forth in Clause E hereinabove.

15.38    "List Price" has the meaning set forth in Subparagraph 7.2(b) hereinabove.

15.39    "Manufacturer" has the meaning set forth in Subparagraph 2.4 hereinabove.

15.40    "Moral Rights" means any rights to claim authorship of a work, to object to or prevent the modification of a work, or to withdraw from circulation or control the publication or distribution of a work, and any similar or analogous right, existing under the law of any country in the world or under any treaty.

15.41    "Net Sales" has the meaning set forth in Subparagraph 7.2(b) hereinabove.

15.42    "Permitted Distribution Channel" has the meaning set forth in Exhibit I.

15.43    "Picture" has the meaning set forth in Clause E hereinabove.

15.44    "Premium" means a product, good or article based on or incorporating the Licensed Property that is used in connection with any promotional activity(ies) intended to augment or enhance the sale or other exploitation of products other than Licensed Products, whether or not as part of in a licensed promotion, purchase-with-purchase promotion, self-liquidator program, joint merchandising program, giveaway, sales incentive program, fan club program, fund-raiser or sweepstakes entry or to Customers for resale by direct mail or other direct marketing method using any and all media whether now known or hereafter developed.

15.45    "Proposed Product & Marketing Plan" has the meaning set forth in Exhibit II hereinbelow.

15.46    "Retail Entity" means a Customer in a Permitted Distribution Channel which is ordinarily and primarily in the business of reselling goods on a retail basis directly to an End Consumer through a physical real estate location and/or through a bona fide third party direct "business-to consumer" printed retail catalog, or direct "business to consumer" web site, expressly excluding any Excluded Distribution Channel.

15.47    "Royalties" has the meaning set forth in Subparagraph 7.2(a) hereinabove.

15.48    "Royalty Report Form" has the meaning set forth in Subparagraph 8.3 hereinabove.

15.49    [Intentionally omitted]

15.50    "Sale," with respect to a specific unit of a Licensed Product, means the first to occur of any of the following events:

    (a)    the date of the invoice for such unit of a Licensed Product actually issued by Licensee or a Sublicensee to a Customer;

    (b)    the date of the shipment of such unit of a Licensed Product to a Customer of Licensee or a Sublicensee; or

    (c)    the date payment is received in respect of such unit of a Licensed Product by Licensee or a Sublicensee from a Customer.

15.51    "Sell-Off Period" has the meaning set forth in Subparagraph 14.5(b) hereinabove.

15.52    "Sourcebook" has the meaning set forth in Subparagraph 5.3 hereinabove.

15.53    "Start Date" has the meaning set forth in Clause H hereinabove.

15.54    "Sublicensee" has the meaning set forth in Subparagraph 2.5 hereinabove.

15.55    "Sub-Territory", if used in this Agreement, means each enumerated grouping of more than one country as designated by Licensor.

15.56    "Tax" includes, without limitation, any sales tax, use tax, VAT, income tax, gross receipts tax, excise tax, tariff, duty, property tax, remittance tax or assessment, expressly excluding any tax based on Licensor's net income.

15.57    "Television Home Shopping Retailer" means a Retail Entity that markets and sells products directly to End Consumers primarily through television (such as, without limitation, QVC, HSN).

15.58    "Territory" has the meaning set forth in Clause G hereinabove.

15.59    "Term" has the meaning set forth in Clause H hereinabove.

15.60    "U.S. Release Date," with respect to a particular Picture, means the date on which the initial general theatrical release of such Picture occurs in the United States.

15.61    "VAT" means any sales, use, value-added tax, excise, local privilege or any other similar type of tax.

16.    GENERAL:

16.1    Assignment. Subject to the other terms and conditions of this Subparagraph 16.1, this Agreement will bind and inure to the benefit of each party and to their respective successors and assigns, to the fullest extent permitted. This Agreement is personal to Licensee. Licensee shall not voluntarily or by operation of law assign, sublicense, transfer, encumber, delegate or otherwise dispose of all or part of any right or privilege licensed to Licensee in this Agreement or sub-contract or delegate any of its obligations hereunder (collectively "Transfer"), including to a Licensee Affiliate, without Licensor's prior written approval in its sole discretion. Any request for approval of a Transfer shall be submitted to LFL in advance in writing, and shall be accompanied by (a) full and complete financial statements (including without limitation a balance sheet, cash flow statement and income statement) of the party to which Licensee desires to Transfer all or any part of a right or privilege licensed to Licensee in this Agreement and/or obligation hereunder ("Proposed Transferee"), and (b) payment to LFL of a fee equal to the greater of: 100% of the amount of the Advance(s) set forth in Clause I(1) of the Deal Terms, or 50% of the total amount of Royalties accrued to LFL over the twelve (12) month period immediately preceding the date of Licensee's request for approval of the Transfer. The foregoing financial statements shall be certified to be accurate by a certified public accountant if the Proposed Assignee is a publicly traded company; otherwise by an officer of the Proposed Transferee. For purposes of this Subparagraph 16.1, any change in control of Licensee, and/or any merger, acquisition, reorganization (regardless of the type of merger, acquisition or reorganization, whether direct or indirect), liquidation, foreclosure, involuntary sale in bankruptcy, or the purchase of substantially all of Licensee's assets or otherwise, shall be deemed a purported assignment subject to Licensor's prior written approval pursuant to this Subparagraph 16.1. Any attempted Transfer without such approval will be null and void and constitute a material default and material breach of this Agreement.

16.2    Governing Law. This Agreement will be governed by and construed in accordance with the laws of the federal laws of the United States and the laws of the State of California applicable to agreements entered into, and to be performed entirely, within California between California residents (and excluding the United Nations Convention on Contracts for the International Sale of Goods) without regard to choice of law provisions and regardless of the place or places of its actual execution or performance. Any suit, action or proceeding between or among any of the parties hereto arising out of or related to this Agreement will be brought solely in the federal or state courts in the Northern District of California, and Licensee hereby submits to the personal jurisdiction thereof and agrees to such courts as the appropriate venue. Notwithstanding the foregoing, Licensee agrees that, for purposes of collecting monies due pursuant to this Agreement Licensee, at Licensor's election, may be subject to whatever local laws and courts have jurisdiction in any country of the Territory over Licensee. Process in any action or proceeding referenced to in this Subparagraph 16.2 may be served on Licensee at the address for notices set forth in this Agreement.

16.3    Attorneys' Fees. In the event of any legal proceeding between the parties arising out of or related to this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief awarded or granted, its costs and expenses (including, without limitation, attorneys' fees and costs whether or not in connection with litigation) incurred in connection with any such proceeding.

16.4    Equitable Relief. Licensee recognizes and acknowledges that a breach by Licensee of any covenants, agreements or undertakings made or assumed by it will cause Licensor irreparable damage, which cannot be readily remedied in damages in an action at law, and may, in addition thereto, constitute an infringement of Licensor's intellectual property and other rights in the Licensed Property, thereby entitling Licensor to equitable remedies (including, without limitation, injunctive relief), costs and expenses (including, without limitation, attorneys' fees and costs, whether or not in connection with litigation). For purposes of this Subparagraph 16.4, Licensee

acknowledges that (by way of example and not limitation) infringement of Licensor's intellectual property rights includes any use of the Licensed Property by Licensee other than as expressly licensed permitted pursuant to this Agreement, the failure to obtain approvals required under this Agreement, the use, shipment or release of any Licensed Product or Confidential Licensor Information in violation of any term of this Agreement, and/or the failure to secure permission and/or transfer of rights from any third party as required pursuant to this Agreement.

16.5     Notices. Any notice to be given or served under this Agreement shall be in writing and shall be delivered to the parties addressed as set forth in this Agreement, or to such other address as either party shall notify the other party of in writing, as follows: personally or sent by facsimile or other print out communication mechanism or by first class, prepaid, registered or certified mail (if available) post (air mail if posted to another country) or recognized national or international express courier (e.g., Federal Express, DHL) to the party to be served at the address set forth on page 1 or to such other address as either party may from time to time notify in writing to the other. All notices shall be deemed to have been served: (a) immediately in the case of personal delivery; (b) in the case of express courier, on the date of guaranteed delivery; (c) in the case of facsimile or other print out mechanism, on the expiration of four (4) hours from the time of transmission subject to proof by the sender that the sender holds an acknowledgment (whether in mechanical form other otherwise) confirming its receipt at its destination and subject in the case of facsimile or other print out transmission in the absence of a written acknowledgment to the original notice being sent by post or by personal delivery in accordance with this Subparagraph 16.5 not later than the next business day after such transmission; and (d) in the case of postal delivery, on the second business day following the date of posting (the fifth business day if posted to another country) or on acknowledgment of receipt if earlier. Until otherwise notified by Licensor in writing, all communications to Licensor shall be addressed as follows: for notices to Licensor- the address set forth on page 1, Attention: Director of Domestic Licensing, with a copy to: General Counsel; for approvals requested of Licensor- to the address set forth on page 1; Attention: Approvals Coordinator; for statements and payments to Licensor: to the address set forth on the first page; Attention: Licensing Finance; and for deliveries requiring Licensor's street address-1 Letterman Drive, Building B, San Francisco, California 94129; Attention: Director of Domestic Licensing.

16.6     No Waiver. No action taken by either party pursuant to this Agreement, and no waiver by either party, whether express or implied, of any provision or right in this Agreement or any breach thereof, and no failure of either party to exercise or enforce any of its rights under this Agreement, will constitute a continuing waiver with respect to such provision or right or as a breach or waiver or any other provision or right, whether or not similar.

16.7     Independent Contractors. The parties to this Agreement are and shall remain independent contractors. There is no relationship of partnership, employer, employee, principal, agent, joint venture, employment, franchise or agency between the parties. Except as expressly provided in this Agreement, neither party will have the power to bind the other or incur obligations on the other's behalf without the other's prior written approval and shall not represent that it has such right.

16.8     Nonexclusive Remedy. The exercise by either party of any remedy under this Agreement will be without prejudice to its other remedies under this Agreement or otherwise.

16.9     Severability. This Agreement is severable. If any provision of this Agreement is found invalid or unenforceable in any jurisdiction, that provision, as to that jurisdiction, will be ineffective only to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the other remaining provisions of this Agreement, which other remaining provisions will not be affected and shall remain in force, to the maximum extent permissible.

16.10     Approvals. Except as otherwise expressly stated in this Agreement, any and all Licensor approvals pursuant to this Agreement may be given or withheld by Licensor in its sole discretion and the failure by Licensor to give written approval within fourteen (14) days from the date of a submission to Licensor will be deemed disapproval.

16.11     Headings, Captions and Names. The name of this Agreement, and all headings and captions herein contained, are for reference and convenience only and do not define, limit or expand the scope or intent of any provision hereof and shall not be relied upon in or in connection with the construction or interpretation of this Agreement. The words "herein," "hereunder," "hereof" and similar terms refer to this entire Agreement and shall not be limited to the specific paragraphs or subparagraphs in which they are used.

16.12     Counterparts. This Agreement may be executed in one or more counterparts, and by telefacsimile transmission, each copy of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument, but this Agreement shall not be binding upon the parties until it has been signed by both parties. The parties hereto agree that facsimile signatures on a copy of this Agreement shall be effective and enforceable as if they were original signatures.

16.13     Further Instruments. Except as otherwise expressly provided in this Agreement, each party shall furnish to the other (and shall deliver and cause to be executed, acknowledged and delivered to the other) any further instruments, which such other party may reasonably require or deem necessary from time to time to evidence, establish, protect, enforce, defend or secure to such other party any or all of its rights hereunder or to more effectuate or carry out the purposes, provisions or intent of this Agreement. Without limitation of the foregoing, Licensee will assist and cooperate, and will

cause its employees and independent contractors to assist and cooperate, with Licensor in all respects, including, without limitation, by executing documents, giving testimony, and taking such further acts reasonably requested by Licensor in order to acquire, transfer, maintain, perfect and enforce copyright, trademark, trade secret, contract rights and other legal protection for the Licensed Property and/or any Copyright Material or to effect the reversion of rights pursuant to this Agreement. If Licensee fails to comply with the obligations set forth above within ten (10) business days of Licensor's request, Licensee hereby irrevocably appoints Licensor and its representatives as Licensee's attorneys-in-fact (which appointment is irrevocable and coupled with an interest) to execute documents on behalf of Licensee and its employees and contractors.

*   *   *

## EXHIBIT I

## PERMITTED DISTRIBUTION CHANNELS / EXCLUDED DISTRIBUTION CHANNELS

| PERMITTED/EXCLUDED | DISTRIBUTION CHANNELS: |
|---|---|
| PERMITTED | "Airport Gift and Other Airport Stores" shall mean gift and other stores located within airports, excluding duty-free store operator. Examples of Airport Gift and Other Stores include, without limitation, Paradies and W.H. Smith. |
| PERMITTED | Art & Craft Stores" shall mean stores that offer for sale primarily art and craft supplies. Examples of Art & Craft Stores include, without limitation, Fast Frame, Michaels, and Michaels MJ Designs. |
| PERMITTED | "Athletic Apparel & Footwear Stores" shall means stores that offer for sale primarily athletic apparel and footwear. Examples of Athletic Apparel & Footwear Stores include, without limitation, Footlocker, Athlete's Foot, and Champs. |
| PERMITTED | "Automotive/Carwash Stores" shall mean (a) stores that offer for sale primarily automotive supplies, or (b) stores located at carwash or gasoline station premises. |
| EXCLUDED | "Chain Book Stores" shall mean chain stores (containing twenty [20] or more individual stores) that offer for sale primarily books. Examples of Chain Book Stores include, without limitation, B. Dalton, Super Crown, Walden Books, and Brentano's. |
| PERMITTED | "Chain Comic Book Stores" shall mean chain stores (containing twenty [20] or more individual stores) that offer for sale primarily comic books. |
| PERMITTED | "Chain Drug Stores" shall mean chain stores (containing twenty [20] or more individual stores) that offer for sale primarily prescription and over-the-counter drugs, personal care products and household products. Examples of Chain Drug Stores include, without limitation, Walgreens, Rite-Aid, Thrifty/Payless, CVS/Revco, Thrift Drug, Phar Mor, Longs Drugs, Jean Coutu, London Drugs, and Shopper's Drug Mart. |
| PERMITTED | "Chain Toy Stores" shall mean chain stores (containing twenty [20] or more individual stores) that offer for sale primarily toys. In order to be considered a "Toy Store" hereunder, the total number of toy-type SKU's (Stock-Keeping Units) must represent eighty percent (80%) or more of such store's total SKUs. Examples of Chain Toy Stores include, without limitation, Toys R Us. |
| EXCLUDED | "Coffee Specialty Stores" shall mean stores that offer for sale primarily specialty coffee and related products, such as coffee mugs. Examples of Coffee Specialty Stores include, without limitation, Starbucks, Buzz Coffee, Gloria Jeans, and The Coffee Beanery. |
| EXCLUDED | "Computer Specialty Stores" shall mean stores that offer for sale primarily computer equipment and supplies. Examples of Computer Specialty Stores include, without limitation, CompUSA. |
| PERMITTED | "Convenience Stores" shall mean stores that offer for sale primarily packaged and "quick service" food products, are generally open 24 hours a day, and are designed to offer greater convenience than larger Supermarket/Grocery Stores. Examples of Convenience Stores include, without limitation, 7-11, AM/PM, Dairy Mart, and Circle K |
| PERMITTED | "Direct Mail Catalogs" shall mean catalogs that offer products for sale and are mailed directly to consumers' homes. The "Direct Mail Catalogs" channel shall specifically exclude catalogs for fundraising purposes which shall be included in the "Fundraising" channel defined below. Examples of Direct Mail Catalogs Include, without limitation, Spiegel, Hearth & Home, Domestications, Tapestry, Company Store, Hamacher Schlemmer, Fingerhut, Amway, Lillian Vernon, Regal, Avon, and Sears Catalog. |

EXHIBIT I

| PERMITTED/EXCLUDED | DISTRIBUTION CHANNELS: |
|---|---|
| EXCLUDED | "Direct Response" shall mean print advertisement, free standing inserts ("FSI") and other promotional material (except catalogs) that are mailed directly to consumers' homes for the purpose of soliciting product sales directly from consumers. The "Direct Response" channel shall specifically exclude direct mail catalogs which shall be included in the "Direct Mail Catalog" channel defined above.<br>If Licensor grants to Licensee the right to distribute Licensed Products through Direct Response, each print advertisement, FSI and other promotional material depicting or referring to the Licensed Products or the Licensed Property must be submitted to Licensor for prior written approval in accordance with Licensor's Brand Assurance policies and procedures. |
| PERMITTED | "Educational Specialty Stores" shall mean stores that offer for sale primarily educational products. Examples of Educational Specialty Stores include, without limitation, Imaginarium and Nature Company. |
| PERMITTED | "Electronics Stores" shall mean stores that offer for sale primarily electronic products. Examples of Electronics Stores include, without limitation, Circuit City, Fry's, and Best Buy. |
| PERMITTED | "Fashion Accessory Stores" shall mean stores that offer for sale primarily costume jewelry, hair accessories and other fashion accessories. Examples of Fashion Accessory Stores include, without limitation, Claire's Boutique, Afterthoughts, It's About Time, Piercing Pagoda, Ardene, and Bentley's. |
| EXCLUDED | "Fashion Specialty Boutiques" shall mean stores that offer for sale primarily fashion apparel product. Examples of Fashion Specialty Boutiques include, without limitation, Fred Segal, Urban Outfitters, American Rag, and Dr. J's. |
| PERMITTED | "Gift Retailers" shall mean stores that (a) offer products for sale that are in somewhat related product categories and are known as "gifts" in the trade, which products generally are classified in the trade as "better" quality and are higher priced (as compared to National and Regional Discount / Mass Retailers' product), (b) do not usually discount merchandise or sell it a greatly reduced prices, (c) usually focus more on aesthetics in merchandise displays than on price, and (d) generally required individual store servicing by suppliers in merchandise set-up, display, SKU maintenance and reordering. Suppliers to Gift Retailers typically advertise in trade publications, such as "Gift & Stationery Business", "Giftware News" and "Gifts & Decorative Accessories". Suppliers to Gift Retailers usually include companies such as Enesco, Midwest of Cannon Falls, New Creative Enterprise, Dale Tiffany, Pacific Rim, Ande Rooney, Waterford, GiftCraft, Carson Industries, Possible Dreams, Lenox, Department 56, Lefton, Swarovski, and Flambro. The "Gift Retailers" channel shall specifically exclude Novelty Gift Stores (as defined below), duty-free store operators, and Airport Gift and Other Airport Stores (as defined above). |
| PERMITTED | "Greeting Card Stores" shall mean stores that offer for sale primarily greeting cards. Examples of Greeting Card Stores include, without limitation, Hallmark. |
| PERMITTED | "Hobby & Model Stores" shall mean stores that offer for sale primarily hobby and model supplies. |
| PERMITTED | "Home Specialty Stores" shall mean stores that offer for sale primarily bedding, towels, and other bathroom products, kitchen merchandise, and housewares. Examples of Home Specialty Stores include, without limitation, Strouds, Linens 'N' Things, 3D Bed & Bath, Bed/Bath/Beyond, and Luxury Linens. |
| EXCLUDED | "In-Store Bakeries" shall mean the in-store bakery departments within Supermarket/ Grocery Stores, National and Regional Discount/Mass Retailers and Warehouse Clubs. Such departments offer for sale primarily freshly baked breads, cakes, cookies and similar bakery items. |

EXHIBIT 1

| PERMITTED/EXCLUDED | DISTRIBUTION CHANNELS: |
|---|---|
| EXCLUDED | "Internet Retail Entity", subject to the provisions of the Agreement with respect to distribution or sales of Licensed Products outside the Territory. |
| EXCLUDED | "Mall Clothing Specialty Stores" shall mean stores that offer for sale primarily clothing and are located within a mall. Examples of Mall Clothing Specialty Stores include, without limitation, Millers Outpost, Wet Sea, Au Coin Des Petites, La Senza, Suzie Shier, and Reitmans. |
| PERMITTED | "Mid-Tier Department Stores" shall mean stores that offer products for sale in a board assortment of unrelated product categories, which products are generally classified in the trade as "better" (but no "best") quality products. Examples of Mid-Tier Department Stores include, without limitation, JC Penney, Sears, Mervyn's, SteinMart, Kohls, Fred Meyer, The Bay, Clement, and Simon's. |
| PERMITTED | "Military Exchange Services" shall mean military headquarters as well as individual bases of armies and/or airforces of each country within the Territory. Example as of Military Exchange Services include, without limitation, U.S. Army and Airforce Exchange Services ("AAFES") and the Canadian Forces Exchange Service ("CANEX"). If Licensor grants to Licensee the right to distribute products through Military Exchange Services, such channel of distribution shall be limited to the Military Exchange Services of the countries within. |
| PERMITTED | "Music/Video Stores" shall mean stores that offer for sale primarily musical recordings, on compact discus, cassettes or other media, and/or movie recordings on videos, laser discs or other media for home use by consumers. Examples of Music/Video Stores include, without limitation, Blockbuster, Musicland, Tower Records, Virgin Records, Wherehouse Records, Sam Goody's, and Suncoast. |
| PERMITTED | "National Discount / Mass Retailers" shall mean stores that (a) have nation-wide distribution, (b) offer products for sale in a broad assortment of unrelated product categories, which products generally are not classified in the trade as "better/best" quality products, (c) are usually "self-service" with more of an emphasis on price than aesthetics, and (d) generally do not require individual store servicing by suppliers. Suppliers to National Discount / Mass Retailers typically advertise in trade publications, such as "Discount Store News" and "Discount Merchandiser", and usually attend the IMRA (International Mass Retailer Association) trade show. The "National Discount/Mass Retailers" channel shall specifically exclude the in-store bakery departments of such stores, which shall be included in the "In-Store Bakeries" channel defined above. Examples of National Discount /Mass Retailers include, without limitation, Walmart, K-mart, Target, Zellers, Biway, and Canadian Tire. |
| EXCLUDED | "Non-Chain Book Stores" shall mean stores or groups of stores (containing fewer than twenty [20] individual stores) that offer for sale primarily books. |
| PERMITTED | "Non-Chain Comic Book Stores" shall mean stores or groups of stores (containing fewer than twenty [20] individual stores) that offer for sale primarily comic books. |
| PERMITTED | "Non-Chain Drug Stores" shall mean stores or groups of stores (containing fewer than twenty [20] individual stores) that offer for sale primarily prescription Andover-the-counter drugs, personal care products, and household products. |
| PERMITTED | "Non-Chain Toy Stores" shall mean stores or groups of stores (containing fewer than twenty [20] individual stores) that offer for sale primarily toys. In order to be considered a "Toy Store" hereunder, the total number of toy-type SKUs must represent eighty percent (80%) or more of such store's total SKUs. Examples of Non-Chain Toy Stores include, without limitation, Talbot's Toyland and Tons of Toys, Inc. |

| PERMITTED/EXCLUDED | DISTRIBUTION CHANNELS: |
|---|---|
| EXCLUDED | "Non-Mall Clothing Specialty Stores" shall mean stores that offer for sale primarily clothing and are not located within a mall. Examples of Non-Mall Clothing Specialty Stores include, without limitation, Kids Mart, Kids R Us, Clothestime, and Fashion Bug. |
| PERMITTED | "Novelty Gift Stores" shall mean stores that offer for sale primarily novelty gift items. The "Novelty Gift Stores" channel shall specifically exclude Airport Gift and Other Airport Stores and duty-free operators. Examples of Novelty Gift Stores include, without limitation, Spencer's and It Stores. |
| PERMITTED | "Off-Price/Closeout Stores" shall mean stores that offer for sale primarily discounted apparel and other merchandise. Examples of Off-Price/Closeout stores include, without limitation, Marshall's, T.J. Max, Ross Dress for Less, Hit or Miss, Tuesday Morning, and Winners. |
| PERMITTED | "Office Specialty Stores" shall mean stores that offer for sale primarily office supplies. Examples of Office Specialty Stores include, without limitation, Office Depot, Staples, and Office Max. |
| PERMITTED | "Outlet Stores" shall mean stores that offer for sale primarily discounted merchandise of a particular manufacturer or retailer. |
| PERMITTED | "Party Stores" shall mean stores that offer for sale primarily party supplies. Examples of Party Stores include, without limitation, Party City and Party World. |
| PERMITTED | "Regional Discount/Mass Retailers" shall mean stores that (a) have regional distribution, (b) generally offer products for sale in a broad assortment of unrelated product categories, which products generally are not classified in the trade as "better/best" quality products, (c) are usually "self-service" with more of an emphasis on price than esthetics, and (d) generally do not require individual store servicing by suppliers. Suppliers to Regional Discount/Mass Retailers typically advertise in trade publications, such as "Discount Stores News" and "Discount Merchandiser", and usually attend the IMRA (International Mass Retailer Association) trade show. The "Regional Discount/Mass Retailers" channel shall specifically exclude the in-store bakery departments of such stores, which shall be included in the "In-Store Bakeries" channel defined above. Examples of Regional Discount/Mass Retailers include, without limitation, Meijers, Caldor, Ames, Bradlees, Hill's, Rose's, Venture, Shopko, Cotter, Fields, Giant Tiger, Harts, Northwest, and Saan Stores. |
| EXCLUDED | "Retail Bakeries" shall mean stores that offer for sale primarily freshly baked breads, cakes, cookies and similar bakery items. The "Retail Bakeries" channel shall specifically exclude in-Store Bakeries (as defined above). |
| PERMITTED | "Sporting Good Stores" shall mean stores that offer for sale primarily sporting goods, equipment, athletic apparel, and other merchandise that reflects a sports theme. Examples of Sporting Good Stores include, without limitation, Big 5 and Sports Chalet. |
| EXCLUDED | "Street Vendors" shall mean individual merchants who offer products for sale in stands, booths, or other non-permanent structures usually located on the sidewalk and designed to attract passing pedestrians. |
| PERMITTED | "Supermarket/Grocery Stores" shall mean stores that offer for sale primarily packaged food products. The "Supermarket/Grocery Stores" channel shall specifically exclude the in-store bakery departments of such stores, which shall be included in the "In-Store Bakeries" channel defined above. The "Supermarket/Grocery Stores" channel shall specifically exclude Gourmet Food Specialty Stores (as defined above) and Convenience Stores (as defined above). Examples of Supermarket/Grocery Stores include, without limitation, Kroger, Safeway, American Stores, Albertson's, Winn Dixie, Food Lion, Vons, Finast, Ralph's, Marsh, and Superstores. |
| EXCLUDED | "Swap Meets / Flea Markets" shall mean offering products for sale through organized events known as swap meets or flea markets, which involve a group of vendors offering for sale a variety of products, often collectibles or antiques. |

| PERMITTED/EXCLUDED | DISTRIBUTION CHANNELS: |
|---|---|
| PERMITTED | "Television Home Shopping Retailer" shall mean offering products for sale through cable and broadcast television, including informercials, QVC, and Home Shopping Network. The "Television Home Shopping" channel shall specifically exclude sales through the Internet, CD-Interactive, and other electronic media. |
| PERMITTED | "Toy Specialty / Better Toy Chain Stores" shall mean companies that offer for sale primarily specialty toys. Examples of Toy Specialty / Better Toy Chain Stores include, without limitation, FAO Schwarz, Zany Brainy, and Noodle Kadoodle. |
| PERMITTED | "Upstairs Department Stores" shall mean stores that (a) offer products for sale in a broad assortment of unrelated product categories, which products are generally classified in the trade as "best" quality products, and (b) offer a high lever of customer service with a strong emphasis on store aesthetics. Examples of Upstairs Department Stores include, without limitation, Bloomingdale's, Macy's, Nordstrom, May Department Stores, Saks Fifth Avenue, Neiman Marcus, and Dillards. |
| PERMITTED | "Warehouse Clubs" shall mean stores that offer for sale products in large sizes and quantities with more of an emphasis on price than service or store aesthetics. The "Warehouse Clubs" channel shall specifically exclude in the in-store bakery departments of such stores, which shall be included in the "In-Store Bakeries" channel defined above. Examples of Warehouse Clubs include, without limitation, Sam's Club, and Price Costco. |

EXHIBIT I

## EXHIBIT II

### ANNUAL PRODUCT & MARKETING PLANS

Proposed Product & Marketing Plans.  Prior to the product development, manufacture, distribution or sale of any Licensed Product hereunder for the applicable time period set forth in this Exhibit II, Licensee shall submit to Licensor for Licensor's written approval or disapproval a "Proposed Product &  Marketing Plan" (as such terms are hereinafter defined), as follows for the Territory and/or such countries of the Territory as Licensor may, in its sole discretion, designate:

(a)    Submissions to Licensor:

(i)    Final and Annual Proposed Product & Marketing Plans: For each Licensed Product to be manufactured, distributed and sold from and after January 1, 2007 through December 31, 2009, Licensee shall submit a final Proposed Product & Marketing Plan on or before the date set forth in Clause J(1) of the Agreement (the "Final Proposed Product & Marketing Plan"), and Licensee shall submit on or before the date set forth in Clause J(2) of the Agreement of each Calendar Year of the Term, Licensee shall submit a Proposed Product & Marketing Plan (in Licensor's standard form), for each Licensed Product to be manufactured, distributed and sold for the next succeeding Calendar Year of the Term (each an "Annual Proposed Product & Marketing Plan"),

(ii)    Annual Product & Marketing Plans:  On or before the dates set forth in Clause J(2) of each Calendar Year of the Term, Licensee shall submit a marketing plan for each Licensed Product to be manufactured, distributed and sold for the next succeeding Calendar Year of the Term, setting forth Licensee thorough and detailed plans for the distribution, advertising, marketing and sale of each Licensed Product (each such marketing plan a "Annual Product & Marketing Plan" herein), and notwithstanding when such manufacture, distribution or sale occurs.  Each Annual Product & Marketing Plan shall contain the "Plan Elements" (as hereinafter defined), but Licensor's approval rights will not extend to product pricing or discounts provided to any Customer; and

(iii)    Quarterly Updates:  On or before the commencement of each Calendar Quarter of the Term, commencing with the Calendar Quarter immediately following the Calendar Quarter in which each proposed Product & Marketing Plan is submitted by Licensee to Licensor, Licensee shall prepare and submit to the Licensor, for Licensor's written approval, a document identifying all actual or projected additions, deletions, modifications or changes, if any, to a previously submitted Plan Element for such proposed Product &  Marketing Plan (each a "Quarterly Update").

(b)    Plan Elements: Each proposed Product & Marketing Plan element shall detail for each country at least the following components with respect to the applicable time period to be covered thereby (collectively the "Plan Elements").  License will supply appropriate approved forms for submission:

(i)    Final and Annual Proposed Product & Marketing Plans: On Licensor's consolidated product plan spreadsheet, this report will delineate the appropriate property, category/sub-category and product descriptions (including materials and sizes/ages) on a SKU-by-SKU basis of any Licensed Product to be manufactured hereunder.  Included on spreadsheet will be wholesale and retail pricing, marketing dates, distribution types, and limited edition quantities where applicable.

(ii)    Marketing Plan Calendar:  annual plan created on a month-by-month basis supplemented with detailed narrative description or strategic and creative positioning for the plan.  Licensor form will be supplied.

(iii)    Detailed Pricing Sheet with Related Policies and Procedures:  consolidated spreadsheet of itemized products that include pricing for all classes of trade, F.O.B., distributor, wholesale and suggested retail and a detailed summary of Licensee's policies and procedures with respect to discounts, product pricing, trade allowances, promotions and sales incentive programs as the same relate to any Licensed Product.

(iv)    Forecasts and Consolidated Sales Activity Report:  separate, detailed forecasts of shipments and sales for to each Customer as well as shipments and sales to each End Consumer for, and all inventory of, each Licensed Product (the "Sales Projections") by Licensed Product and/or by SKU, by Top Ten Customers, and by Country, if applicable.

*    *    *

EXHIBIT  II – Page 1 of 3

**EXHIBIT II**

**Proposed Product & Marketing Plans**

| Marketing Year | |
|---|---|
| Initial Proposed Product & Marketing Plan | |
| Final Proposed Product & Marketing Plan | |
| | |
| | |

| Property | |
|---|---|
| *Star Wars* | |
| Indiana Jones | |
| Clone Wars (CN) | |
| Clone Wars (LFL) | |
| [New Live Action Feature] | |
| [New Animated Feature] | |

| Contract Number | L |
|---|---|
| Contract Date Begins | (M/D/Y) |
| Contract Date Ends | (M/D/Y) |
| | |
| | |

| Agent | |
|---|---|
| Licensed Name | |
| Distribution Source (LFL) | |
| Territory | |

| Manufacture | |
|---|---|
| Distributor | |
| Manufacturer/Distributor | |
| Retailer | |

Please only check one box

| Category | Sub-Category (Assortment) | Item Name (Character / Vehicle) | Item Number | Materials | Age | Size | Production Amount | LE/ET/ER | Wholesale Price | Suggested Retail Price | On-Shelf Date | Dist. Type | Dev. Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

| Product & Marketing Plan Submission Date (Month/Day/Year): | | | |
|---|---|---|---|

**KEY:**

**MARKETING YEAR -** The year of product is released onto the market.

**INITIAL PROPOSED PRODUCT & MARKETING PLAN -** Check this box if this is the Initial Proposed Product & Marketing Plan which must be submitted to Lucasfilm as part of the initial proposal and the fully signed contract.

**FINAL PROPOSED PRODUCT & MARKETING PLAN -** Check this box when submitting the Final Proposed Product & Marketing Plan which shall be the final refinement and modification of all previously submitted Proposed Product & Marketing Plans and is based on review of material and input by Lucas Licensing. You still have the option to modify this form, however, all new variations must be submitted to Lucas Licensing for approval.

_NOTE_: No product development will be carried out until the Final Proposed Product & Marketing Plan has been approved by Lucas Licensing.

**MANUFACTURER -** Licensees that develop & manufacture their own products.

**DISTRIBUTOR -** Licensees that only distribute products sourced from other licensees.

**MANUFACTURER / DISTRIBUTOR -** Licensees that not only develop & manufacture their own products but also source from other licensees and distribute as well.

**DISTRIBUTION SOURCE** – i.e. Whose products are you distributing?

**CATEGORY** – e.g. Apparel

**SUB-CATEGORY** – e.g. T-shirts

**MATERIALS -** Materials used for each licensed product (e.g., if apparel, list material(s) used, such as cotton & polyester).

**AGE** – Enter: **(K)** kids 3-7, **(Y)** youth 8-12, **(YA)** young adult 13-18, **(A)** adult 18+

**SIZE -** Enter as appropriate to the product. (e.g. S, M, L for apparel or A3, A4 for stationary etc)

**PRODUCTION AMOUNT** – As much as possible; list intended amount of products to be manufactured (particularly for Limited Edition items).

**LE / ET / ER -** Note if the product is: **(LE)** limited edition, **(ET)** exclusive at time of launch, **(ER)** exclusive to retailer.

**WHOLESALE / SUGGESTED RETAIL -** enter price points.

**ON-SHELF DATE -** Target date for distribution of product to market.

**DISTRIBUTION TYPE** – Enter: **(H)** high-end, **(M)** mid-range/specialty, **(L)** discount/mass

**DEVELOPMENT STATUS -** Enter: **(N)** for new product, **(C)** for carry forward, **(IN)** for in development.

# EXHIBIT III

## ROYALTY REPORT FORM

1.    <u>Financial Information.</u>   Licensee shall furnish to Licensor, at the times set forth in the Agreement, a full and complete statement, in Licensor's standard Royalty Report Form, as duly certified by an officer of Licensee to be true and accurate, providing at least the following information, on a country-by-country basis:

     (a)     one hundred percent (100%) of all gross amounts derived by Licensee or a Sublicensee (whether or not such Sublicensee is a Licensee-Related Entity), as the case may be, from the sale of each and every Licensed Product SKU hereunder, itemized by Licensed Product SKU;

     (b)     itemization of all allowable deductions, if any, in calculating the Net Sales for each Licensed Product;

     (c)     the Net Sales for each and every Licensed Product SKU, the Customer from whom such Net Sales are derived and the percentage of such Net Sales derived from End Consumers purchasing through each Customer;

     (d)     the amount of Royalties due to Licensor with respect to such Net Sales;

     (e)     credits for any Advance recoupment or other payments made since the last Royalty Report Form rendered to Licensor hereunder;

     (f)     the balance payable;

     (g)     an itemization of each and every Licensed Product SKU utilizing the name, voice or likeness of such individual previously identified to Licensee by Licensor to whom Licensor has an obligation to pay a participation in proceeds generated by the sale of such Licensed Product and the identification of each and every name, voice or likeness of a character which is embodied in such Licensed Product SKU;

     (h)     an itemization of all information required by Licensor and previously advised to Licensee for Licensor to calculate any participation referred to in Clause 1(g) of this Exhibit III and/or to render accountings with respect thereto; and

     (i)     such other pertinent information as Licensor may reasonably request from time to time.

2.    <u>Category Breakdowns.</u>   Each and every item of financial information required to be submitted by Licensee pursuant to Clause 1(a)-1(i) of this Exhibit III shall be broken down into the following categories: the Calendar Quarter to which the statement applies; cumulative from the inception of the Calendar Year to which such statement applies; and cumulative from and after the date of the Agreement to the close of the Calendar Quarter to which such statement applies; and such information shall be aggregated as follows:

     (a)     by country; and

     (b)     by all Licensed Products throughout the Territory as a whole.

3.    <u>Local Currency.</u>   All amounts to be reported pursuant to this Exhibit III shall be first stated in the local currency in which the pertinent Net Sales occurred. If several currencies are involved in any reporting category, that category shall be broken down by each such currency. Next to each local currency amount shall be set forth the equivalent amount stated in U.S. Dollars, and the rate of exchange required to be used hereunder in making the conversion calculation.

4.    <u>Electronic Media Format.</u>   All information required to be submitted to Licensor pursuant to Subparagraph 8.3 of the Agreement shall be provided by Licensee, at its sole expense, to Licensor **[in ASCII format]** or any other electronic media format as Licensor may reasonably request.

5.    <u>Related Information.</u>   Upon Licensor's written request, Licensee shall also provide to Licensor such relevant data and information which Licensor shall require to substantiate any financial information submitted to Licensor pursuant to the Agreement related to the proper exercise of the rights licensed to Licensee pursuant to the Agreement and/or the operation and performance of Licensee's duties and obligations pursuant to the Agreement.

*   *   *

Exhibit III - Page 2 of 3

# ROYALTY REPORT FORM

## STAR WARS - CLASSIC

TO: Royalty Accounting
Lucasfilm Ltd.
P.O. Box 29905
San Francisco, CA 94129

Name of Licensee _____

By Country _____ Currency Used _____ Exchange Rate _____

Date _____
Month Reported _____
Page _____ of _____

| | | | CURRENT PERIOD | | | | | | | | | | CALENDAR YEAR-TO-DATE | | | | INCEPTION-TO-DATE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SKU Number | Description of Item | Char. Code | Number of Units | | Total | Unit Price | Gross Sales | Allowable Deductions | Net Sales | Royalty Rate | Royalty Due in Local Currency | Royalty Due in USD | Total Units | Total Net Sales | Royalty Reported in Local Currency | Royalty Reported in USD | Total Units | Total Net Sales | Royalty Reported in Local Currency | Royalty Reported in USD |
| | | | Shipped/ Invoiced | Adjustments (if applicable) | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |

TOTAL            TOTALS            GROSS ROYALTY DUE

LESS: Advances/Guarantees Paid (_____)

Signature _____
Printed Name _____
Title _____
Phone # _____

Character Code:  A: Luke Skywalker - Mark Hamill
B: Han Solo - Harrison Ford
C: Princess Leia - Carrie Fisher
D: Lando Calrissian - Billy Dee Williams

NET ROY DUE/(BAL OF ADV) _____

LESS: Advances/Guarantees Paid (_____)

LESS: Royalty Overages Paid (_____)
This Calendar Year

NET ROY DUE/(BAL OF ADV) _____

LESS: Advances/Guarantees Paid (_____)

LESS: Total Royalty Overages Paid (_____)

NET ROY DUE/(BAL OF ADV) _____

Exhibit III - Page 3 of 3

# ROYALTY REPORT FORM
## STAR WARS - EPISODE I & EPISODE II & EPISODE III

TO: Royalty Accounting
Lucasfilm Ltd.
P.O. Box 29905
San Francisco, CA  94129

Name of Licensee _____

By Country _____  Currency Used _____  Exchange Rate _____

Date _____
Month Reported _____
Page _____ of _____

| | | | Number of Units | | | | | | | | | Royalty Due | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SKU Number | Description of Item | Char. Code | Shipped/ Invoiced | Adjustments (if applicable) | Total | Unit Price | Gross Sales | Allowable Deductions | Net Sales | Royalty Rate | Royalty Due in Local Currency | Royalty Due in USD | |

**CURRENT PERIOD**

TOTAL          TOTALS          GROSS ROYALTY DUE

LESS: Advances/Guarantees Paid  ( _____ )

NET ROY DUE/(BAL OF ADV) _____

**CALENDAR YEAR-TO-DATE**

| Total Units | Total Net Sales | Royalty Reported in Local Currency | Royalty Reported in USD |
|---|---|---|---|

LESS: Advances/Guarantees Paid  ( _____ )

LESS: Royalty Overages Paid  ( _____ )
This Calendar Year

NET ROY DUE/(BAL OF ADV) _____

**INCEPTION-TO-DATE**

| Total Units | Total Net Sales | Royalty Reported in Local Currency | Royalty Reported in USD |
|---|---|---|---|

LESS: Advances/Guarantees Paid  ( _____ )

LESS: Total Royalty Overages Paid  ( _____ )

NET ROY DUE/(BAL OF ADV) _____

Signature _____
Printed Name _____
Title _____
Phone # _____

Character Code:    A: Episode I - Qui-Gon Jinn - Liam Neeson
B: Episode I & II & III- Obi-Wan Kenobi - Ewan MacGregor
C: Episode I & II & III -Queen Amidala/Padme - Natalie Portman

EXHIBIT IV

APPROVAL OF MANUFACTURER AGREEMENT

## APPROVAL OF MANUFACTURER AGREEMENT

THIS AGREEMENT dated as of October 23, 2007 by and among LUCASFILM LTD. ("Licensor"), located at P.O. Box 29901, San Francisco, California 94129-0901 U.S.A.), «Company», ("Company"), located at «Company_Address», «Company_City», «Company_State», «Company_Zip» «Company_Country» and «Licensee» ("Licensee"), located at «Licensee_Address», «Licensee_City», «Licensee_State», «Licensee_Zip» «Licensee_Country».

WHEREAS: Reference is made to that certain License Agreement dated as of «License_Agreement_Date» (the "License Agreement") between Licensor and Licensee under which Licensee was granted the right to manufacture and distribute the products, goods and articles of merchandise specified therein ("Licensed Products") relating to the certain Licensed Property governed thereby; and

WHEREAS: Company and Licensee have executed an agreement dated «Manuf_Agree_Date» (the "Manufacturing Agreement") whereby Company has been engaged by Licensee to manufacture certain Licensed Products based on or incorporating the Licensed Property in the country or countries set forth therein (the "Territory") and for a term as set forth therein (the "term") commencing on «EffectiveStart_Date» and continuing until «Term_End_Date».

NOW, THEREFORE, for the promises set forth herein by the parties and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree, as follows:

1.  RESPONSIBILITY OF LICENSEE: Subject to the terms and conditions of the License Agreement, nothing contained in this Agreement or in the Manufacturing Agreement shall in any manner whatsoever affect or otherwise diminish or relieve Licensee of any of its obligations under the License Agreement.

2.  MANUFACTURING AGREEMENT: In order to induce Licensor to execute this Agreement, Licensee and Company hereby represent and agree that, subject to the approval of Licensor, Company has executed the Manufacturing Agreement. Without limitation of Licensor's rights, if Company breaches a material term of the Manufacturing Agreement and, as a result of such breach, Licensee is in material breach of the License Agreement, then, notwithstanding anything to the contrary contained in the Manufacturing Agreement, Licensor shall have the right, pursuant to the License Agreement to send to Company a notice of termination ("Termination Notice") in the name of Licensee and the Agreement shall be deemed terminated as of the date Company receives such Termination Notice.

3.  APPROVAL BY LICENSOR: Subject to the terms and conditions hereof, Licensor hereby approves of Company as a manufacturer of the Licensed Products governed by the Manufacturing Agreement, for the Term, as such Term shall expire or be terminated hereunder, and for the Territory.

4.  ACKNOWLEDGMENT OF LICENSE AGREEMENT: Company hereby represents that Company has reviewed and is familiar with all of the provisions of the License Agreement relevant to Company's activities hereunder, and Company agrees that in performing under this Agreement, Company shall perform, be bound by and comply with each of such terms and conditions of the License Agreement as they apply to Company. Without limitation of Licensor's rights and remedies, in the event of a breach or threatened breach by Licensee of any term or condition of the License Agreement and/or in the event of a breach or threatened breach by Company of any term or condition of the Manufacturing Agreement that would result in a breach of Licensee's Agreement, Licensor shall be entitled to legal and/or equitable relief by way of injunction or otherwise against Licensee and/or against Company, at the discretion of Licensor, to restrain, enjoin and/or prevent any such breach or threatened breach.

RIDER

5.  OBLIGATIONS OF COMPANY:  Company hereby agrees that in exercising the rights authorized herein:

    (a)  Company shall only manufacture the Licensed Products pursuant to the Manufacturing Agreement in accordance with the instructions of Licensee;

    (b)  Company shall not assign or License, in any manner whatsoever, the rights granted to Company herein or delegate any of its obligations under the Manufacturing Agreement or under this Agreement, to any party without Licensor's prior written consent;

    (c)  Company shall execute a Trademark License Agreement with Licensor, or with any entity designated by Licensor, with respect to the Licensed Products in a form substantially identical to the Trademark License Agreement executed by Licensee with respect to the Licensed Products; and

    (d)  Without limitation of Licensor's rights hereunder, Company shall upon execution of the Manufacturing Agreement and this Agreement assume all of Licensee's obligations with respect to manufacture of the Licensed Products governed thereby.

6.  EFFECT OF EXPIRATION OR TERMINATION:  Without limitation, upon the expiration or earlier termination of the Manufacturing Agreement, Company shall (a) immediately cease all activities authorized hereunder respecting the Licensed Products including, without limitation, the distribution and sale of Licensed Products and, within thirty (30) days after such expiration or termination, Company shall send Licensor a complete inventory report of all Licensed Products within its possession or control; and (b) at Licensor's election, either (i) deliver to Licensor all Production Materials; or (ii) furnish Licensor with a sworn certificate of destruction of such Production Materials, signed by an officer of Company. Without limitation of its rights and remedies, Licensor shall have the right to enter the premises where the Licensed Products are located to verify such inventory statement and/or take possession of and remove any remaining Production Materials. Upon the expiration or termination of the Manufacturing Agreement, except as otherwise expressly provided herein, Company shall have no further right to exercise the rights approved hereunder or otherwise acquired pursuant to the Manufacturing Agreement.

7.  COMPANY RECORDS AND AUDITS:

    (a)  Company will maintain complete and accurate records during and for five (5) years after the termination or expiration of the Manufacturing Agreement related to this Agreement and/or the rights granted to Company pursuant to the Manufacturing Agreement. The obligation to maintain records and to grant Licensor and Licensor's representatives access to such records shall survive the expiration or earlier termination of this Agreement.

    (b)  An independent certified Public accountant selected by Licensor may, upon reasonable notice and during normal business hours, inspect any and all records of Company related to the exercise of Company's rights under this Agreement and/or under the Manufacturing Agreement. If, upon performing such audit, it is determined that Company owes Licensor monies, Company will immediately make full payment thereof.  If the amount of such payment exceeds Five Thousand Dollars (U.S.$ 5,000.00), Company will bear all expenses and costs of such audit in addition to its obligation to make full payment. All underpayments and late payments will accrue interest charges from the due date through the date of payment at an interest rate equal to three percent (3%) over the prime lending rate set by the Bank of America N.T.S.A., or the maximum legal rate, if such maximum legal rate is lower, and shall be payable upon demand.

8.  LICENSOR AS THIRD PARTY BENEFICIARY:  In addition to Licensor's other rights and remedies pursuant to the License Agreement and this Agreement, Licensor is a third party beneficiary of the obligations of Company under any and all agreements, whether oral or written, between Company and Licensee respecting the Licensed Products, including, without limitation, the Manufacturing Agreement, and Licensor shall have the right at any time to enforce such obligations and to exercise any of Licensee's rights and

remedies directly against Company as if a direct party thereto if Licensee fails to enforce such obligations or to exercise any such rights or remedies within twenty-five (25) days following Licensee's receipt of Licensor's written request therefore.

9.     <u>CONFIDENTIALITY</u>:

    (a)    <u>Confidential Information</u>. Company acknowledges and agrees that the terms and conditions contained in this Agreement, the Manufacturing Agreement and/or any other agreement between or among any or all of the parties are confidential, as well as any and all information and material concerning or pertaining to: (i) any script, concept, marketing plan, schedule of Licensor or of any Licensor-Related Entity (including, without limitation, any pre-production, production or post-production schedule or release schedule for any "Prequel" [as defined in the License Agreement] or for any derivative work thereof); (ii) any project, product, good or article pertaining to the Licensed Property; (iii) any term or condition of any agreement between Licensor and any individual or entity relating to any Licensed Product (including, without limitation, any talent agreement); and (iv) any "Copyright Material" (as such term is defined in the License Agreement) are confidential and proprietary to Licensor (individually and collectively the "Confidential Information"). Company further acknowledges and agrees that, except as otherwise expressly provided in this Subparagraph 9(a), Company shall not use, copy, or disclose, or authorize or permit the use, copy or disclosure of, any Confidential Information in whole or in part in any manner or to any person, firm, enterprise, organization, corporation or entity unless authorized in advance in writing by Licensor. Company shall receive and hold, and shall contractually obligate and cause all entities with whom it contracts relative to the Licensed Products to maintain, all Confidential Information in the strictest confidence and Company acknowledges, represents, warrants and agrees to use its best efforts to protect the confidentiality of all Confidential Information. Furthermore, Company will not disclose any Confidential Information to any third party for any purpose (including the exercise of its rights or performance of its obligations) unless Licensor otherwise agrees in writing and such third party has executed a written confidentiality agreement in form and substance acceptable to Licensor, which confidentiality agreement, <u>inter alia</u>, shall restrict the use of any Confidential Information to the minimal extent necessary to effectuate the terms and conditions of this Agreement as they apply to such third party shall require such third party to use its best efforts to maintain all Confidential Information in the strictest confidence. Company's obligations pursuant to this Subparagraph 9(a) shall not apply to any Confidential Information which: is authorized in writing by Licensor to become publicly known; is rightfully received from a third party authorized by Licensor to receive such information without restriction and without breach of this Agreement; or is the minimum amount necessary to comply with any valid order of a court of competent jurisdiction.

    (b)    <u>Publicity or Announcements</u>. Without limitation of the foregoing, except to the extent necessary to comply with any law, regulation or stock exchange rule, no announcements, press releases, or publicity about the existence or any terms of this Agreement, the relationship of the parties or about the rights relating to the Licensed Products to be exercised hereunder shall be made by Company without the prior written approval of Licensor in each instance.

    (c)    <u>Rights of publicity</u>. Except as expressly set forth herein, Company acquires no rights to use and will not use without Licensor's prior written approval the characters, artwork, designs, trade names, copyrighted materials, trademarks or service marks of Licensor in any Advertising, Publicity or promotion, to express or imply any endorsement by Licensor of Company's services or products, or in any other manner except as expressly authorized in this Agreement. The foregoing provision shall survive expiration or termination of this Agreement.

10.     <u>GENERAL</u>:

    (a)    <u>Assignment</u>. This Agreement will bind and inure to the benefit of each party and to their respective successors and assigns. Company shall not voluntarily or by operation of law assign, sub-license, transfer, encumber or otherwise dispose of

all or part of any right or privilege granted to Company in this Agreement or in the Manufacturing Agreement, without Licensor's prior written approval. For purposes of this Subparagraph 10(a), any change in control of Company, whether through merger, acquisition, reorganization, liquidation, foreclosure, involuntary sale in bankruptcy, or the purchase of substantially all of Company's assets or otherwise, shall be deemed a purported assignment subject to Licensor's prior written approval. Any attempted assignment, sublicense, transfer, encumbrance or other disposal without such approval will be null and void and constitute a material default and material breach of this Agreement.

(b)  Governing Law. This Agreement will be governed by and construed in accordance with the federal laws of the United States and the laws of the State of California applicable to agreements executed, and to be performed entirely, within California between California residents (and excluding the United Nations Convention on Contracts for the International Sale of Goods) without regard to choice of provisions and regardless of the place or places of its actual execution and performance. Any suit, action or proceeding between or among any of the parties hereto arising out of or related to this Agreement will be brought solely in the federal or state courts in the Northern District of California, and Company hereby submits to the personal jurisdiction thereof and agrees to such courts as the appropriate venue. Notwithstanding the foregoing, Company agrees that, for purposes of collecting monies due pursuant to this Agreement, Company, at Licensor's election, may be subject to whatever local laws and courts have jurisdiction in any country of the Territory over Company.

(c)  Attorneys' Fees. In the event of any legal proceeding between or among any of the parties hereto arising out of or related to this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief awarded or granted, its costs and expenses (whether or not in connection with litigation and including, without limitation, reasonable attorneys' fees and costs) incurred in connection with any such proceeding.

(d)  Equitable Relief. Company recognizes and acknowledges that a breach by Company of any covenants, agreements or undertakings made or assumed by it hereunder or under the Manufacturing Agreement will cause Licensor irreparable damage, which cannot be readily remedied in damages in an action at law, and may, in addition thereto, constitute an infringement of Licensor's intellectual property and other rights in the Licensed Property, thereby entitling Licensor to equitable remedies (including, without limitation, injunctive relief), reasonable costs (including, without limitation, whether or not in connection with litigation) and reasonable attorney's fees.

(e)  Notices. All notices and approvals under this Agreement will be deemed received when delivered personally, sent by confirmed facsimile transmission or received through nationally-recognized express courier, to the address shown below or as may otherwise be specified by either party to the other in accordance with this Subparagraph 10(e). All such notices to Licensor will be directed as follows:

For notices to Licensor: Lucasfilm, Ltd. P. O. Box 29901, San Francisco, CA 94129-0901
Attention: Vice President, with a courtesy copy to: Business Affairs

For notices to Company: _____

(f)  No Waiver. No waiver by either party, whether express or implied, of any provision of this Agreement or any breach thereof, and no failure of either party to exercise or enforce any of its rights under this Agreement, will constitute a continuing waiver with respect to such provision or right or as a breach or waiver or any other provision or right, whether or not similar.

(g)  Severability. This Agreement is severable. If any provision of this Agreement is found invalid or unenforceable, that provision will be enforced to the maximum extent permissible, and the other remaining provisions of this Agreement will not be affected and shall remain in force.

(h)    Approvals. Any and all approvals of Licensor permitted, rendered or required pursuant to this Agreement may be given or withheld in Licensor's sole discretion, subject to the terms of the License Agreement.

(i)    Headings, Captions, and Definitions. The name of this Agreement, and all headings and captions herein contained are for reference and convenience only and do not define, limit or expand the scope or intent of any provision hereof and shall not be relied upon in or in connection with the construction or interpretation of this Agreement. Except as herein otherwise expressly defined, all capitalized terms contained in this Agreement shall have the same meaning as such words have in the License Agreement. The words "herein," "hereunder" and similar terms refer to this entire Agreement and shall not be limited to the specific paragraphs or subparagraphs in which they are used.

(j)    Counterparts. This Agreement may be executed in one or more counterparts, and by telefacsimile transmission, each copy of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument, but this Agreement shall not be binding upon the parties until it has been signed by all parties hereto. The parties hereto agree that telecopied signatures hereto shall be effective and enforceable.

(k)    Further Instruments. Except as otherwise provided in this Agreement, each party shall furnish to the others (and shall deliver and cause to be executed, acknowledged and delivered to the other) any further instruments, which any such other party may reasonably require or deem necessary from time to time to evidence, establish, protect, enforce, defend or secure to such other party any or all of its rights hereunder or to more effectuate or carry out the purposes, provisions or intent of this Agreement.

11.    ENTIRE AGREEMENT: This Agreement constitutes the complete and entire agreement by and among all of the parties with respect to the subject matter hereof, superseding and replacing any and all prior agreements, negotiations, communications, and understandings (both written and oral) by and among all of the parties regarding such subject matter. This Agreement may only be modified, or any rights under it waived, by a written document executed by all parties.

By signing in the spaces provided below, the parties hereto have accepted and agreed to all of the terms and conditions hereof.

RAND INTERNATIONAL
«Company» ("Company")                    LUCASFILM LTD. ("Licensor")

By:  _Steven Goldmeier_                   By:  _____

Its:  _PRINCIPAL_                         Its:  Vice President

Name:  _STEVEN GOLDMEIER_                 Name:  Howard Roffman

Date:  _10/24/2007_                       Date:  _____


«Licensee» ("Licensee")

By:  _Steve Goldmeier_

Its:  _____

Name:  _____

Date:  _____

## RIDER

Notwithstanding anything to the contrary contained in the Agreement, the Agreement is hereby deemed modified as follows:

## BASIC TERMS

Clause D:

LICENSED PRODUCTS.   The term "Licensed Products" means those products, goods and articles described below that incorporate or utilize the Licensed Property in the manner authorized in the Agreement:

| NO. | Column A<br>LICENSED PRODUCT<br>WHEELED ITEMS | Column B<br>(EXCL or<br>NON-EXCL) |
|-----|-----------------------------------------------|-----------------------------------|
| 1. | Bicycles | NON-EXCL |
| 2. | Tricycles | NON-EXCL |
| 3. | "Low Riders"- 3 wheel-big wheeled tricycles in either metal or plastic | NON-EXCL |
| 4. | 2- and 3-wheeled scooters | NON-EXCL |
| 5. | "Ride-ons" -- Battery operated vehicles and foot to floor vehicles for children | NON-EXCL |
| 6. | Roller/in-line skates | NON-EXCL |
| 7. | Skateboards | NON-EXCL |

| NO. | Column A<br>LICENSED PRODUCT<br>NON-WHEELED ITEMS | Column B<br>(EXCL or<br>NON-EXCL) |
|-----|---------------------------------------------------|-----------------------------------|
| 1. | Balls (all types) | NON-EXCL |
| 2. | Ball games (e.g., paddleball, stand-alone tetherball, stand-alone basketball hoop sets) | NON-EXCL |
| 3. | Bubbles and bubble sets | NON-EXCL |
| 4. | Swim toys and accessories (e.g., goggles, snorkel masks, fins, kick boards, body boards, dive sticks) | NON-EXCL |
| 5. | Bubble gum banks; Paint-A-Piggy bank | NON-EXCL |
| 6. | Non-metal dry erase boards; Magnetic drawing boards | NON-EXCL |
| 7. | Protective gear for wheeled goods: helmets, pads, gloves | NON-EXCL |
| 8. | Sun catchers; mints in tins | NON-EXCL |

Notwithstanding anything to the contrary contained in the Agreement, including, without limitation, Subparagraph 1.1, the rights granted to Licensee hereunder, including, without limitation, the right to manufacture, distribute and sell a particular Licensed Product described in Column A above shall only be on an exclusive basis if denoted "EXCL" in Column B above and shall otherwise be on a non-exclusive basis.

Clause I(1):      PAYMENTS.

## NO CROSS-COLLATERALIZATION:

Each advance payment in **Clause I(1)(a)** above shall be allocated to each country (or grouping of countries) listed below in the applicable amount listed in Column I below and shall be recouped only from Royalties earned from Net Sales of Licensed Products in such country(ies) or Sub-Territory(ies) up to the prorated advance amount listed in Column II below:

Rand.L5179.102207FINAL

| Column I: Country or Sub-Territory | Column II: Advance Allocation |
|---|---|
| 1. United States | 1. Fifty Thousand Dollars ($50,000) |
| 2. Canada | 2. Twenty-five Thousand Dollars ($25,000) |

Each advance payment in **Clause I(1)(b) above** shall be allocated to each country (or grouping of countries) listed below in the applicable amount listed in Column I below and shall be recouped only from Royalties earned from Net Sales of Licensed Products in such country(ies) or Sub-Territory(ies) up to the prorated advance amount listed in Column II below:

| Column I: Country or Sub-Territory | Column II: Advance Allocation |
|---|---|
| 1. United States | 1. Fifty Thousand Dollars ($50,000) |

Each advance payment in **Clause I(1)(c) above** shall be allocated to each country (or grouping of countries) listed below in the applicable amount listed in Column I below and shall be recouped only from Royalties earned from Net Sales of Licensed Products in such country(ies) or Sub-Territory(ies) up to the prorated advance amount listed in Column II below:

| Column I: Country or Sub-Territory | Column II: Advance Allocation |
|---|---|
| 1. United States | 1. Seventy-five Thousand Dollars ($75,000) |

For the avoidance of doubt, there shall be no cross-collateralization between countries, i.e., Licensee may only offset Royalties earned from the sale of any Licensed Product in one country (or grouping of countries / Sub-Territory(ies), as set forth in the list above) against the Advance payment allocated to that same country (or grouping of countries / Sub-Territory(ies)) and not against the Advance payment allocated to any other country (or grouping of countries / Sub-Territory(ies), as the case may be).

**STANDARD CONDITIONS:**

Subparagraph 1.1:
Notwithstanding anything to the contrary contained in this Agreement, the sole activity of manufacturing Licensed Products by a Manufacturer hereunder may take place in a country outside of the Territory so long as no Licensed Product manufactured in such country is distributed by Licensee (or with Licensee's express or implied authority) from such country for the "sale" (as defined in Subparagraph 15.50 of the Agreement) thereof to a Customer outside of the Territory.

Subparagraphs 1.1 and 1.2:
The following language is hereby deemed inserted after the last sentences of Subparagraphs 1.1 and 1.2:

"Licensee's right to manufacture and distribute any Licensed Product into a wholesale warehouse club (e.g., B.J.'s Wholesale, Costco/Price Club, Sam's) shall be limited to a Licensed Product which contains different design and/or packaging elements from Licensed Product distributed to or through any other distribution channels and for which there will be a separate sell sheet. The foregoing sentence is not intended in any way to restrict or dictate product pricing and is not intended to require product packaging for such wholesale warehouse club that is commercially inferior to that distributed to or through such other distribution channels."

Subparagraph 15.59.1
The following language is deemed inserted as Subparagraph 15.59.1:

"'U.S. Exhibition'" means: exhibition to a general U.S. audience via any visual mass medium, including but not limited to theatrical, network television, television syndication, basic cable television, pay television, pay-over-the-air television, closed circuit television, any on demand television services (e.g. subscription video on demand, free on demand), Internet exhibition, or any other now known or hereafter developed exhibition method, whether delivered in a linear or non-linear manner and regardless of format e.g. streaming, still or downloadable."

* * *

RIDER

**EXHIBIT R-2**

**BANK GUARANTY**

Reference is hereby made to that certain License Agreement made between Lucasfilm Ltd., located at 1 Letterman Drive, Building B, San Francisco, California 94129  ("LFL") and _____ ["Licensee"], located at _____ and dated _____ ("the Agreement"). *[INSERT NAME OF LENDER]* agrees to guarantee to LFL the due fulfillment of the financial obligations of Licensee arising from the Agreement, up to the maximum amount set forth in this Guaranty.

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and as a further inducement to LFL to enter into the Agreement, the undersigned *[Name of Guarantor]*, located at _____ and organized under the jurisdiction of [_____] and registered under No. [_____] (the "Guarantor") hereby irrevocably guarantees and commits to pay to LFL not later than five (5) business days following its receipt of a written request from LFL any or all of the advances and royalties due and owing to LFL pursuant to the Agreement in the event that *[Licensee]* does not meet any of its financial obligations to LFL pursuant to the terms and conditions of the Agreement , up to the maximum amount of One Hundred Twenty-five Thousand Dollars[$125,000] (plus interest pursuant to the Agreement) in amounts due and owing to LFL, including, without limitation, the following non-returnable advance to LFL pursuant to the terms of the Agreement:

Fifty Thousand Dollars ($50,000) on or before June 1, 2008; and

Seventy-five Thousand Dollars ($75,000) on the first "U.S. Exhibition" of "Clone Wars" (as such terms are defined in the Agreement);

This Guaranty is valid until the earlier to occur of the following dates:  the date the Advance is paid in full to LFL pursuant to the Agreement, or the date this Guaranty has been returned to the undersigned by LFL.

Guarantor waives any notice which may be required relative to the acceptance of this Guaranty, or the creation, extension, renewal or amendment of the License, and also waives presentment, demand, protest, notice of dishonor or nonpayment or other default by Licensee.

In the event the Licensee shall be in default in the payment of any indebtedness, the payment of which is hereby guaranteed, Guarantor shall immediately, upon demand by LFL, pay to LFL the full amount of such indebtedness, and such obligation shall become the direct and primary obligation of the Guarantor.

This agreement shall bind the successors and assigns of the Guarantor.

This guarantee is given in compliance with the _____ *[DRAFTING NOTE: Insert applicable Exchange Rules]*

This Agreement will be governed by and construed in accordance with the laws of the federal laws of the United States and the laws of the State of California applicable to agreements entered into, and to be performed entirely, within California between California residents (and excluding the United Nations Convention on Contracts for the International Sale of Goods) without regard to choice of law provisions and regardless of the place or places of its actual execution or performance. Any suit, action or proceeding between or among any of the parties hereto arising out of or related to this Agreement will be brought solely in the federal or state courts in the Northern District of California, and Licensee hereby submits to the personal jurisdiction thereof and agrees to such courts as the appropriate venue.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty at _____ on the ____ day of _____, 200_.

Yours faithfully,

_____        *[NOTARIAL CERTIFICATION]*
("GUARANTOR")

By: _____

Title: _____

# Exhibit 2

**Kristina Anderson**

REDACTED

**From:** Roman, Jon [mailto:Jon.Roman@toysrus.com]
**Sent:** Thursday, March 06, 2008 5:04 AM
**To:** Derek Stothard
**Cc:** Arrizabalaga, Juan; Winslow, Paul; Barry, Richard
**Subject:** Clone Wars Wheel Goods at TRU
**Importance:** High

Derek,

Thanks for calling me back yesterday, I appreciate your sense of urgency.

As we discussed, we have a keen interest in listing Star Wars Clone Wars wheel goods at TRU this Fall in support of our mutual brands.

But, I will not do business with your current licensee.

I recommended to you for bikes and wheels: Huffy; Kent or Pacific Cycles.
I recommended to you for Skateboards, helmets, etc. : Bravo Sports or PTI

If you want, I will forward the contact information for those resources.

The timing is now as we will be setting the feature shop soon, and we are finalizing Fall business plans by the end of March.

Please help me have Star Wars Clone Wars included in my range.

I am confident you will find a new resource for us.

Jon


*Sincerely,*
*Jon Roman - Buyer, Toys R Us U.S. Wheel Goods*
*        phone 973.617.5948*

# GO GREEN, RIDE A BIKE!

---

**From:** Roman, Jon
**Sent:** Wednesday, March 05, 2008 7:55 AM
**To:** 'derek.stothard@lucasfilm.com'
**Cc:** Winslow, Paul; Arrizabalaga, Juan; Barry, Richard
**Subject:** Lucas
**Importance:** High

Hello Derek,

My name is Jon Roman, I am the "wheels" buyer at TRU.  Bikes, scooters, skates, skateboards: anything a kid would ride on or in!

I urgently need to speak to you personally about Star Wars Clone Wars at TRU in my area of responsibility.

Please call me today if you can.

Thanks in advance, Jon

*Sincerely,*
*Jon Roman - Buyer, Toys R Us U.S. Wheel Goods*
*        phone 973.617.5948*

# GO GREEN, RIDE A BIKE!

**From:** Winslow, Paul
**Sent:** Tuesday, March 04, 2008 6:26 PM
**To:** Roman, Jon
**Subject:** RE: Lucas

*Derek Stothard*
*Director of Licensing*
*Toy Categories*
*Lucasfilm Ltd*
*1110 Gorgas Ave*
*San Francisco*
*CA 94129*
*415-623-1479*

Derek Stothard [Derek.Stothard@lucasfilm.com]

8/15/2008

**From:** Roman, Jon
**Sent:** Monday, March 03, 2008 9:14 AM
**To:** Winslow, Paul
**Subject:** Lucas

Paul, can you get me the contact info of the licensing person at Lucas please?

*Sincerely,*
*Jon Roman - Buyer, Toys R Us U.S. Wheel Goods*
        *phone 973.617.5948*

This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized review, use, disclosure
or distribution is prohibited. If you are not the intended recipient, please contact
the sender by reply email and destroy all copies of the original message. To reply to our
email administrator directly, send an email to EmailAdmin@toysrus.com. Toys "R" Us, Inc.

# Exhibit 3

Redacted

---

**From:** Steve Goldmeier [mailto:sgoldmeier@randinternational.com]
**Sent:** Tuesday, March 11, 2008 2:53 PM
**To:** Kristina Anderson
**Cc:** 'Mark Worksman'; 'George Gross, Jr.'
**Subject:** RE: Rand / TRU - Can we talk?

Kristina,

A Star Wars bicycle purchased at TRU would be one less Star Wars bicycle (supplied by Rand) purchased at Wal-Mart.

Rand signed our contract with guarantees regardless of whichever retailers signed up to buy Star Wars bikes. What you are doing would dilute Rand per our contract and Wal-Mart's retail program as well. This is morally wrong in every way whatsoever, and LucasFilm should not cave to such substandard behavior by TRU. Rand would like the opportunity to meet with the TRU Board of Directors for the opportunity of correcting this unfair situation before you sell out to this improper arrangement. This is a terrible mistake which needs to be reversed. This would be an unprecedented development in the licensing community that LucasFilm would sign a contract with one licensee and then allow a retailer to purchase from their favorite vendor by extending a competing license. LucasFilm should stand tall and support the contract issue and proper business procedure without allowing TRU to push unprecedented arrangements.

Thank you for the 9:00 AM meeting tomorrow. I will see you then.

Best regards,

*Steven Goldmeier*
*RAND INTERNATIONAL*
*631-249-6000, Ext 252*

**From:** Kristina Anderson [mailto:Kristina.Anderson@lucasfilm.com]
**Sent:** Tuesday, March 11, 2008 5:40 PM
**To:** Steve Goldmeier
**Cc:** George Gross, Jr.
**Subject:** RE: Rand / TRU - Can we talk?

Steve,

I have found 15 minutes at 9am tomorrow on Paul's and my schedule. Please send me the issues ahead of time - don't want any surprises.

Thanks,
K

**From:** Kristina Anderson
**Sent:** Tuesday, March 11, 2008 2:28 PM
**To:** 'Steve Goldmeier'; Paul Southern
**Cc:** 'George Gross, Jr.'
**Subject:** RE: Rand / TRU - Can we talk?
**Importance:** High

Steve,

As I have now said a couple of times both verbally and in writing, TRU is a dead issue, they won't buy from Rand. Period. There is nothing further to discuss.

Also, as I mentioned, we have over 250 partners coming in tomorrow and I need to know what we are discussing as everyone wants a meeting and it is not physically possible to accommodate everyone, as much as we wish we could. Why is Wal Mart now an issue when it was wanting more product from Rand as of yesterday? I need to know.

Thanks
K

**From:** Steve Goldmeier [mailto:sgoldmeier@randinternational.com]
**Sent:** Tuesday, March 11, 2008 2:20 PM
**To:** Kristina Anderson; Paul Southern
**Subject:** RE: Rand / TRU - Can we talk?

Dear Kristina & Paul,

Please hold tight on the Toys R Us decision. I'd appreciate if you would extend a meeting with me early AM tomorrow (Wed) in advance of the Summit. It would be a terrible mistake to allow Toys R Us a side deal in spite of Rand's contract, and this will seriously damage Rand's volume program at Wal-Mart. I am available early AM. Please confirm.

Kindest regards,

*Steven Goldmeier*
*RAND INTERNATIONAL*
*516-982-8963 – Cell Phone*

**From:** Kristina Anderson [mailto:Kristina.Anderson@lucasfilm.com]
**Sent:** Tuesday, March 11, 2008 2:55 PM
**To:** Steve Goldmeier
**Cc:** George Gross, Jr.; Paul Southern
**Subject:** RE: Rand / TRU - Can we talk?
**Importance:** High

Hi Steve,

Time is really tight - perhaps we can talk on the phone later today? I need to know what we are talking about as TRU is a dead issue...they won't budge.

What is the Wal Mart concern? Let me know so I can best prepare how to help.

Thanks,

8/15/2008

# Exhibit 4

**From:**     Roman, Jon [Jon.Roman@toysrus.com]
**Sent:**     Tuesday, May 27, 2008 7:02 AM
**To:**       Derek Stothard
**Subject:** FW: Star Wars Helmets safety testing

Derek, not good.  We now have <u>no helmets</u> to go with our Clone Wars bikes.

*Sincerely,*
*Jon Roman - Buyer, Toys R Us U.S. Wheel Goods*
*        phone 973.617.5948*

# GO GREEN, RIDE A BIKE!

**From:** Parker, Joe
**Sent:** Tuesday, May 27, 2008 9:55 AM
**To:** Goldmeier, Steve - Rand Int'l, USA
**Cc:** Roman, Jon; Arrizabalaga, Juan; DeBlasis, Hope
**Subject:** Star Wars Helmets safety testing

Steve –

Toys R Us has received the test report from BV on the 2 helmets placed on PO 685305.  Based on test report number (5208)130-1206, both helmets failed to meet the safety requirements for items of this type.  Based on the test, Toys R us <u>will not be able to accept these items now or in the future.</u>

Items such as bike helmets require us to be even more diligent in our application of the standard, as they can have such in extreme impact on the safety and welfare of our children.  Parents count on Toys R Us to provide them with safety gear that will protect their children, in the unfortunate event such as an accident.

Hopefully the remainder of the items in the Star Wars program meet all of the safety requirements.  Have they all been submitted to BV for testing?

Regards,

Joe Parker
Toys R Us
Associate Buyer - Wheel World
1 Geoffrey Way, Wayne, NJ 07470
973-617-4861

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, send an email to EmailAdmin@toysrus.com. Toys "R" Us, Inc.

# Exhibit 5

## Paul Southern

| | |
|---|---|
| **From:** | Kristina Anderson |
| **Sent:** | Wednesday, May 28, 2008 3:44 PM |
| **To:** | 'Steven Goldmeier'; 'George Gross, Jr.' |
| **Cc:** | Paul Southern |
| **Subject:** | Rand and Helmets at TRU |
| **Importance:** | High |

Hi,

I've sent a couple of emails and also called and left a message asking you to ring me to discuss the helmet issue at TRU asap. My preference is to discuss the situation on the phone but given I can't seem to reach you I need to let you know this has put us in the position of having to consider our alternative partner options for TRU helmets/protective gear given the Rand items failed this retailer's safety tests.

Please ring me at your earliest convenience as this has put us in a rather uncomfortable position with TRU (again) unfortunately. I'm going to need to know your safety testing will not be an issue with any other retailers before they contact us with the news.

Thanks
K

*Kristina Anderson*
*Licensing Manager*
*Lucasfilm, Ltd.*
*1110 Gorgas Avenue*
*San Francisco, CA 94129-1406*
*Tel: 415-623-1852*
*Fax: 415-623-1550*
*BB: 415-342-7488*
*Kristina.Anderson@lucasfilm.com*

8/15/2008

## Kristina Anderson

**From:**    Kristina Anderson
**Sent:**    Thursday, May 29, 2008 9:48 AM
**To:**    'George Gross, Jr.'; 'Veronica'
**Subject:**    Rand

Hi

I have now left Steve 2 voicemails and three emails and he STILL hasn't contacted me about the TRU helmet catastrophe. This is, as you can imagine, very VERY serious....especially as TRU is telling me they have not yet received the results of the wheeled goods safety tests from Rand.

Please find out whichever forest Steve has disappeared into and bring him out of it so he can get a cell phone signal and have him ring me.

Ahh, so good to be back!

K

*Kristina Anderson*
*Licensing Manager*
*Lucasfilm, Ltd.*
*1110 Gorgas Avenue*
*San Francisco, CA 94129-1406*
*Tel: 415-623-1852*
*Fax: 415-623-1550*
*BB: 415-342-7488*
*Kristina.Anderson@lucasfilm.com*

# Exhibit 6

----- Original Message -----
From: Parker, Joe <Joe.Parker@toysrus.com>
To: Goldmeier, Steve - Rand Int'l, USA <sgoldmeier@randinternational.com>
Cc: Roman, Jon <Jon.Roman@toysrus.com>; Arrizabalaga, Juan
<Juan.Arrizabalaga@toysrus.com>; DeBlasis, Hope <Hope.DeBlasis@toysrus.com>; Rao, Virginia
<Virginia.Rao@toysrus.com>; Kristina Anderson
Sent: Tue Jun 10 12:42:11 2008
Subject: RE: Star Wars Folding Scooter safety testing

See comments below............

From: Steve Goldmeier [mailto:sgoldmeier@randinternational.com]
Sent: Tuesday, June 10, 2008 1:58 PM
To: Parker, Joe
Cc: Roman, Jon; Arrizabalaga, Juan; DeBlasis, Hope; Rao, Virginia
Subject: FW: Star Wars Folding Scooter safety testing

June 10, 2008

Joe,

For the Star Wars Program here's where we stand:

1.          Regarding Star Wars Skate Combo:

Rand has received the COC (Certificate of Compliance) and the shipment is on its way. —

          We will await shipment

2.          Regarding Star Wars Helmets:

Rand has received today the updated CPSC test certifications (and can send these documents
to you at once for your review) to cover both Star Wars Helmet Models.   We await your
advice.   Please advise if you would like to reinstate your order requirements.   The cargo
can be shipped immediately and arrive in time for your original ship date.

          As mentioned in my email yesterday, we are not granting a second test on the
helmets.  They failed, that's the end of it.

1

3.        Regarding the Star Wars Skateboards:

We expect the test result within 48 hours.  Cargo is ready to ship A/O.

        Hope they pass.


4.        Regarding the Star Wars Folding Scooter:

As you know the test result was failed; although the factory could resubmit immediately
and have cargo available to ship within 10 days from now upon a passed result if you will
allow for resubmission by return reply today copied to BV.

        7 points of failure is unacceptable, we will pass on this item.


5.        Regarding Star Wars Bicycles:

Rand has a recent CPSC test certification via a recent voluntary submission; although when
we resubmitted to BV for testing under TRU's PO# the result for the same identical test
was a failure.  The factory could resubmit immediately and have cargo available to ship
within 10 days from now upon a passed result if you allow for resubmission by return reply
today copied to BV.

        This one is the most disappointing of the group, as there was significant volume
tied to the bikes.  Steve, the bikes failed due to lead content and soluble heavy metal
content as well as 3 separate packaging guidelines.  All of our manufacturers are aware
and have been communicated to regarding our testing standards.  I shouldn't have to tell
you the ramifications of having lead based product on our shelves.  We will not be
accepting the bikes.  The PO will be cancelled.



Thank you,


Steven Goldmeier

RAND INTERNATIONAL

631-249-6000, Ext 252

==================================================


From: Parker, Joe [mailto:Joe.Parker@toysrus.com]
Sent: Monday, June 09, 2008 10:36 AM
To: Steve Goldmeier
Cc: Roman, Jon; Arrizabalaga, Juan; DeBlasis, Hope; Rao, Virginia
Subject: Star Wars Folding Scooter safety testing


Steve -

Toys R Us has received the test report from BV on the Folding Scooter placed on PO 700907. Unlike the earlier helmet failure, the scooter failed on 5 different structural tests, and 2 documentation/labeling points for a total of 7 different points of failure.  We cannot accept this item based on these failures, the PO will be cancelled.


We now have 3 Star Wars items left to be tested.  Hopefully they will be produced at a higher quality than the scooter. When do you expect to submit the remaining items?


Regards,


Joe Parker
Toys R Us
Associate Buyer - Wheel World
1 Geoffrey Way, Wayne, NJ 07470
973-617-4861

===============================================================
This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, send an email to EmailAdmin@toysrus.com. Toys "R" Us, Inc.

# Exhibit 7

# TOYS "R" US CORPORATION - USA

| **Technical Report:** | **(5208)140-0847** | June 04, 2008 |
|---|---|---|
| Date Received: | May 27, 2008 | Page 1 of 4 |

TERRY HU
SALES CHIEF ENTERPRISE CO. LTD.
ROOM A, 11/F
NO 80, SUNG CHIANG ROAD
TAIPEI 104
TAIWAN

# FAIL

**RESULT: FAIL**

| **Sample Description:** | **STAR WARS SCOOTER** | | |
|---|---|---|---|
| Resource Name: | RAND INTERNATIONAL | Sample Size: | 3 |
| P.O. Name: | RAND INTL LEISURE PRODUCTS | Country of Origin: | N/A |
| Manufacturer: | JINYUN HENGFENG ALUMINIUM CO.,LTD | Program: | PORT OF ENTRY |
| Vendor Style Number: | SW-031 | Order Number: | 700907 |
| Labeled Age Grade: | AGES 5+ | Ship Date: | 06/29/08 - 07/05/08 |
| Appropriate Age Grade: | FROM 5 TO 14 YEARS OF AGE | Item Number: | 060953 |
| Tested Age Grade: | FROM 5 TO 14 YEARS OF AGE | Private Label: | N/A |
| Product Batch / Date Code: | 1440837054S | Testing Stage: | 1ST FULL TEST |
| Retail Package Batch / Date Code: | 1440837054S | 2nd Full Test Report No.: | N/A |

**TEST:**

- 16 CFR 1303 Lead content - 1
- ASTM F2264 Non-powered scooters - 1
- Packaging and labeling evaluation
- 16 CFR 1500.44 Flammability (solids) - 1
- ASTM F963 Soluble heavy metals content - 2

TOYS "R" US CORPORATION - USA
Technical Report: **(5208)140-0847**
June 04, 2008
Page 2 of 4

The sample(s) DOES NOT MEET the following requirement(s):

- The requirements of ASTM F2264-03, "Standard Consumer Safety Specification for Non-Powered Scooters".

Reason:

**(Section 6.1)**
After the following test, the scooter was show the evidence of permanent deformation.
Dynamic Strength test – Front wheel frame

**(Section 5.1)**
After the labeling mechanisms test, the following hazard was found.
Sharp edge – (location): Joint

**(Section 9.1 & 9.2)**
No instruction was submitted.

**(Section 5.1)**
After the Dynamic Strength test, the following hazard was found.
Sharp edge – (location): Frame near rear wheel

**(Section 5.3)**
After the test, the latching device can't prevent the scooter from folding.

**(Section 6.1)**
After the following test, the scooter was show the evidence of component failure.
Dynamic Strength test – Frame

**(Section 8.1)**
The product did not present the following information:
Model number

- The packaging and labeling requirements of the client's testing program.

Reason:

Packaging and labeling evaluation

The date code on the package and product was later than inspection date.

TOYS "R" US CORPORATION - USA
Technical Report: **(5208)140-0847**
June 04, 2008
Page 3 of 4

The sample(s) MEET the following requirement(s):

- The lead content requirements of 16 CFR 1303, "Ban of lead-containing paint and certain consumer products bearing lead-containing paint" (CPSC and CPSA regulations).

- The flammability requirements of 16 CFR 1500.3(c)(6)(vi), "Flammable solid" (FHSA regulations).

- The soluble heavy metals content requirements of ASTM F963-07 E1, "Standard consumer safety specification on toy safety," Section 4.3.5.2.


BUREAU VERITAS HONG KONG LIMITED


Lau Wing Kit, Keff
Director
Toys and Juvenile Products Department

KL/ag/cn


cc:    HOPE DE BLASIS, TOYS "R" US CORPORATION - USA

TOYS "R" US CORPORATION - USA
Technical Report: **(5208)140-0847**
June 04, 2008
Page 4 of 4

**RESULTS:**

**TOTAL LEAD CONTENT (16 CFR 1303, "Ban of Lead-containing paint and certain consumer products bearing Lead-containing paint")**

| Element: | | | | Lead | |
|---|---|---|---|---|---|
| Requirement:  Maximum allowable limit (0.06% by weight) | | | | 600 mg/kg | |
| Sample Description | | | | Result (mg/kg) | Conclusion |
| | Color / Component | Location | Style | | |
| (A) | Surface Coating<br>blue<br>black | frame<br>board | | LT 10 | Pass |

*LT = Less than*          *mg/kg = milligrams per kilogram (ppm = parts per million)*
*\* = Average of duplicate analyses*

**SOLUBLE HEAVY METALS CONTENT (ASTM F963-07 E1, Section 4.3.5.2)**

Test Method:        Soluble heavy metals content analysis was determined by Inductively Coupled Plasma Spectrometry.

| | Color / Component | Location | Style |
|---|---|---|---|
| A. | Surface Coating<br>blue | frame | |
| B. | black | board | |

| Element | As | Ba | Cd | Cr | Hg | Pb | Sb | Se | Mass of | |
|---|---|---|---|---|---|---|---|---|---|---|
| Maximum Limit (mg/kg) | 25 | 1000 | 75 | 60 | 60 | 90 | 60 | 500 | trace Amount | |
| Analytical Correction | 60% | 30% | 30% | 30% | 50% | 30% | 60% | 60% | | |
| Sample | Result (mg/kg) | | | | | | | | (gram) | Conclusion |
| A | LT 2 | 410 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | | Pass |
| B | LT 2 | 400 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | | Pass |

*LT  = Less Than*                                    *As = Arsenic, Ba = Barium, Cd = Cadmium,*
*CR  = Adjusted analytical result*              *Cr = Chromium, Hg = Mercury, Pb = Lead,*
*mg/kg  = milligrams per kilogram (ppm = parts per million)*   *Sb = Antimony, Se = Selenium*
*\*      = Average of duplicate analyses*

## TOYS "R" US CORPORATION - USA

| | | |
|---|---|---|
| **Technical Report:** | **(5208)130-1206** | May 23, 2008 |
| Date Received: | May 20, 2008 | Page 1 of 4 |

KERI PHELPS
RAND INTERNATIONAL LEISURE PRODUCTS LTD.
51 EXECUTIVE BOULEVARD
FARMINGDALE
NEW YORK 11735
UNITED STATES

# FAIL

**RESULT: FAIL**

| | | | |
|---|---|---|---|
| Sample Description: | **STAR WARS HELMET AND PAD SET (ON PACKAGING: STAR WARS CLONE TROOPER)**<br>1. ) WITH FLOWER ON TOP - SW-978<br>2. ) WITH WORDS "CLONE WARS" - SW-977 | | |
| Resource Name: | RAND INTERNATIONAL LEISURE PRODUCTS LTD. | Sample Size: | 6 |
| P.O. Name: | RAND INTERNATIONAL YNT | Country of Origin: | CHINA |
| Manufacturer: | TWINKLE PLASTIC MANUFACTURING CO., LTD | Program: | DIRECT IMPORT |
| Vendor Style Number: | SW-9778 | Order Number: | 685305 |
| Labeled Age Grade: | AGES 3+ | Ship Date: | 06/01/08 - 06/07/08 |
| Appropriate Age Grade: | N/A | Item Number: | 060929 |
| Tested Age Grade: | CHILDREN PRODUCTS, OVER 3 YEARS OF AGE | Private Label: | N/A |
| Product Batch / Date Code: | 1360837054G | Testing Stage: | 1ST FULL TEST |
| Retail Package Batch / Date Code: | 1360837054G | 2nd Full Test Report No.: | N/A |

**TEST:**

- 16 CFR 1203 Safety standard for bicycle helmet-doc
- 16 CFR 1500 Mechanical hazards - 2
- ASTM F963 Soluble heavy metals content - 5
- 16 CFR 1303 Lead content - 2
- 16 CFR 1500.44 Flammability (solids) - 2
- Packaging and labeling evaluation - 2

The sample(s) DOES NOT MEET the following requirement(s):

- **16 CFR 1203 Safety standard for bicycle helmet-doc**

  With Flower On Top
  No documentation was provided to indicate the compliance of the requirements of helmet.
  Note: Valid document must be within one year period.

  With Words "Clone Wars"
  Non-compliance documentation was provided to indicate the compliance of the requirements of helmet.
  Note: The document provided was a fail report.

TOYS "R" US CORPORATION - USA
Technical Report: **(5208)130-1206**
May 23, 2008
Page 2 of 4

The sample(s) MEET the following requirement(s):

-   The lead content requirements of 16 CFR 1303, "Ban of lead-containing paint and certain consumer products bearing lead-containing paint" (CPSC and CPSA regulations).

-   The mechanical hazards requirements of 16 CFR 1500, "Federal Hazardous Substances Act Regulations".

-   The flammability requirements of 16 CFR 1500.3(c)(6)(vi), "Flammable solid" (FHSA regulations).

-   The soluble heavy metals content requirements of ASTM F963-07 E1, "Standard consumer safety specification on toy safety," Section 4.3.5.2.

-   The packaging and labeling requirements of the client's testing program.


BUREAU VERITAS HONG KONG LIMITED



Lau Wing Kit, Keff
Director
Toys and Juvenile Products Department

KL/ag/lk



cc:     HOPE DE BLASIS, TOYS "R" US CORPORATION - USA

TOYS "R" US CORPORATION - USA
Technical Report: **(5208)130-1206**
May 23, 2008
Page 3 of 4

## RESULTS:

TOTAL LEAD CONTENT (16 CFR 1303, "Ban of Lead-containing paint and certain consumer products bearing Lead-containing paint")

| Element: | | | | Lead | |
|---|---|---|---|---|---|
| Requirement:  Maximum allowable limit (0.06% by weight) | | | | 600 mg/kg | |
| Sample Description | | | | Result (mg/kg) | Conclusion |
| | Color / Component | Location | Style | | |
| (A) | Surface Coating all/ white/ decal | pattern on helmet | 1 | LT 17 | Pass |
| (B) | black/blue/grey bright black | pad sewn label | all all | 35 | Pass |

*LT = Less than*          *mg/kg  =  milligrams per kilogram (ppm = parts per million)*
*\* = Average of duplicate analyses*

TOYS "R" US CORPORATION - USA
Technical Report: **(5208)130-1206**
May 23, 2008
Page 4 of 4

**RESULTS:**

**SOLUBLE HEAVY METALS CONTENT (ASTM F963-07 E1, Section 4.3.5.2)**

Test Method:    Soluble heavy metals content analysis was determined by Inductively Coupled Plasma
Spectrometry.

| | Color / Component | Location | Style |
|---|---|---|---|
| A. | Surface Coating all/ white/ decal | pattern on helmet | 1 |
| B. | black | pad | all |
| C. | blue | pad | all |
| D. | grey | pad | all |
| E. | bright black | sewn label | all |

| Element | As | Ba | Cd | Cr | Hg | Pb | Sb | Se | Mass of | |
|---|---|---|---|---|---|---|---|---|---|---|
| Maximum Limit (mg/kg) | 25 | 1000 | 75 | 60 | 60 | 90 | 60 | 500 | trace Amount | |
| Analytical Correction | 60% | 30% | 30% | 30% | 50% | 30% | 60% | 60% | | |
| Sample | | | | Result (mg/kg) | | | | | (gram) | Conclusion |
| A | LT 2 | 10 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | | Pass |
| B | LT 2 | 12 | LT 2 | LT 2 | LT 2 | 3 | LT 2 | LT 2 | 0.019 | Pass |
| C | LT 2 | 11 | LT 2 | LT 2 | LT 2 | 2 | LT 2 | LT 2 | 0.0162 | Pass |
| D | LT 2 | 21 | LT 2 | LT 2 | LT 2 | 2 | LT 2 | LT 2 | 0.0195 | Pass |
| E | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | 0.0126 | Pass |

LT  = Less Than
CR = Adjusted analytical result
mg/kg    = milligrams per kilogram (ppm = parts per million)
*        = Average of duplicate analyses

As = Arsenic, Ba = Barium, Cd = Cadmium,
Cr = Chromium, Hg = Mercury, Pb = Lead,
Sb = Antimony, Se = Selenium



CONSUMER PRODUCTS SERVICES DIVISION

**B·U·R·E·A·U**
**V·E·R·I·T·A·S**

## TOYS "R" US CORPORATION - USA

| Technical Report: | (5208)143-0851 | |
|---|---|---|
| Date Received: | June 02, 2008 | June 10, 2008 |
| | | Page 1 of 4 |

VIVIAN HUANG
LI CHEN MACHINERY INT'L CO LTD
10F-2, 128, SEC3
MING SHENG EAST ROAD
TAIPEI 105
TAIWAN

# FAIL

RESULT: FAIL

| | | | |
|---|---|---|---|
| Sample Description: | STAR WARS CLONE 16" BIKE | | |
| Resource Name: | LI CHEN MACHINERY INT'L CO LTD | Sample Size: | 2 |
| P.O. Name: | RAND INT'L LEISURE PRODUCTS | Country of Origin: | CHINA |
| Manufacturer: | LIWANG CYCLE JURONG CO LTD | Program: | PORT OF ENTRY |
| Vendor Style Number: | 5041658 | Order Number: | 700907 |
| Labeled Age Grade: | 3+, AGES 3+ | Ship Date: | 06/29/08 - 07/05/08 |
| Appropriate Age Grade: | OVER 9 YEARS OF AGE | Item Number: | 060940 |
| Tested Age Grade: | OVER 3 YEARS OF AGE | Private Label: | N/A |
| Product Batch / Date Code: | NIL | Testing Stage: | 1ST FULL TEST |
| Retail Package Batch / Date Code: | 1440837054L | 2nd Full Test Report No.: | N/A |

### TEST:

- 16 CFR 1303 Lead content - 2
- ASTM F963 Soluble heavy metals content – 4
- TRU 16 CFR 1512 Sidewalk bicycles (no reflectors) – 1

- 16 CFR 1500.44 Flammability (solids) - 1
- Packaging and labeling evaluation

Bureau Veritas Hong Kong Limited
Kowloon Bay Office
1/F Pacific Trade Centre, 2 Kai Hing Road,
Kowloon Bay, Kowloon, Hong Kong
Tel (852) 2331 9288  Fax (852) 2331 0889  www.bureauveritas.com

This report is governed by, and incorporates by reference, the Conditions of Testing as posted at the date of issuance of this report at http://www.cps.bureauveritas.com and is intended for your exclusive use. Any copying or replication of this report to or for any other person or entity, or use of our name or trademark, is permitted only with our prior written permission. This report sets forth our findings solely with respect to the test samples identified herein. The results set forth in this report are not indicative or representative of the quality or characteristics of the lot from which a test sample was taken or any similar or identical product subsequently produced. Our report includes all of the tests requested by you and the results thereof based upon the information that you provided to us. You have 60 days from the date of issuance of the report to notify us of any material error or omission caused by our negligence; provided, however, that such notice shall be in writing and shall specifically address the issue you wish to raise. A failure to raise such issue within the prescribed time shall constitute your unqualified acceptance of the completeness of this report, the tests conducted and the correctness of the report contents.

**BUREAU VERITAS**

TOYS "R" US CORPORATION - USA
Technical Report: (5208)143-0851
June 10, 2008
Page 2 of 4

The sample(s) DOES NOT MEET the following requirement(s):

- The lead content requirements of 16 CFR 1303, "Ban of lead-containing paint and certain consumer products bearing lead-containing paint" (CPSC and CPSA regulations).

TOTAL LEAD CONTENT (16 CFR 1303, "Ban of Lead-containing paint and certain consumer products bearing Lead-containing paint")

| Element: | | | Lead | |
|---|---|---|---|---|
| Requirement: Maximum allowable limit (0.06% by weight) | | | 600 mg/kg | |
| Sample Description | | | Result (mg/kg) | Conclusion |
| | Color / Component | Location | Style | |
| (A) | Surface Coating dull black | seat post, brake, crankarm, axis of wheels chain wheel and axle of pedals | | 970 | Fail |
| | bright black | handle bar, forks, frame of training wheel | | | |

*LT = Less than*       *mg/kg = milligrams per kilogram (ppm = parts per million)*
*\* = Average of duplicate analyses*

- The soluble heavy metals content requirements of ASTM F963-07 E1, "Standard consumer safety specification on toy safety." Section 4.3.5.2.

SOLUBLE HEAVY METALS CONTENT (ASTM F963-07 E1, Section 4.3.5.2)

Test Method:    Soluble heavy metals content analysis was determined by Inductively Coupled Plasma Spectrometry.

| | Color / Component | | | | Location | | | | Style |
|---|---|---|---|---|---|---|---|---|---|
| A. | Surface Coating bright black | | | | handle bar, fork, frame of training wheel | | | | |

| Element | As | Ba | Cd | Cr | Hg | Pb | Sb | Se | Mass of trace Amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| Maximum Limit (mg/kg) | 25 | 1000 | 75 | 60 | 60 | 90 | 60 | 500 | | |
| Analytical Correction | 60% | 30% | 30% | 30% | 50% | 30% | 60% | 60% | | |
| Sample | Result (mg/kg) | | | | | | | | (gram) | Conclusion |
| A. | LT 2 | 250 | LT 2 | CR 60 | LT 2 | CR 380 | LT 2 | LT 2 | | Fail |

*LT = Less Than*
*CR = Adjusted analytical result*
*mg/kg = milligrams per kilogram (ppm = parts per million)*
*\* = Average of duplicate analyses*

*As = Arsenic, Ba = Barium, Cd = Cadmium,*
*Cr = Chromium, Hg = Mercury, Pb = Lead,*
*Sb = Antimony, Se = Selenium*



TOYS "R" US CORPORATION – USA
Technical Report: (5208)143-0851
June 10, 2008
Page 3 of 4

The sample(s) DOES NOT MEET the following requirement(s):

- The packaging and labeling requirements of the client's testing program.

    Reason:    The product did not contain a tage of bag to be attached to indicating users should wear a helmet.
    (e.g. "USE YOUR HEAD WEAR A HELMET")

    The date code was not present on product.

- The mechanical hazards requirements for sidewalk bicycle of 16 CFR 1512, "Requirements for bicycles" (FHSA regulations).

    Reason:    Instruction and Labeling (Section 1512.19(b)(2))
    A drawing illustrating the minimum leg-length dimension of a rider and a method of measurement of this dimension was not presented on the package.

The sample(s) MEET the following requirement(s):

- The flammability requirements of 16 CFR 1500.3(c)(6)(vi), "Flammable solid" (FHSA regulations).

Note:    The received sample(s) contained surface coating(s) which are bonded to the substrate materials during the manufacturing process and cannot be scraped off for testing, therefore such coating material(s) was not subject to the soluble heavy metals analysis of ASTM F963-07 E1, "Standard consumer safety specification on toy safety", section 4.3.5.2.

BUREAU VERITAS HONG KONG LIMITED

Lau Wing Kit, Keff
Director
Toys and Juvenile Products Department

KL/ag/ja

cc:    HOPE DE BLASIS, TOYS "R" US CORPORATION – USA

TOYS "R" US CORPORATION - USA
Technical Report: (5208)143-0851
June 10, 2008
Page 4 of 4

RESULTS:

TOTAL LEAD CONTENT (16 CFR 1303, "Ban of Lead-containing paint and certain consumer products bearing Lead-containing paint")

| Element: | | | Lead |  |
|---|---|---|---|---|
| Requirement: Maximum allowable limit (0.06% by weight) | | | 600 mg/kg |  |
| Sample Description | | | Result (mg/kg) | Conclusion |
| | Color / Component | Location | Style | |
| (A) | Surface Coating<br>lacquer/ blue<br>white<br>black | frame<br>wheels<br>staples under seat | | LT 13 | Pass |

LT = Less than                    mg/kg = milligrams per kilogram (ppm = parts per million)
* = Average of duplicate analyses

SOLUBLE HEAVY METALS CONTENT (ASTM F963-07 E1, Section 4.3.5.2)

Test Method:    Soluble heavy metals content analysis was determined by Inductively Coupled Plasma Spectrometry.

| | Color / Component | Location | Style |
|---|---|---|---|
| A. | Surface Coating<br>lacquer/ blue underlying | frame | |
| B. | white | wheels | |
| C. | dull black | seat post, brake, crankarm, axis of wheel, chain wheels, axle of pedals | |

| Element | As | Ba | Cd | Cr | Hg | Pb | Sb | Se | Mass of trace Amount | |
|---|---|---|---|---|---|---|---|---|---|---|
| Maximum Limit (mg/kg) | 25 | 1000 | 75 | 60 | 60 | 90 | 60 | 500 | | |
| Analytical Correction | 60% | 30% | 30% | 30% | 50% | 30% | 60% | 60% | | |
| Sample | Result (mg/kg) | | | | | | | | (gram) | Conclusion |
| A | LT 2 | 47 | LT 2 | LT 2 | LT 2 | 4 | LT 2 | LT 2 | | Pass |
| B | LT 2 | 340 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | LT 2 | | Pass |
| C | 5 | 11 | LT 2 | 5 | LT 2 | LT 2 | LT 2 | LT 2 | 0.0386 | Pass |

LT = Less Than
CR = Adjusted analytical result
mg/kg = milligrams per kilogram (ppm = parts per million)
* = Average of duplicate analyses

As = Arsenic, Ba = Barium, Cd = Cadmium,
Cr = Chromium, Hg = Mercury, Pb = Lead,
Sb = Antimony, Se = Selenium

# Exhibit 8

**Kristina Anderson**

| | |
|---|---|
| **From:** | Roman, Jon [Jon.Roman@toysrus.com] |
| **Sent:** | Tuesday, June 17, 2008 6:59 AM |
| **To:** | Kristina Anderson |
| **Cc:** | Arrizabalaga, Juan |
| **Subject:** | FW: ROTO CHANGE 9/14 roto, INT091408 FRONT COVER |
| **Importance:** | High |

Need your help, we are losing opportunity after opportunity to do Clone Wars business.

Had to pull out of feature shop also.
*Sincerely,*
*Jon Roman - Buyer, Toys R Us U.S. Wheel Goods*
*     phone 973.617.5948*

# GO GREEN, RIDE A BIKE!

**From:** Roman, Jon
**Sent:** Tuesday, June 17, 2008 9:58 AM
**To:** Kan, Sandra; Montello, Tracy
**Cc:** VanDette, Joe; Parker, Joe; Mikic, Anka; Rao, Virginia; Bressner, Keren; Bula, Stephen; Arrizabalaga, Juan; Winslow, Paul
**Subject:** ROTO CHANGE 9/14 roto, INT091408 FRONT COVER
**Importance:** High

## Please remove the 16" Clone Wars bike from the front cover of the 9/14 roto, INT091408.

The bike will not be delivered in time due to testing issues.

I do not have a suitable Clone Wars replacement.

Please choose another item from another buyer.

We will remove from sales IQ.

Please confirm.

*Sincerely,*
*Jon Roman - Buyer, Toys R Us U.S. Wheel Goods*
*     phone 973.617.5948*

# GO GREEN, RIDE A BIKE!

8/15/2008

This email message is for the sole use of the intended recipient(s) and may contain
confidential and privileged information. Any unauthorized review, use, disclosure
or distribution is prohibited. If you are not the intended recipient, please contact
the sender by reply email and destroy all copies of the original message. To reply to our
email administrator directly, send an email to EmailAdmin@toysrus.com. Toys "R" Us, Inc.

8/15/2008

# Exhibit 9

## Kristina Anderson

| | |
|---|---|
| **From:** | Kristina Anderson |
| **Sent:** | Tuesday, June 17, 2008 10:42 AM |
| **To:** | 'Steve Goldmeier' |
| **Cc:** | Paul Southern; 'George Gross, Jr.' |
| **Subject:** | RE: Tests |
| **Importance:** | High |

Hi again,

No reply from you about this and I am continuing to get email after email from TRU. Please send by today together with the result of your conversation with Jon concerning your email of last week stating your items were now ok.

This is now more than incredibly important so please prioritize for today.

Appreciate it.

Kristina

---

**From:** Kristina Anderson
**Sent:** Monday, June 16, 2008 4:23 PM
**To:** 'Steve Goldmeier'
**Subject:** Tests
**Importance:** High

Hi Steve

I received the tests you sent through - thanks.

I need the recent test results you have for the Star Wars folding scooter as what you sent me is for a generic scooter and dated 10/22/07. Plus, please send me the other retailer test reports as requested as soon as possible.

Do you have a key as to what each coded number on each test means too?

Appreciate the above.

Thanks,
K

*Kristina Anderson*
*Lucasfilm, Ltd.*
*1110 Gorgas Avenue*
*San Francisco, CA 94129-1406*
*Tel: 415-623-1852*
*Fax: 415-623-1550*
*BB: 415-342-7488*
*Kristina.Anderson@lucasfilm.com*

8/15/2008

# Exhibit 10



June 18, 2008

VIA FACSIMILE AND FEDEX

RAND International, Inc.
51 Executive Boulevard
Farmingdale, NY 11735
Attn: Steve Goldmeier

Re: *Notice of Termination for Breach (Contract No. L517)*

Dear Mr. Goldmeier:

This shall serve as notice that RAND International, Inc. ("RAND") is in default under the Merchandise License Agreement (Contract No. L5179) between Lucasfilm Ltd. ("Lucasfilm") and RAND dated October 1, 2007 (the "Agreement").

We have recently received testing results dated as of June 10, 2008 based on tests conducted by Bureau Veritas, an independent testing facility, on behalf of Toys R Us, with respect to the following Licensed Product: STAR WARS CLONE 16" BIKE. The test stated that the product has failed testing with respect to acceptable lead paint and heavy metal content levels. In addition, we have received the results of other independent tests carried out by Bureau Veritas on behalf of Toys R Us regarding non-compliance with respect to certain safety issues for the STAR WARS Scooter (folding scooter) product in the areas of component failure and strength testing (for example in connection with the failure of the frame and front wheel frame to pass dynamic strength testing).

Based on the foregoing reports, the products do not qualify as Licensed Products which we approve of and we do not approve of their release, distribution or sale in the market (see Paragraphs 4.6 of the Agreement on Recall of Products and 8 on Approvals generally). The information we have received leads us to reasonably suspect that these products and possibly other Licensed Products RAND is manufacturing (or is having manufactured on its behalf) are defective. As a result Lucasfilm demands that RAND immediately cease the manufacturing, distribution and/or sale of Licensed Products and take immediate actions to recall these Licensed Products that have been shipped to anyone, including to resellers, distributors, retailers, and/or consumers.

Paragraph 4.4 of the Agreement requires that each Licensed Product, among other things, comply "with all **good manufacturing practices** relevant to any Licensed Property and/or Licensed Products including methods of storage." The failure of two different products to pass safety testing for two different reasons clearly demonstrates RAND does not have sufficient control of its manufacturing processes to comply with the requirement to have good manufacturing practices. Notably, we do not have in our files the required Approval of

June 18, 2008
Page 2 of 2

Manufacturer Agreements executed by RAND and its manufacturers. In addition this paragraph requires RAND, as Licensee, to comply with all laws and regulations relevant to any Licensed Products, including the manufacturing and sale of such products. Furthermore, Paragraph 10.2(e) of the Agreement provides that RAND represents and warrants that "it and all others authorized by it or acting on its behalf" comply with all applicable laws, rules and/or regulations relating the manufacture, sale, use and safety of each Licensed Product sold.

The failure of these Licensed Products to pass routine safety tests indicates that these products are apparently inherently unsafe. Such failures constitute material breaches of the Agreement, including without limitation breaches of Paragraphs 4.4 and 10.2(e). The bicycle products have failed the lead testing at a time when there are heightened safety concerns surrounding lead paint in products for children. In addition, Toys R Us, one of the major retailers of STAR WARS products is refusing to accept these products because they believe these products to be unsafe. RAND, as a licensee of Lucasfilm, has committed under the Agreement to produce STAR WARS licensed items which are of a high quality and maintain the brand image of the STAR WARS name. Because of the serious nature of these safety issues, we believe that the production and distribution of these products would significantly compromise and damage the STAR WARS brand and trademark in the consumer market and also damage the reputation and goodwill of Lucasfilm. These breaches are not curable given their endangerment of young consumers in the United States and also given the fact that the agreed on product and marketing plans provide that the products must be on shelf no later then July 26, 2008. Lucasfilm is and will incur significant damages as a result of these incurable breaches as it has detrimentally relied on RAND to produce and sell Licensed Products which comply, among other things, with all rules and regulations pertaining to the safety of products and this will negatively impact its licensing program.

In light of the foregoing, Lucasfilm hereby exercises its right to immediately terminate the Agreement pursuant to Paragraph 14 of the Agreement. In addition we demand that you send to us an immediate accounting in writing of the names and contact information of any persons, including resellers, distributors and/or retailers, to whom, if any, the products in question have been sent to. The foregoing shall not be deemed a waiver of any rights or remedies that may be available to Lucasfilm, each of which is expressly reserved, including without limitation RAND's indemnity obligations under the Agreement.

Sincerely,

Christine K. Talarides
Director of Business Affairs

cc:    David J. Anderman
       Howard Roffman
       Paul Southern

# Exhibit 11



June 20, 2008

VIA E-MAIL, FACSIMILE AND FEDEX

Rand International, Inc.
51 Executive Boulevard
Farmingdale, NY 11735
Attn: Mark Worksman

Re: *Merchandise License Agreement (Contract No. L5179)*

Dear Mr. Worksman:

      I am writing to follow up on our conference call earlier today regarding our letter of June 18. We appreciate your summarizing once again the background regarding these serious issues. As we discussed, we are well aware of the history between Rand and Toys R Us (TRU), and we were supportive of Rand's efforts to become a supplier of STAR WARS branded products to TRU.

      We also discussed the following facts. We have been provided with specific test results from an independent testing lab for at least two separate STAR WARS branded Rand products which indicate that those products are not safe for retail sale. One of the largest retailers of STAR WARS toys has decided not to carry those products based on the tests. While product safety issues are always critical, there has been a particular focus on lead based paint and other safety issues in children's products over the past year. Finally, the STAR WARS brand is one of the most valuable and respected brands in the world, and cannot be associated with products that are not of the best possible quality, much less those that have failed independent safety tests.

      We appreciate your acknowledgment that all of these facts are true, and that our response—demanding that the products not appear in retail stores—is entirely reasonable given the circumstances. While we are more than willing to hear what Rand intends to do to establish that these products are in fact safe and re-establish the vendor relationship with TRU, for the time being our position remains as stated in our June 18 letter.

      As an initial matter, you agreed to take the following actions immediately:

      1) You will ensure that no Licensed Products enter the market or are made available to consumers. You indicated during the telephone call that you are not aware of any STAR WARS products appearing on-shelf with any retailer (which is consistent with the July 26 on-shelf date). Following the call, we received an e-mail from you which stated that Rand has made shipments to Wal-Mart and Comatt. Please confirm in writing that these are the only

June 20, 2008
Page 2 of 2

Licensed Products in all categories which have been shipped to retailers by the close of business on Monday, June 23.

2) To the extent any Licensed Products are with retailers or in transit to retailers (or with any party outside Rand's direct control), you will immediately recall such Licensed Products and stop any additional Licensed Products from being shipped, including without limitation the products which have been shipped to Wal-Mart and Comatt.

3) You will provide to Lucasfilm with a complete written inventory of all the Licensed Products in all categories that have been manufactured, and which items have been shipped. Your second email of today included a partial inventory of bikes and scooters in Rand's warehouse, which we appreciate you sending. The complete inventory needs to include, at a minimum and without limitation, the following information for each product: name of product, model and SKU numbers, number of units manufactured (and name of manufacturing company and actual plant of manufacture), number of units shipped, when such units shipped, the current location of each unit, the destination of shipment and name and location of the retailer being shipped to. Lucasfilm of course has the right to demand such an inventory and confirm its accuracy in accordance with the terms of the License Agreement, and we reserve our right to conduct a physical inventory. We expect to receive the inventory by the close of business on Monday, June 23.

If Rand fails to recall the Licensed Products and do everything in its power to prevent them from reaching consumers, Lucasfilm will file for injunctive relief in order to protect its rights without further notice to you.

We expect your full cooperation in resolving this serious issue and hope that the problems are corrected to the full satisfaction of both Lucasfilm and Rand.

Sincerely,

Christine K. Talarides
Director of Business Affairs

cc:    Alan Goldmeier
       Steve Goldmeir
       David J. Anderman
       Howard Roffman
       Paul Southern

# Exhibit 12

**David Anderman**

| | |
|---|---|
| **From:** | Allen Goldmeier [agoldmeier@randinternational.com] |
| **Sent:** | Tuesday, June 24, 2008 10:20 AM |
| **To:** | Christine Talarides |
| **Cc:** | mworksman@randinternational.com; 'RAND - Peter Pergament '; Kristina Anderson; David Anderman; Howard Roffman; Paul Southern; 'Goldmeier, Steve - Rand Int'l, USA'; SGCycles@aol.com; C1219@aol.com |
| **Subject:** | FW: Star Wars Folding Scooter Test Report |
| **Attachments:** | SHAH00063883 .pdf; 06 24 08 Reply to Lucas Films Revised.doc; 06 24 08 Star Wars Products Listing Revised.doc; 06 24 08 Reply From BV Lab to Lichen Redg Testing Sample Not In Existence Any Longer.doc |

June 24, 2008

Dear Christine,

I am re-sending yesterday's letter (attached) to now include the very important ITS Testing Certification to cover the Star Wars Folding Scooter. I have also made some minor corrections in this revised edition.

Sincerely,


Allen Goldmeier

June 24, 2008                                      REVISED

Ms. Christine K. Talarides
Director of Business Affairs
Lucas Film Ltd
P.O. Box 29901
San Francisco, CA 94129

Dear Ms. Talarides:

I was extremely surprised to get your letters of June 18th and June 20th 2008. Quite frankly I was surprised Lucas Film chose to terminate Rand instead of giving us an opportunity to evaluate the circumstances and do corrective action, if necessary, under Rand's own Quality Assurance Program. Rand would never make or sell any product that would create a risk or danger to society, as you will learn after you review the facts. Rand has sold millions of products for over thirty years with little or no incident. In addition, I see no reason to terminate Rand for its behavior as Rand did nothing wrong. In fact, Rand has placed many Star Wars sku's merchandise that is scheduled to be shipped unrelated to these incidents you referred to.

In any event, I am replying to your letter dated June 20, 2008, and as you could see from the information that follows, I will do my best to provide you every detail pertaining to your request via total disclosure. No doubt part of my presentation will include my best effort to convince you that Rand is a responsible supplier in spite of existing documentation and a retailer's complaint which may lead you to believe otherwise. There is a lot more to be told in what is going on here, and surely Rand is most conscientious as it pertains to proper quality. I realize you are citing the certification failures performed at an independent lab forwarded to you by TRU; and in no way is Rand downplaying these failures. I would like to tell you the full story while providing you the additional information you requested.

1. **Star Wars Folding Scooters:**
    Steven Goldmeier has been promising you a Star Wars test certification for the past week, and we expected to have this to you last week, although a backlog at Intertek Testing Lab resulted in not being able to get this to you in the timeframe that we had hoped. Rand's supplier has received a verbal pass result from Intertek Testing Lab today, although the official certification document will be issued tomorrow. This is pretty standard, and I expect to forward the Star Wars Folding Scooter certification to you by tomorrow. The Intertek Testing Lab certification is now attached in this revised edition.

    Footnote:    The same Star Wars Folding Scooter is supplied to market as Model SW-021, and to TRU with an exclusive retail box via Model SW-031.

    To tell you more about our scooter business; Rand presently supplies the same Folding Scooter model that we are supplying in the Star Wars brand to Wal-Mart in our generic "Jackknife" sku. This very same model has been supplied to Wal-Mart since January of 2007, and continues to grow at Wal-Mart via added distribution. We are approaching 300,000 units shipped to date and for second half Wal-Mart plans an additional 500,000 units (no exaggeration) of this same scooter of which approximately 60,000 units are projected in the Star Wars brand. These additional 60,000 units come from the positive sales result of the initial Star Wars Folding Scooters that we shipped to Wal-Mart a few weeks back, and reported to you this past Friday.

This Folding Scooter model has been a proven quality model and the testing certification that we will send you tomorrow for this Star Wars model is addendum to the BV Testing Lab test certification performed last Fall, previously sent to you. Rand has tested the same model intermittently before then also with pass result. We also supplied this exact same Folding Scooter to TRU three years ago (approximately 38,000 pieces) in our Batman brand, and we could pull out this prior certification for you as well, if you require. Wal-Mart has also committed to purchase the Batman Folding Scooter from Rand, also approximately 60,000 pieces, as well for their second half distribution.

The reason the Folding Scooter recently failed the BV Testing Lab under TRU's testing is because the protocol of the BV test was incorrectly processed for a 200 lb rider. This incorrect test approach testing for a 200 lb rider is what caused the failure, although at present ITS (Intertek) Testing Lab's pass certification, and the prior test multiple certifications at BV Testing Lab under the correct test procedure, has always passed. The product we shipped in the past is proper standard per the certifications we documented. This product could be shipped to TRU with proper certification if they allow. In the meantime TRU has cancelled their order.

2. **Star Wars Skateboards:**
Rand has supplied several million Skateboards to the marketplace since I started doing business in 1976. We supplied a few hundred thousand units to TRU in many different brands over the years without problems via prior certifications.

We have a pass BV Testing Lab certification dated May 30th, and a failed BV Lab certification dated June 16th due to an incorrect date code application. The failure of the second lab test performed for TRU is not indicative of a quality issue; instead TRU has an added requirement above and beyond the industry norm, which is to put date codes on their product. TRU requires the date code affixed to the master carton (which was complied with), the retail packaging (which was complied with), and on the product itself (which the factory carelessly put the date code on the wrapping of the Skateboard instead). For this reason Rand failed on the second June 16th submission to BV Lab, although the factory is presently in the process of re-applying the date code properly. This product is now ready to ship if TRU allows a second chance.

In the meantime, TRU has cancelled the order.

3. **Star Wars Helmets:**
Rand has supplied licensed helmets to the market for over twenty years via over twenty licensed brands. Recently we tested the Star Wars Helmets under the TRU PO# at BV Testing Lab. BV themselves is not equipped to do the required CPSC testing standard as this is done by Intertek Testing Lab in the USA. When we recently submitted our Star Wars Helmets to BV Testing Lab for certification the factory submitted the testing samples along with the Intertek CPSC certifications as required. Helmets are made from a mold and once the shell meets CPSC standards they will continue to do so as long as the same model (shell) is used. Generally speaking the industry accepts the Intertek Testing Lab's CPSC certification beyond a one-year period, although TRU's unique requirement is that the Intertek CPSC certification is updated within a twelve-month period. When BV Testing Lab cited the Intertek certification was not dated as per the uniqueTRU requirement our China Helmet supplier resent the Star Wars samples to the Intertek Lab in the USA for an updated CPSC certification. Intertek reissued these certifications to cover the Star Wars Helmets on June 6, 2008. The cargo is made and sitting at our China Factory, although TRU has cancelled their PO requirement.

4. **Star Wars Toy Skate Combos:**

Our China vendor makes Toy Skate Combos for practically every licensed brand and their product is retailed at practically every USA hard goods vendor today. Rand has used the same factory for many years supplying branded Toy Skate Combos. We have the required TRU test certification on file and the TRU order remains valid for their Star Wars Toy Skate product requirement (I believe).

5. **Star Wars Bicycles 12"/16":**
   Please note as follows:

Rand originally purchased 12" and 16" Star Wars Bicycles from the following China Vendor:

> Topright Cycle Technology Co., Ltd.
> Maoshan Industrial Zone
> Ningbo 315193
> Zhejiang, China

The above product was shipped to Rand FOB Ningbo and we have previously imported the following quantities from this supplier:

| | | |
|---|---|---|
| 275 pcs | SW-1268 | Farmingdale, NY |
| 275 pcs | SW-1668 | Farmingdale, NY |
| 1,100 pcs | SW-1268 | Carson, CA |
| 1,100 pcs | SW-1668 | Carson, CA |

Rand has BV Testing Lab certifications in hand covering the above product made by Topright Factory in both the 12" and 16" models.

Rand has only supplied 12"/16" bicycles to Wal-Mart and Commat Toy Store produced by the Topright Cycle Factory. The product shipped to these two customers is indicative of the BV Testing Lab certifications Rand presently has in hand. Thereafter Rand submitted testing samples of 16" Star Wars bicycles produced from a second factory as follows:

Model # SW-1668                          Li Wang Cycle Jurong Co., Ltd
                                         212400 TaiWan Town
                                         North of Ning Hang Road
                                         Jurong, Jiangsu, China

The BV test for the sample submitted from this newer second factory failed for lead content and some other specific TRU labeling requirements. Rand's factory cannot understand why they are cited for lead content when they tell us their paint supplier has lead free certifications on hand from their assembly factory for their paint. Here is the problem; a bicycle is assembled and sold to the importer from the assembly factory, although the bicycle consists of many individual components from the assemblers' sub-vendors. The failed BV test cites that every part has the same lead content level, although this is a mistake as it is not possible for this to happen. Our assembly factory is trying to find out which part of many may be where lead content is being found by BV Testing Lab, although it is impossible that almost the entire bicycle has lead content as the failed report cites. The factory has been trying to find out if the failed sample is still at hand with the BV Testing Lab so we could test the same model further. After contacting BV Lab several times in the past ten days, after receiving the failed test notification, we requested if the failed sample is available to perform addendum testing. With each request they advised our overseas supplier they would check and get back to us.

Today we finally received a reply from BV Lab advising the sample is no longer available. This is very unfortunate in the least because in the past BV Lab has always allowed Rand's supplier the opportunity to retrieve the testing sample, but for this failed sample after waiting more than ten days for BV Lab to allow Rand's supplier to retrieve the sample, they surprisingly tell us it's not available. The assembly factory has additional samples that were produced from the same allotment (Li Wang Cycle). We need further time to investigate where the problem lies, and we will soon be able to determine the problem. Rand will surely get to the bottom of this unless there is a possibility the failure was a mistake. Once we find out where the problem is we will report back to Lucas Film.

In the meantime, Rand will assure you today not one piece of the Star Wars bicycles made by Li Wang Cycle will come to the USA market. The only bicycles that Rand has distributed to date were produced from Topright Cycle and certified by BV Testing Lab.

Regarding Wal-Mart:
Wal-Mart has committed to an extensive Star Wars program to be supplied from Rand. The products that you asked Rand to recall from Wal-Mart in your June 20th letter are quality problem free products. Rand has supplied these same products to market (and Wal-Mart) for many years and we feel it would be a mistake to recall them as these products meet certification and no risk or danger to society.

The 3-Wheel Toy Scooters; we expect to have a pass certification momentarily on the Star Wars model, although Rand has supplied Toy Scooters to the marketplace for several years and we have prior certifications for this model.

More regarding Wal-Mart; Rand presently has the Star Wars Battery Operated Quad placed with Wal-Mart:. For second half 2008 program they are projecting approximately 100,000 units – approximately $4million dollars in revenues. Rand has supplied Spiderman Battery Operated Quads to Wal-Mart for the past two years in excess of 200,000 units, and the Rand Spiderman model continues at Wal-Mart for second half. Due to Rand's positive past supply of Battery Operated Quads to Wal-Mart; Wal-Mart has also nominated Rand as their second half 2008 supplier for Disney Princess and Disney Fairies Battery Operated Quads, supplying to Wal-Mart under their DTR license. Rand's supply of the two Disney models is taking the place of the Dora Quad previously supplied by the Fisher Price Company. The total second half program of these four sku's, including the Star Wars model, is forecasted at 450,000 units total, and as mentioned 100,000 in the Star Wars brand. Rand presently has in hand an updated certification of the Spiderman model issued within the past couple of weeks from Intertek Testing Lab. The same exact Quad presently certified in the Spiderman model is now made in the Star Wars brand. The test certifications for Battery Operated Quads are extensive, and takes approximately 25 days to issue. Rand will supply the Star Wars certification to Lucas Film immediately upon issuance.

For the Star Wars Quad Rand has approximately 21,000 units in transit which will distribute to Wal-Mart between July 8th to approximately July 23rd. This product is earmarked for Wal-Mart's retail set date for this item. In quick timeframe Rand has placed multiple Star Wars sku's at Wal-Mart. Rand presently has Star Wars product either presently placed or pending placement at every important hard goods retailer.

Regarding Toys R Us:
You know the story and this has become a political situation that is bringing an unusual perspective to what's truly going on. We hope Lucas Film continues to be fair Rand is working hard building a responsible Star Wars distribution to all retailers, including our sincere efforts at Toys R Us.

We hope Toys R Us will allow Rand a second chance, no different than they allow almost every other of their vendors. Rand will find out very soon if Toys R Us will grant Rand a second chance request, although this is my concern. Rand is presently formulating a proposal to Toys R Us that would be difficult for them to refuse, although if they do refuse, then this alone is the unfair political problem that is creating this difficult situation.

Previously Rand felt we had an appropriate solution to the Toys R Us problem when we originally approached TRU proposing that we would supply the Rand licensed Star Wars products utilizing a preferred nominated factory that Toys R Us was interested to have manufacture their product. In this case Rand would take TRU's ex-factory price and we would include the appropriate margin to their OEM negotiated price to include Rand's royalty and margin requirements. Rand would make sure while supplying from TRU's select factories we would transact each shipment in accordance with the Star Wars contract requirement. Rand felt this would be the best way to supply the Toys R Us program and TRU themselves could negotiate the OEM price prior to Rand adding on our royalty/margin formula. Surprisingly TRU did not accept this proposal although Rand still has it on the table if TRU is willing to revisit.

1. As of today Rand is resending our sales to date report which includes some shipments omitted when we hastenedly sent the information to you late Friday, prior to running in depth reports.

2. Rand has also sent you our present inventories. There are additional quantities which we are receiving today into our warehouse; a container of scooters and a container of launchers which we are reporting today in our domestic inventory update.

3. Rand sent you the names of our China suppliers for our various products produced to date.

4. Of most importance Rand will freeze our present inventory and will refrain from shipping to provide you a chance to review the documentation you requested and which Rand `2submitted today.

5. Of even greater importance Rand will now resend new samples to BV and Intertek Testing Lab for reassurance that our products are in proper compliance of standards to eliminate any doubt that may exist. We are confident our products are in compliance, and retesting again and ongoing we are confident will prove the same. Of greatest relevance is to find out why the 16" Star Wars bicycles from our second supplier included a detailed lead content, although I will assure you these bicycles will not enter the country.

6. Regarding TRU; we will revisit with them as mentioned previously in this presentation, and ask them to reasonably allow Rand a second chance. Their decision is out of Rand's control and I hate to say it, but of political overture. When Rand signed the Lucas Film contract we obligated ourselves with or without TRU's support of the program, although our efforts have been aggressive to place our Star Wars products at Toys R Us.

Rand will initiate all measures to continue a responsible supply and we will continue to provide Lucas Film with all information requested as fast as possible. We ask you to review the information sent today as we are confident there is no necessity to issue a recall of any product shipped to date.

In all respects Rand greatly values the Lucas Film license and will continue to manage it in a responsible manner. Could you please reverse the termination per this presentation?

Sincerely,

Allen Goldmeier

**Model #:   SW-1268 12" Star Wars Bicycle**
Name of China Factory: Topright Cycle Technology (Ningbo) Co., Ltd.
                       Maoshan Industrial Zone
                       Ningbo 315193, Zhejiang China
# of Units Shipped: 1,375 pieces
When Shipped: April 20th
Current Location of Shipments:
Customer Name: Wal-Mart: 200 pieces for test order
             Comatt:  12 pieces
Rand's Present Inventory: 1,163 pieces

**Model#:   SW-1668 16" Star Wars Bicycle**
Name of China Factory:  Topright Cycle Technology (Ningbo) Co., Ltd.
                        Maoshan Industrial Zone
                        Ningbo 315193, Zhejiang China
# of Units Shipped:  1,374 units
When Shipped:  April 20th
Current Location of Shipments:
Customer's Name:  Wal-Mart:  200 pieces for test order
                  Comatt:  12 pieces
Rand's Present Inventory:  1,162 pieces

**Model #:   SW-021 Folding Scooter**
Name of China Factory: JinYun HengFeng Aluminum Co., Ltd.
                       Xinxi Road, Xinjian town, JinYun City
                       Zhejiang, China
#of Units Shipped:  9,313 units
When Shipped:  April 14th
Current Location of Shipments:
Customer Name:  Wal-Mart:  8,658 pieces
Rand's Present Inventory:  655 pieces before June 23rd.

**Model #:   SW-5 Star Wars 3 Wheel Toy Scooter**
Name of China Factory:   Zhejiang Hongsheng Mfg. Co., Ltd.
                         Huangdian Industrial Area, Yongkang City
                         Zhejiang, China
# of Units Shipped:  3,328 pieces
When Shipped: May 19th
Current Location of Shipments:
Customer's Name:  Wal-Mart:  2,705 pieces
Rand's Present Inventory:  623 pieces before June 23rd.

**Model #:  ML-999110 Star Wars Mints:**
Name of USA Factory:  F & F Foods
                      3501 W. 48th Place
                      Chicago, IL 60632
# of Units Shipped:  201,600 units
Customer's Name: Wal-Mart:167,440 pieces
Rand's Present Inventory: 34,160 pieces

**Model #;  SW-60000BG Star Wars 16" Beach Ball:**
Name of China Factory:  Modern Plastic Mfg. Ltd.
                        Liushi Developing Area
                        Liushi Town
                        Dongyang, Zhj China
# of Units Shipped: 5,370 pieces
Customer's Name: Bazaar - 4,656 pieces
                 Shepher Dist. - 480 pieces
Rand's Present Inventory: 234 pieces

**Model #:  ML-4906 Star Wars 6" Play Balls:**
Name of China Factory:    Shanghai Orlin Sports & Stationery Co., Ltd.
                          No. 900 West Pingfu Road, Pingan Town
                          Fengxian, Shanghai, China
# of Units Shipped:       54,046 pieces
Customer's Name: Dollar Tree
Rand's Present Inventory: 0 pieces

**Model #:  ML-5919 Star Wars Mini Hoop Sets:**
Name of China Factory:    Concord Toys International Ltd.
                          Zhongyue Building Fengxin 2nd Road
                          Chenghai, Shantou, Guangdong Providence, China
# of Units Shipped: 137,034 pieces (April 12th/18th) 15,876 pieces (May 28th)
Customer's Name:          Dollar Tree
Rand's Present Inventory:  0 pieces

**Model #:  ML-209-4 Star Wars 3 Pack Mini Space Discs:**
Name of China Factory:    Kai Shun Toy Company Ltd.
                          Yang Gong Zhou Industrial Area, Sha Tian Town
                          Dong Guan City, Guang Dong Province, China
# of Units Shipped:       149,952 pieces
When shipped:             April 14th - April 19th
Customer's Name:          Dollar Tree
Rand's Present Inventory:  0 pieces

June 24, 2008                          **REVISED**                          **Page 3**

**Model #:   ML-1-1008 Star Wars 8" Splash Disc:**
Name of China Factory: Concord Toys International Ltd.
                       Zhongyue Building Fengxin 2nd Road
                       Chenghai, Shantou, Guangdong Providence, China

\# of Units Shipped:      96,072 pieces
When Shipped:          Between April 18th and April 21st.
Customer's Name:       Dollar Tree
Rand's Present Inventory: 0 pieces

**Model #:   SW-6600 Star Wars 6 Volt Battery Operated Quad:**
This Model will start supplying July 8th.

Name of China Factory:   Weikesi Children Toys Coy. Ltd.
                         Nanxing Village Quantang Town,
                         Pinghu City, Zhejiang

Shipments Pending Wal-Mart      —      Early July

**Model #:   SW-60020BG Star Wars 20" Beach Ball:**
Name of China Factory:   Jinhua Baide Plastic Production Co., Ltd.
                         Building No. 8 - 9 Senjyu Industrial Park Triangle
                         Economic Development Zone,
                         Jinhua, Zhejiang, China
\# of Units Shipped: 48,080
When Shipped:      May
Customer Name: Dollar Tree
Rand's Present Inventory:  0 pieces

**Model #:   SW-4010 Star Wars Clone Toy Skates:**
Rand expects first shipment to supply next week if TRU maintains present
PO.

Name of China Factory: Twinkle Plastic Mfg. Co., Ltd.
                       Shijia Industrial Area,
                       Shijie, Dongguan, China

Orders Also In Hand From Kmart/Sears


**Model #:   SW-9778   Star Wars Clone Trooper Helmets:**
This product will supply from Twinkle Plastic Mfg. Co., Ltd.
                             Shijia Industrial Area,
                             Shijie, Dongguan,China

The cargo is made at the factory and the TRU PO was cancelled.

**Model #:  SW-2000 Star Wars Clone Skateboards:**
Name of China Factory:   Sportward Enterprise Co., Ltd.
                         3th Project, Wenxi Road,
                         Hardware Science & Technology Industrial Zone,
                         YongKang
                         Zhejiang, China

The cargo is made at the factory and the TRU PO was cancelled.

**Model # SW-031 Star Wars Clone Scooter:**
Name of China Factory:   Jinyun Hengfeng Aluminum Co., Ltd.
                         Xinxi Road, Xinjian Town, JinYun City,
                         Zhejiang, China

The cargo is made at the factory and the TRU PO is cancelled.  There Is
Also Order In Hand With Kmart/Sears Via Model SW-021.

**Model # SW-1668L Star Wars Clone 16" Bicycle w/Litho Box:**
Name of China Factory:   LiWang Cycle Jurong Co., Ltd.
                         212400 Tai Wan Town
                         North of Ning Hang Road
                         Jurong, Jiangsu, China

Cargo will not bring to market.

**NEW ARRIVALS IN FARMINGDALE, NEW YORK JUNE 23RD:**
SW-021 Star Wars Folding Scooter   720 pieces
SW-5 Star Wars 3 Wheel Toy Scooter 720 pieces

**NEW ARRIVALS IN CARSON, CA. JUNE 23RD:**
SW-5045 Star Wars Fly Disc w/ Launcher  116,640 pieces

Name of China Factory:   Chen Hongda Plastic Craft Toy Factory
                         Pu Mei An Hu Lu Duan, Shan Tou, ChengHai
                         Shan Tou/Cheng Hai
                         China 515800

**RAND WILL PROVIDE OUR OFFICIAL SECOND QUARTER ROYALTY REPORT TO LUCAS FILM
DURING JULY IN A TIMELY FASHION.**



Intertek Testing Services Ltd., Shanghai
**TFH Division**
Block B, Jinling Business Square,No.801 Yi Shan Road,
Shanghai, China, 200233
Tel: +86 21 6120 8665
Fax: +86 21 6127 9740
E-mail: labtest.shanghai@intertek.com
www.intertek.com
www.intertek-labtest.com.cn
China Toll-Free: 800 999 1338

<u>**TEST REPORT**</u>                    NUMBER: SHAH00063883

APPLICANT:  SALES CHIEF ENTERPRISE CO., LTD.        DATE: JUN 23, 2008
            SHANGHAI REP.OFFICE RM 2405-06,
            NO.322 XIAN XIA RD, SHANGHAI, CHINA
            ATTN: TERRY HU

SAMPLE DESCRIPTION:
    TWO (2) PIECES OF SUBMITTED SAMPLE SAID TO BE :
    ITEM NAME            : STARWARS FOLDING SCOOTER.
    ITEM NO.             : SW-031.
    GOODS EXPORTED TO    : USA.
    COUNTRY OF ORIGIN    : CHINA.
    ****************************************************************
TESTS CONDUCTED:
    AS REQUESTED BY THE APPLICANT, FOR DETAILS REFER TO ATTACHED PAGE(S)
    ****************************************************************
                                            TO BE CONTINUED

PREPARED AND CHECKED BY:            AUTHORIZED BY:
FOR INTERTEK TESTING SERVICES       FOR INTERTEK TESTING SERVICES
LTD., SHANGHAI                      LTD., SHANGHAI

PETER YU                            STEPHEN TSANG
SENIOR MANAGER                      GENERAL MANAGER



Intertek Testing Services Ltd. Shanghai
**TFH Division**
Block B, Jinling Business Square,No.801 Yi Shan Road,
Shanghai, China, 200233
Tel: +86 21 6120 6555
Fax: +86 21 6127 9740
E-mail: labtest.shanghai@intertek.com
www.intertek.com
www.intertek-labtest.com.cn
China Toll-Free: 800 999 1338

## TEST REPORT                    NUMBER: SHAH00063883

CONCLUSION:

| TESTED SAMPLES | STANDARD | RESULT |
|---|---|---|
| SUBMITTED SAMPLE | ASTM F 2264-03, STANDARD CONSUMER SAFETY SPECIFICATION FOR NON-POWERED SCOOTERS | PASS |
| | U.S. CFR TITLE 16 (CPSC REGULATIONS) PART 1500.3(C)(6)(VI) FLAMMABILITY TEST ON RIGID AND PLIABLE SOLIDS | PASS |
| BOTH TESTD COMPONENTS OF SUBMITTED SAMPLE | U.S. CFR TITLE 16 (CPSC REGULATIONS)- PART 1303 TOTAL LEAD CONTENT | PASS |
| | U.S. ASTM F963-07$^{\epsilon 1}$- TOXIC ELEMENTS TEST | PASS |

*******************************************************************

TO BE CONTINUED

PREPARED AND CHECKED BY:
FOR INTERTEK TESTING SERVICES
LTD., SHANGHAI

PETER YU
SENIOR MANAGER

AUTHORIZED BY:
FOR INTERTEK TESTING SERVICES
LTD., SHANGHAI

STEPHEN TSANG
GENERAL MANAGER

PAGE 2 OF 5



Intertek Testing Services Ltd. Shanghai
**TFH Division**
Block B, Jinling Business Square,No.801 Yi Shan Road,
Shanghai, China, 200233
Tel: +86 21 6120 6565
Fax: +86 21 6127 9740
E-mail: labtest.shanghai@intertek.com
www.intertek.com
www.intertek-labtest.com.cn
China Toll-Free: 800 999 1338

### TEST REPORT                     NUMBER: SHAH00063883

TESTS CONDUCTED
**1. NON-POWERED SCOOTERS**
As per ASTM F 2264-03, standard consumer safety specification for non-powered scooters, the submitted sample was subjected to the following tests
Number of sample tested: one (1) piece
Initial inspection: no any damage was found
Executive summary:

| CLAUSE | TEST ITEMS | VERDICT |
|--------|-----------|---------|
| 5 | General requirements | – |
| 6 | Performance requirements | P |
| 8 | Marking and labelling | P |
| 9 | Instructional literature | P |

Abbreviation: P=Pass

**2.Flammability Test:**

As Per U.S. Code Of Federal Regulations Title 16 Part 1500.44 For Rigid And Pliable Solids.

Result = Did not ignite

**3.TOTAL LEAD (Pb) CONTENT**

AS PER U.S. CODE OF FEDERAL REGULATIONS TITLE 16 PART 1303, ACID DIGESTION METHOD WAS USED AND TOTAL LEAD CONTENT WAS DETERMINED BY INDUCTIVELY COUPLED ARGON PLASMA SPECTROMETRY.

| TESTED COMPONENT | RESULT IN % | LIMIT |
|------------------|-------------|-------|
| (1) | <0.001 | 0.060% |
| (2) | <0.001 | 0.060% |

< = LESS THAN

TESTED COMPONENTS :

(1) BLUE COATING.
(2) BLACK COATING.



Intertek Testing Services Ltd., Shanghai
**TFH Division**
Block B, Jinling Business Square,No.801 Yi Shan Road,
Shanghai, China, 200233
Tel: +86 21 6120 6565
Fax: +86 21 6127 9740
E-mail: labtest.shanghai@intertek.com
www.intertek.com
www.intertek-labtest.com.cn
China Toll-Free: 800 999 1338

<u>**TEST REPORT**</u>                       NUMBER: SHAH00063883

TESTS CONDUCTED

<u>**4.TOXIC ELEMENTS ANALYSIS**</u>

AS PER SECTION 4.3.5 OF THE ASTM STANDARD CONSUMER SAFETY SPECIFICATION ON TOY
SAFETY F963-07[€1], ACID DIGESTION AND EXTRACTION METHODS WERE USED AND TOXIC
ELEMENTS CONTENT WERE DETERMINED BY INDUCTIVELY COUPLED ARGON PLASMA
SPECTROMETRY.

|                      | <u>RESULT IN ppm</u> |        | <u>LIMIT</u> |
|----------------------|-------|--------|-------|
|                      | (1)   | (2)    | <u>ppm</u> |
| TOTAL LEAD (Pb)      | <10   | <10    | 600   |
| SOL. BARIUM (Ba)     | 435   | 471    | 1000  |
| SOL. LEAD (Pb)       | <5    | <5     | 90    |
| SOL. CADMIUM (Cd)    | <5    | <5     | 75    |
| SOL. ANTIMONY (Sb)   | <5    | <5     | 60    |
| SOL. SELENIUM (Se)   | <5    | <5     | 500   |
| SOL. CHROMIUM (Cr)   | <5    | <5     | 60    |
| SOL. MERCURY (Hg)    | <5    | <5     | 60    |
| SOL. ARSENIC (As)    | <2.5  | <2.5   | 25    |

SOL. = SOLUBLE
< = LESS THAN
ppm = PARTS PER MILLION = mg/kg

TESTED COMPONENTS :

(1) BLUE COATING.
(2) BLACK COATING.

**Intertek Testing Services Ltd. Shanghai**
**TFH Division**
Block B, Jinling Business Square,No.801 Yi Shan Road,
Shanghai, China, 200233
Tel: +86 21 6120 6565
Fax: +86 21 6127 9740
E-mail: labtest.shanghai@intertek.com
www.intertek.com
www.intertek-labtest.com.cn
China Toll-Free: 800 999 1338

## TEST REPORT                    NUMBER:  SHAH00063883

TESTS CONDUCTED



Picture 1                    Picture 2

Date Sample Received: Jun.12, 2008

Testing Period: Jun.12, 2008 To Jun.23, 2008
*********************************************************************************
                                                        End Of Report

# Exhibit 13

**LUCASFILM**
Ltd.

June 26, 2008

VIA E-MAIL, FACSIMILE, AND FEDEX

Allen Goldmeier
Rand International, Inc.
51 Executive Boulevard
Farmingdale, NY 11735

Re: *Merchandise License Agreement (Contract No. L5179)*

Dear Mr. Goldmeier:

In your letter of June 23, 2008 and in subsequent communications, you have
repeatedly asked Lucasfilm to rescind its termination of Rand's *Star Wars* license agreement. At
the same time you have indicated that you are not willing to complete the recall we required in
our letter to you of June 20, 2008. It is our understanding that your unwillingness to complete
the recall as required is based on your confidence in the safety and compliance of the products at
issue.

The fact remains that you still have not obtained a reversal or update of the
independent test results from Bureau Veritas (BV) which showed significant safety issues and
other problems with a number of Rand products, which calls into question whether Lucasfilm,
retailers, and consumers can in fact trust the safety of any *Star Wars* branded products from
Rand. Nothing in your correspondence since then alters that fact. Although you have provided
other test results for various products from different labs, as we said to you last Friday, Lucasfilm
is not in a position to judge which of the conflicting reports are correct, and we therefore require
Rand to get updated certificates from BV indicating that the issues have been resolved.

In addition, we are seriously concerned by your continued assertion that the
negative test results conducted by an independent lab for one retailer should not affect the sales
by other retailers (such as the scooter, which is provided to both Toys R Us and Wal-Mart), or
that a failed test result for a product made in one factory should not affect the production of that
item by another factory (such as the bikes). As we explained last Friday, if such products fail any
independent tests, it is reasonable to assume that they are unsafe wherever they are sold or
manufactured absent proof that they are in fact safe. Moreover, the failure of multiple products
from a single vendor can reasonably cause Lucasfilm, retailers and consumers to conclude that all
of the products from that vendor may be unsafe—just as TRU has done in this case. If
consumers discover that one retailer rejected the products as unsafe, it will cause serious issues
for all of the products wherever sold.

At this point, due to Rand's failure to provide updated test results from BV
indicating that it has reexamined and approved the items which previously failed, and Rand's

refusal to recall items that have not been proven safe, our position remains the same: no *Star Wars* branded Rand products may be sold at retail. We list below the conditions on which we would consider reversing this position in specific cases, provided that Rand immediately and fully complies with what you've acknowledged to be reasonable precautions necessary to protect the *Star Wars* brand as set forth in our June 20 letter.

In that regard, we must first remind you that the damage to Lucasfilm and the *Star Wars* brand resulting from the sale of products that are not proven to be safe would be astronomical. The *Star Wars* brand is among the most famous and valuable brands in the world, with retail sales measured in billions of dollars. The vast majority of retail consumers of *Star Wars* branded products are children and their parents. Any doubt among these consumers as to the safety of products bearing the *Star Wars* brand will immediately and seriously impact our ability to sell products not only in the lines directly shown to be defective, but across the board. It will also cause immense damage to the goodwill that we have spent thirty years developing among consumers. We will hold Rand responsible for all such damages in the event it fails to comply with its contractual—and ethical—obligations to prove that its products are safe. While we recognize that a termination and recall will impact Rand, the situation which we now face is entirely the result of Rand's actions, and the solution is entirely within Rand's control.

Based on the foregoing, we are willing to consider potentially allowing you to fulfill the binding purchase orders that are currently outstanding from retailers of licensed products—other than those which have failed tests and will not be sold—thereby limiting the required recall. In order to provide Lucasfilm, retailers, and consumers with confidence in Rand's products, however, we would require the following procedures for all items that are currently being produced and shipped pursuant to outstanding purchase orders:

1.    Provide to us by fax and pdf copies of all existing valid and binding purchase orders for Lucasfilm licensed products by the end of the day (5:00 PM Pacific time) Monday, June 30, 2008;

2.    Notify all retailers with outstanding purchase orders that Lucasfilm has terminated its licensing relationship with RAND because of the failure of independent testing regarding the 16 inch bicycle, the folding scooter, and the helmet;

3.    Inform the retailers with existing purchase orders that you and they must arrive at a testing protocol by an independent testing laboratory (satisfactory to the retailers) on all lots of licensed items prior to their being sold. To the extent the retailers confirm in writing that they are satisfied with the existing or new tests of *Star Wars* products performed on Rand's behalf (e.g. the tests performed by Intertek Testing Services), that too would be acceptable to Lucasfilm;

4.    If you do not provide the notices set in items 2 and 3 above to retailers in writing (with a copy to Lucasfilm) by the end of the day Monday, June 30, 2008, then no items may be sold pursuant to those purchase orders, and the required recall will apply to all licensed products; and

June 26, 2008
Page 3 of 3

     5.     If you fail to inform the retailers as provided in item 4, then Lucasfilm will inform them directly to ensure that no Lucasfilm licensed items are sold without authorization and without verified independent testing.

     We are hopeful that this satisfies your concerns regarding fulfillment of current outstanding purchase orders and give us the assurance of safety for the consumers.

Sincerely,

Christine K. Talarides
Director of Business Affairs

cc:    Howard Roffman, David J. Anderman, Paul Southern, Kristina Anderson